# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                  No. CR 11-2281 JB

RICHARD D. CRISMAN,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the United States' Sentencing Memorandum and Recommendation, filed October 10, 2012 (Doc. 58)("United States' Memo."); and (ii) the Defendant's Sentencing Memorandum and Motion for Sentence Varying from the Guideline Range, filed May 9, 2013 (Doc. 72)("Crisman Memo."). The Court held a sentencing hearing on May 14, 2013. The primary issue is whether, and how, the Court should consider the findings in Michael L. Bourke & Andres E. Hernandez, The 'Butner Study' Redux: A Report of the Incidence of Hands-on Child Victimization by Child Pornography Offenders, 24 J. Fam. Violence 183 (2009)("Butner Study Redux"),[1] in determining an appropriate sentence for Defendant Richard D. Crisman. Although the Butner Study Redux indicates that many child

---

[1]The Court will discuss primarily the Butner Study Redux, but it notes that there are two versions of this study. In 2000, the original author presented an early version at the 19th Annual Conference Research and Treatment Conference of the Association for the Treatment of Sexual Abusers in San Diego, California. See Andres E. Hernandez, Self-Reported Contact Sexual Offenses by Participants in the Federal Bureau of Prisons' Sex Offender Treatment Program: Implications for Internet Sex Offenders (Nov. 2000)(unpublished manuscript), available at http://www.ovsom.texas.gov/docs/Self-Reported-Contact-Sexual-Offenses-Hernandez-et-al-2000.pdf ("First Butner Study"). In 2009, the Journal of Family Violence published the second version, the Butner Study Redux. "Redux" means "brought back." Redux, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/redux.

pornography "lookers" are also "touchers," the Court does not think it is appropriate to enhance Crisman's sentence when there is no evidence that Crisman has molested children.  The Court also will not use the <u>Butner Study Redux</u>'s findings to conclude that Crisman poses a risk to the community, because the Court thinks it should base its finding of Crisman's future risk of harm on evidence in his case and not on a study in which he was not involved.  The Court finds that the <u>Butner Study Redux</u>'s findings are, however, persuasive for the following purpose: the Court will not vary from the sentencing guidelines calculation based on a <u>Kimbrough v. United States</u>, 552 U.S. 85 (2007), disagreement with the guidelines, because, although the guidelines may punish child pornographers harshly, the <u>Butner Study Redux</u>'s findings that many "lookers" are also "touchers" are disturbing and, in part, justify the United States Sentencing Commission's, and ultimately Congress', decision to set harsh punishments for child pornographers.  The <u>Butner Study Redux</u> may support what most parents, and the public at large, intuitively think: men who frequently view child pornography might touch children inappropriately, and such men should not be around their children.  Congress and the Commission's sentences reflect these fears, and the Court should be reluctant to set aside these harsh sentences on <u>Kimbrough v. United States</u> grounds.  The Court will not do so here.  The Court will sentence Crisman to ninety-seven months of imprisonment and twenty-five years of supervised release.

## **FACTUAL BACKGROUND**

In 2010, the New Mexico State Police ("NMSP") began an undercover, online investigation of computers involved in distribution, receipt, and possession of visual depictions of minors engaged in sexually explicit conduct, also known as child pornography, using peer-to-

peer ("P2P")[2] file-sharing programs.  Presentence Investigation Report ¶¶ 7-9, at 5-6, disclosed

April 26, 2012 ("PSR").  On September 21, 2010, agents with the New Mexico Internet Crimes

---

[2]P2P file sharing allows users to download files using a P2P software client that searches for other connected computers.  See Peer-to-Peer File Sharing, Wikipedia, http://en.wikipedia.org/wiki/Peer-to-peer_file_sharing (last visited November 10, 2011).  The "peers" are computer systems connected to each other through the internet, and the only requirements for a computer to a join a peer-to-peer network are an internet connection and P2P software.  Peer-to-Peer File Sharing, supra.  In United States v. Swenson, 335 F. App'x 751 (10th Cir. 2009)(unpublished), the United States Court of Appeals for the Tenth Circuit described how the Limewire P2P system operates:

> Once installed on a computer, Limewire allows a user to search for, download and share various types of files over the Internet with other users of the Limewire application.  With the program, a user can input search terms, such as the name of a file or subject matter, and receive in response a list of matching files being shared by computers connected to the Limewire network.  The user may then select for download a desired file from the list and connect to the computer sharing the file to obtain it.  The user can also share files with others by placing files in a computer folder designated for sharing, although this sharing feature is elective and may be disabled.

335 F. App'x at 752 (citing United States v. Shaffer, 472 F.3d 1219, 1221-22 (10th Cir. 2007)(discussing P2P application Kazaa)).

United States v. Swenson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that United States v. Swenson, and United States v. Nghiem, 432 F. App'x 753 (10th Cir. 2011)(unpublished), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

Against Children ("ICAC") Task Force executed a search warrant on Crisman's residence[3] and seized multiple computers and computer-related media.  See PSR ¶ 18, at 7; id. ¶ 30, at 10. During the execution of the search warrant, Crisman participated in an interview with ICAC Task Force investigators.  See PSR ¶ 19, at 7-8.  Crisman informed investigators that he was a "computer geek" and worked for Best Buy's computer and technology customer support service -- the Geek Squad.  PSR ¶ 20, at 8.  Crisman admitted to using P2P file-sharing programs, like Limewire, to receive child pornography images and videos on his computer.  See PSR ¶ 21, at 8. Crisman admitted that the images he downloaded were of children who "were very young, probably pre-teens, in sexual positions."  PSR ¶ 21, at 8.  Crisman saved the images and videos that he downloaded in a file named "A Plus" to conceal them from family and friends.  PSR ¶ 21, at 8.  He "admitted to masturbating while viewing the images," and indicated that he "has thousands of photos of child pornography on an external hard drive and on a flash drive," but that he "has never shared the images with anyone with the exception of peer to peer."  PSR ¶ 21, at 8.  He "indicated he is sexually attracted to children, but he stated he would never hurt a child."  PSR ¶ 22, at 8.  Investigators asked Crisman about a number of pairs of underwear they found in his bedroom; Crisman admitted that, when he was at a co-worker's house, he took a pair of her underwear without her permission, and, regarding the children's underwear, admitted that, when he was at a friend's house who has five daughters, he took a pair of underwear without permission.  See PSR ¶ 23, at 9.  "He denied having ever touched any of the five children, but he admitted to fantasizing about having sex with a child while he masturbates."  PSR ¶ 23, at 9.

---

[3]At the time of his arrest, Crisman resided at 3748 NE Rancher Loop, Rio Rancho, Sandoval County, New Mexico with his mother, Virginia Crisman.  See PSR ¶ 18, at 7.

Investigators stopped the search after finding a number of items in Crisman's bedroom that did not belong to him, including computers, iPods,[4] and credit cards; they subsequently obtained another search warrant and completed the search later that day.  See PSR ¶¶ 24-25, at 9.  Crisman initially said he purchased the computers and iPods using his Best Buy employee discount to then sell for a profit, but later admitted to stealing the Apple products from Best Buy and selling them on eBay.  See PSR ¶ 24, at 9.  He said he used the credit cards and checks to purchase online pornographic materials.  See PSR ¶ 24, at 9.  After completing the search, they placed Crisman under arrest and took him to the Rio Rancho Police Department for further questioning.  See PSR ¶ 25, at 9.  Crisman admitted to searching for child pornography, specifically searching for images of children between five and ten years old.  See PSR ¶ 26, at 9.  To find child pornography images or videos, Crisman searched using terms like "five yo," "boys in action," "LS Magazine," "young boy," "young girl," "girl sex," "boy sex," and "pedo."  PSR ¶ 26, at 9.  "He indicated he would masturbate two to three times a day while viewing the pictures and at times would masturbate five to six times daily."  PSR ¶ 26, at 9.  Crisman also told officers about a specific fantasy that he had about a five-year-old boy who lived next door to him: he wanted to "'kiss[] and lick[] everything, including the penis.'"  PSR ¶ 27, at 10 (quotation unattributed).  Further, Crisman admitted to stealing "approximately 50 pairs of soiled underwear from various children in his neighborhood and from the children of his friends," which he would place on his face while masturbating.  PSR ¶ 32, at 14.

The Federal Bureau of Investigation's Computer Analysis Response Team ("CART") provided the Rio Rancho Police investigator with a report of the forensic examination of the

---

[4]iPod is a line of portable media players that Apple Inc. created and markets.  See iPod Classic, Apple, http://www.apple.com/ipodclassic (last visited June 27, 2014).

computers and computer-related media.  See PSR ¶ 33, at 15.  On the Hewlett Packard computer, the CART examiner found over 200 images and ten videos consistent with child pornography.  See PSR ¶ 33, at 15.  On a Western Digital external hard drive, the CART examiner found 13,532 images and nine video files consistent with child pornography.  See PSR ¶ 33, at 15.  On the Iomega zip disk, the CART examiner found 1,301 images consistent with child pornography.  See PSR ¶ 33, at 15.  "Some of the material Crisman possessed was of masochistic conduct.  Specifically, one image was of a female child tied in ropes, as well as a video where a female child is penetrated by an adult male's penis."  PSR ¶ 35, at 15.  The child pornography images and videos were sent to the National Center for Missing and Exploited Children ("NCMEC") in an effort to identify real, known children depicted in the images and videos.  PSR ¶ 34, at 15.  According to the NCMEC, Crisman had 1,884 known child pornography images from approximately 100 different series and nine known child pornography videos from five different series.[5]  See PSR ¶ 34, at 15.

As part of a Plea Agreement, filed February 24, 2012 (Doc. 45), Crisman admitted the following facts:

a.    On September 21, 2010, investigators with the New Mexico Internet Crimes Against Children (NM ICAC) Task Force served a search warrant at my residence of 3748 NE Rancher Loop, Rio Rancho, Bernalillo County, New Mexico, to seize computers and computer-related media which contained evidence of visual depictions of minors engaged in sexually explicit conduct (hereafter "child pornography["]).    Investigators seized my Hewlett Packard Pavillion Computer, Serial Number CND911273G, with an internal Toshiba 400 GB Hard Drive, Serial Number 2977P3CXT; my Western Digital 500 GB external hard drive, Serial Number WMASY0312503; and my Iomega PC 100 MB zip disk.

---

[5]Each series is a different photographed child.  That the NCMEC did not identify other child pornography images and videos could mean that the children in the images have yet to be discovered and identified.  See United States' Response to Defendant's Appeal of September 13, 2011 Order of Detention (Doc. 18) at 9 n.3, filed September 23, 2011 (Doc. 21).

b.      I now know that this search warrant was based on an undercover operation which began in August 2010 by the New Mexico State Police (NMSP) aimed at those who possessed, received, and distributed child pornography.   NMSP Sergeant Pilon located a computer with an Internet Protocol Address (hereafter "IP Address["]) of 67.16.60.212 which was participating in the distribution of child pornography images and videos on November 3, 2009, February 21, 2010, April 1, 2010, June 22, 2010 and July 30, 2010.  By examination of the SHA1 values associated with images and videos available for distribution on these dates, Sgt. Pilon was able to conclude the videos were in fact child pornography.

c.      I know now that Sgt. Pilon determined the IP Address of 67.16.60.212 was issued to Cable One.  In response to an administrative subpoena, Cable One confirmed that this IP Address[] used on the above dates was registered to my address of 3748 NE Rancher Loop, Rio Rancho, Bernalillo County, New Mexico.  Cable One indicated I had leased Internet Access at my residence from October 30, 2009 to August 10, 2010.

d.      I now know that any receipt of child pornography images and/videos [sic] using the Internet P2P file-sharing program would satisfy the requirement of in or affecting interstate nexus requirement.   I further now know that Cable One's servers are located outside the state of New Mexico so as to satisfy the interstate nexus requirement for receipt of child pornography.

e.      On September 21, 2010, I voluntarily participated in a recorded interview with NM ICAC investigators during execution of the search warrant.  During this interview, I admitted I utilized Cable One as my Internet Service Provider and used P2P file-sharing programs such as Kazaa, Limewire, Bearshare and Torrents.  I further admitted I had seen child pornography images and videos when searching P2P file-sharing programs like those previously identified.  I admitted to the investigators they would in fact find child pornography images and videos on my computer and that I had received these images and videos using Limewire and search terms such as "child sex."   I further voluntarily participated in additional recorded interviews with law enforcement investigators in which I admitted the children depicted in the child pornography images and videos which I received using P2P file-sharing programs of Limewire and Kazaa were between the ages of two (2) to twelve (12) years.  Finally, I admitted I knew my actions of receiving child pornography was against the law.

f.      I now know an extensive computer forensic examination was later conducted on my seized computers and computer-related media as identified above in paragraph 8a.  Forensic Examiner Guilmette, with the Federal Bureau of Investigation (FBI) Regional Computer Forensic Lab (RCFL) found over 14,000 images and 40 videos consistent with child pornography.  Examiner Guilmette also found the P2P file-sharing program of Limewire that was installed on my computer in July 2010.  The computer was registered to "Rick."  One image in

particular, as related to Count 2, which was found on my computer was titled "Private Daughter Mellony stolen pedo lolita pthc hussyfan preteen nude (10yo) 02.jpg." The full file path of this image was "Users\Documents\Limewire\Saved\ Private Daughter Mellony stolen pedo lolita pthc hussyfan preteen nude (10yo) 02.jpg." This image was created on November 2, 2009 and was later identified to be from the "Menz" series. This image depicted a prepubescent girl, whose arm is bound to her leg. The focal point of the picture is her exposed vagina.

g.      I now know the found child pornography images and videos on my computers were sent to the National Center for Missing and Exploited Children (NCMEC) in an attempt to identify real, known children depicted in such images. I now know that according to NCMEC, I had 1884 known child pornography images from approximately 100 different series and 9 known child pornography videos from 5 different series.

h.      In sum, on November 2, 2009, while in Rio Rancho, New Mexico, I knowingly received a visual depiction that had been mailed, shipped, or transported in interstate or foreign commerce by means of computer, the production of which involved the use of minors engaged in sexually explicit conduct and is of such conduct. I received this image via the Internet P2P file-sharing program of Limewire and stored the video of a minor child engaged in sexually explicit conduct on my computer. I knew it was illegal for me to receive and possess these images.

Plea Agreement ¶¶ 8(a)-(h), at 3-6.

## PROCEDURAL BACKGROUND

Crisman was "initially arrested on state charges, however after completion of the forensics examination and receipt of the NCMEC Report, the Defendant was arrested on federal charges in September 2011." United States' Memo. at 3. Crisman pled guilty to "Count 2 of an Indictment charging a violation of 18 U.S.C. § 2252(a)(2), 2252(b)(1), and 2256, that being receipt of a visual depiction of minors engaged in sexually explicit conduct." Plea Agreement ¶ 3, at 2. The mandatory minimum sentence under § 2252(b)(1) is five years imprisonment with a five-year term of supervised release. See PSR at 1; 18 U.S.C. § 2252(b)(1). Regarding the applicable sentencing guidelines, the parties stipulated as follows: (i) U.S.S.G. § 2G2.2 is the applicable guideline, setting the base offense level at 22, see Plea Agreement ¶ 11(a) at 7; PSR

¶ 44, at 52; (ii) the cross reference located in § 2G2.2(c) is not applicable, see Plea Agreement ¶ 11(a) at 7; (iii) decrease by 2 levels pursuant to § 2G2.2(b)(1), because Crisman's "conduct was limited to receipt," Plea Agreement ¶ 11(b) at 7; (iv) increase by 2 levels pursuant to § 2G2.2(b)(2), because "the material involved a prepubescent minor or a minor who had not attained the age of twelve," Plea Agreement ¶ 11(c) at 7; (v) increase by 4 levels pursuant to § 2G2.2(b)(4), because the material portrayed "sadistic or masochistic conduct or other depictions of violence," Plea Agreement ¶ 11(d) at 7; (vi) increase by 2 levels pursuant to § 2G2.2(b)(6), because the "offense involved the use of computer or interactive computer services for the possession, transmission, receipt of distribution of the material," Plea Agreement ¶ 11(e) at 7; (vii) increase by 5 levels pursuant to § 2G2.2(b)(7), because the offense involved over 600 images, see Plea Agreement ¶ 11(f) at 7; and (viii) decrease 3 levels pursuant to U.S.S.G. § 3E1.1, so long as Crisman "continues to accept responsibility" for his conduct, Plea Agreement ¶ 11(g) at 7-8. The PSR agreed with and reflected all of these stipulations, resulting in a total offense level of 30. See PSR ¶¶ 44-55, at 52-53. Further, because Crisman does not have any criminal history points, his criminal history category is I, resulting in a sentencing guideline range of 97 to 121 months incarceration. See PSR ¶ 58, at 54; id. ¶ 86, at 61.

The United States contends that all of the enhancements that the USPO applied in the PSR are appropriate. See United States' Memo. at 3-6. Regarding the 2-level enhancement for the material involving a prepubescent minor, the United States argues that

> [t]he demand by consumers in the child pornography industry has caused an increase in the creation of child pornography which depict younger sexually abused child victims (ie: the supply). Thus, there is an out-cry [sic] to punish consumers of child pornography who have an interest in collecting images which depict the sexual abuse of young prepubescent children, thereby increasing the demands of such images and the sexual abuse of such children.

United States' Memo. at 4.  The United States asserts that the 4-level increase for the material portraying sadistic or masochistic abuse is appropriate, because the images to which Crisman pled guilty portray such abuse, and his "collection of these types of images fueled the demand for production of more child pornography images and videos that depict sadistic and masochistic abuse of children."  United States' Memo. at 4.  For the 2-level increase for using a computer, the United States asserts that, "[h]istorically, child pornography images and videos were acquired via United States Mail," and that the "enhancement became necessary as computers became more prevalent in the distribution and receipt of child pornography."  United States' Memo. at 4-5.  It explains that computers make it easier for offenders to receive images and avoid police detection, and that distributing child pornography through computers is especially harmful, because "it can reach an almost limitless audience."  United States' Memo. at 5.  The United States contends that, because "computers make the dissemination and receipt of child pornography easier and fuels the child pornography market," the 2-level enhancement is appropriate "to deter the relatively easy commission of the crime by offenders in the future."  United States' Memo. at 5.  Finally, the United States contends that the 4-level increase for the number of images Crisman possessed is appropriate, because, "[m]uch like other crimes, sentencing penalties are enhanced and have long been recognized as appropriate based upon the quantity of contraband a defendant possessed."  United States' Memo. at 6.

The United States recommends a sentence of 97 months imprisonment -- the low end of the guideline range -- and a life term of supervised release.  See United States' Memo. at 6.  As support for its argument that a guidelines sentence is "necessary, appropriate, and reasonable," the United States asserts: (i) "Congress, the Supreme Court, and the Sentencing Commission have rationally recognized that the sentences and sentencing ranges for offenses involving the

exploitation of children should be severe," United States' Memo. at 7; (ii) "child pornography is a form of child abuse which presents a clear and present danger to the psychological and social welfare of children," United States' Memo. at 10; (iii) "child pornography offenders, like the Defendant, present an unknown degree of danger," United States' Memo. at 12; and (iv) "receipt of child pornography has a significant impact on the child victims depicted in the images," United States' Memo. at 7-16 (capitalization and bolding altered for readability).

First, the United States asserts that "Congress, the Supreme Court, and the Sentencing Commission have rationally recognized that the sentences and sentencing ranges for offenses involving the exploitation of children should be severe."  United States' Memo. at 7 (capitalization and bolding altered for readability).  It argues that "the prevention of the sexual exploitation and abuse of children constitutes a governmental objective of surpassing importance because of the psychological and physical effects such abuse has on children and families, especially when the abuse is permanently memorialized through pictures and videos."  United States' Memo. at 7.  In its view, child pornography sentences need to be "severe enough to sufficiently deter pornographers from ever beginning the practice of exploiting children for sexual purposes," and that the "federal child pornography statutes and penalty provisions are designed to do precisely that."  United States' Memo. at 7-8.  The United States acknowledges "the current debates surrounding U.S.S.G. § 2G2.2," but notes that "the most recent changes to the United States Sentencing Guidelines did not alter the child pornography guidelines in any way."  United States' Memo. at 8.  In a page-and-a-half footnote, it points to courts that have upheld child pornography related sentences within offenders' applicable sentencing guidelines, arguing that "the trend has been to do everything possible to increase penalties and consistently

punish those involved in the criminal activity of sexual exploitation of minors because of its consequential effects on children."  United States' Memo. at 8-9 & n.3.

Second, the United States argues that "child pornography is a form of child abuse which presents a clear and present danger to the psychological and social welfare of children."  United States' Memo. at 10 (capitalization and bolding altered for readability).  It contends that "Congress understood that children used in the production of child pornography were the 'primary victims' when it passed legislation prohibiting the sexual abuse and exploitation of children through pornographic means."  United States' Memo. at 10 (quoting United States v. Boos, 127 F.3d 1207, 1210 (9th Cir. 1997)).  It asserts that a child pornography consumer causes children to suffer "in various ways: (1) the abuse is perpetuated through dissemination, (2) the existence of the image invades the child's privacy, and (3) the demand for the creation of more images is created by the consumer."  United States' Memo. at 11 (citing United States v. Norris, 149 F.3d 926, 929-30 (5th Cir. 1998)).

Third, the United States asserts that child pornography offenders present an "unknown degree of danger."  United States' Memo. at 12 (capitalization and bolding altered for readability).  The United States argues that "[s]ignificant empirical data provides support for concluding that those who distribute, receive, and posses[s] child pornography pose a significant danger to our community," pointing specifically to the Butner Study Redux as demonstrating that "offenders involved in child pornography-related conduct are often unknown hands-on offenders."  United States' Memo. at 12.  While the United States recognizes the Butner Study Redux's potentially limited import -- it "presents only a single study" -- the United States argues that it "confirms the correlation between child pornography and offenses involving sexual contact," although "formal conclusions could not be drawn."  United States' Memo. at 12.  The

United States points to other studies that "support a similar nexus between child pornography and hands-on offenders."  United States' Memo. at 12 (citing Janis Wolak, David Finkelhor, & Kimberly J. Mitchell, Child-Pornography Possessors Arrested in Internet-Related Crimes: Findings from the National Juvenile Online Victimization Study (2005), available at http://missingkids.com/en_US/publications/NC144.pdf).   According to the United States, the Wolak study "found the conservative number that 'one out of six cases originating with an allegation or investigation of child pornography discovered a dual offender who sexually victimized children or attempted to do so.'"   United States' Memo. at 12-13 (footnotes omitted)(quoting Wolak et al., supra, at 17).   The United States asserts that, "[a]lthough unknown if the Defendant is a hands-on offender or not, these studies reinforce the belief that child pornography offenders often present an unknown danger to our communities and especially children."  United States' Memo. at 13 (footnote omitted).

        The United States notes that the sentence it is recommending -- 97 months -- is less time than the ten years that Crisman has admitted to viewing child pornography images.  See United States' Memo. at 13 & n.6 (second).  It emphasizes that Crisman's conduct -- collecting child pornography images, sexual fantasies related to two neighborhood children, masturbating while viewing his child pornography images, stealing approximately fifty pairs of children's underwear to use for self-sexual pleasure, stealing credit cards and checks to purchase online pornographic materials -- "indicate[s] he is a person with a long-standing, undetected sexual interest in children."  United States' Memo. at 13-14.  Further, the United States points out that Crisman's conduct "promoted the production" of child pornography "under the basic principles of demand and supply."  United States' Memo. at 14.

Fourth, the United States asserts that the "receipt of child pornography has a significant impact on the child victims depicted in the images."  United States' Memo. at 14 (capitalization and bolding altered for readability).  The United States emphasizes again that the primary victims in child pornography cases are the children, and it points to several victim impact statements from children depicted in child pornography images and videos.  See United States' Memo. at 14-16.

The United States urges the Court not to vary from the guideline range.  See United States' Memo. at 16-18.  It asserts that, under 18 U.S.C. § 3553(b)(2),[6] the Court may not vary

---

[6]18 U.S.C. § 3553(b)(2) states:

**(2) Child crimes and sexual offenses. --**

**(A)  Sentencing.**--In sentencing a defendant convicted of an offense under section 1201 involving a minor victim, an offense under section 1591, or an offense under chapter 71, 109A, 110, or 117, the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless --

> **(i)** the court finds that there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence greater than that described;

> **(ii)** the court finds that there exists a mitigating circumstance of a kind or to a degree, that--

>> **(I)** has been affirmatively and specifically identified as a permissible ground of downward departure in the sentencing guidelines or policy statements issued under section 994(a) of title 28, taking account of any amendments to such sentencing guidelines or policy statements by Congress;

>> **(II)** has not been taken into consideration by the Sentencing Commission in formulating the guidelines; and

>> **(III)** should result in a sentence different from that described; or

from the guideline range unless the Court finds one of three listed circumstances, and that none of the circumstances are present in this case. United States' Memo. at 17-18. The United States argues that 97 months is an appropriate sentence, because it reflects the "seriousness of the offense, respect for the law, and just punishment," adequately deters Crisman and future defendants, holds Crisman accountable for his actions, protects the "the public, especially children," from future crimes that Crisman may otherwise commit, provides treatment to Crisman, and avoids unwarranted sentencing disparities among similar defendants. United States' Memo. at 18-22.

Crisman requests the Court to vary from the guideline range and sentence him to 60 months imprisonment. See Crisman Memo. at 1. He argues that "the applicable guideline, U.S.S.G. § 2G2.2 does not differentiate between producers of child pornography images and

---

> **(iii)** the court finds, on motion of the Government, that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense and that this assistance established a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence lower than that described.
>
> In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission, together with any amendments thereto by act of Congress. In the absence of an applicable sentencing guideline, the court shall impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2). In the absence of an applicable sentencing guideline in the case of an offense other than a petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission, together with any amendments to such guidelines or policy statements by act of Congress.

18 U.S.C.A. § 3553(b)(2).

those who, like Mr. Crisman, merely receive or possess it," and that "in some instances, it punishes offenders of receipt and possession of child pornography images equally as or more harshly than hands-on offenders."  Crisman Memo. at 5.  He points out that "a defendant being sentenced under U.S.S.G. § 2A3.4 (Abusive Sexual Contact or Attempt to Commit Abusive Sexual Contact), and who received all sentencing enhancements under that section would still be exposed to a lower guideline range than that recommended for Mr. Crisman," and that "[s]uch a result reveals the substantively unreasonable nature of a guideline sentence as to Richard Crisman."  Crisman Memo. at 5-6.  Crisman urges the Court to "'differentiate between those who create child pornography and those who consume it' when sentencing a defendant under U.S.S.G. § 2G2.2."  Crisman Memo. at 6 (quoting United States v. Kelly, CR-No. 11-1866-BB, slip copy (D.N.M. 2012)(Black, J.)).   He argues that several courts have criticized the enhancements under § 2G2.2, because they apply "'in virtually all cases.'"  Crisman Memo. at 7 (quoting United States v. Diaz, 720 F. Supp. 2d 1039, 1048 (E.D. Wisc. 2010)).  For example, he points out that "the use-of-computer enhancement, under U.S.S.G. § 2G2.2(b)(6)," is applied in "96.2% of all cases sentenced under U.S.S.G. § 2G2.2 in 2010," Crisman Memo. at 8 (citing U.S. Sentencing Comm'n, Use of Guidelines and Specific Offense Characteristics: Fiscal Year 2010, at 38), and further, that this enhancement does not "distinguish between 'serious commercial distributors . . . from more run-of-the-mill users,'" Crisman Memo. at 8 (quoting United States v. Dorvee, 604 F.3d 84, 95-96 (2d Cir. 2010), amended and superseded by 616 F.3d 174 (2d Cir. 2010)).  Next, he takes issue with the "number-of-images enhancement" in § 2G2.2(b)(7)(D), asserting that it was applied in "96.5%[7] of all cases under U.S.S.G. § 2G2.2

_____

[7]Although Crisman asserts that the number-of-images enhancement applied in 96.5% of all cases, the source he cites indicates that it was applied in 66.9% of cases.  See U.S. Sentencing Comm'n, Use of Guidelines and Specific Offense Characteristics: Fiscal Year 2010, at 38.  He

in 2010," Crisman Memo. at 8 (citing U.S. Sentencing Comm'n, Use of Guidelines and Specific Offense Characteristics: Fiscal Year 2010, at 38), and that, because of the nature of internet and computer use, "offenders, often unwittingly, access large numbers of images *en masse*," Crisman Memo. at 8 (citing United States v. Diaz, 720 F. Supp. 2d 1039, 1042 (E.D. Wisc. 2010)).  He finally points to the "sadist-masochistic enhancement" under § 2G2.2(b)(4), which was applied in "73.6% of all cases sentenced under U.S.S.G. § 2G2.2 in 2010," Crisman Memo. at 8-9 (citing U.S. Sentencing Comm'n, Use of Guidelines and Specific Offense Characteristics: Fiscal Year 2010, at 38), and argues that "[t]his enhancement has the additional problematic feature of punishing conduct without any finding of requisite intent on the part of the offender," Crisman Memo. at 9.  Crisman contends that, while he stipulated to "the conceptual applicability" of the sentencing enhancements, his stipulation "does not preclude a sentencing argument that calls into question the sentencing efficacy or structural unreasonableness of those enhancements." Crisman Memo. at 9.  He asks the Court "not to impose any recommended enhancements as to do so would constitute a procedurally and substantively unreasonable sentence."  Crisman Memo. at 9-10.  He contends that 60 months would adequately deter him and the public from future crimes and would avoid unwarranted sentencing disparities between his crime and more severe offenders.  See Crisman Memo. at 16-18.  He attached a Letter from Ralph G. Mendez, PhD, to the Honorable James O. Browning, dated May 28, 2012, filed May 9, 2013 (Doc. 72-1)("Mendez Letter"), in which Ralph G. Mendez, Crisman's uncle, who also has a PhD in psychological counseling, urges the Court not to rely on the Butner Study Redux, because, in

---

may have intended to cite the use-of-computer enhancement, which was applied in 96.2% of the cases in Fiscal Year 2010, see U.S. Sentencing Comm'n, Use of Guidelines and Specific Offense Characteristics: Fiscal Year 2010, at 38; in United States v. Cunningham, 680 F. Supp. 2d 844 (N.D. Ohio 2010), the district court stated that the use-of-a-computer enhancement was applied in 96.5% of cases, but it did not indicate its source for this figure, see 680 F. Supp. 2d at 851.

his view, it "has serious flaws and should not be used to assert that Richard will commit further sexual abuse crimes if not incarcerated."  Mendez Letter at 1.  Crisman's sister, Amanda R. Crisman-Voss, also wrote the Court, urging it not to rely on the Butner Study Redux, because, in her view, the study is "not only flawed, but is also not credible evidence to assert that Richard D. Crisman will pursue further sexual crimes of this nature if he is not incarcerated."  Letter from Amanda R. Crisman-Voss to the Honorable James O. Browning, dated May 31, 2012, filed May 9, 2013 (Doc. 72-1 at 5).  Crisman-Voss included her own critique scrutinizing the Butner Study Redux.  See Amanda R. Crisman-Voss Critique of the Butner Study Redux, dated November 14, 2011, filed May 9, 2013 (Doc. 72-1 at 6).

The Court held a sentencing hearing on May 14, 2013.  See Transcript of Hearing, taken May 14, 2013 ("Tr.").[8]  Crisman agreed that the PSR correctly calculated the sentencing guidelines, based on the stipulations they made in the Plea Agreement.  See Tr. at 2:21-24 (Nieto).  He argued, however, that the enhancements are "increasingly coming under scrutiny by various sentencing courts," and that, with the mandatory minimum five-year sentence, the enhancements "would be inappropriate and unreasonable."  Tr. at 4:11-5:6 (Nieto).  Next, he points to his personal history and how his father sexually abused him when he was growing up; while not arguing that this history excuses his conduct, Crisman asserted that he still suffers the effects of that abuse and that 60 months imprisonment with the BOP's sexual treatment program would be an appropriate sentence.  See Tr. at 5:7-9:5 (Nieto).

The Court noted that, although Crisman took issue with the enhancements, the Sentencing Commission could have assumed that all of the offenders would use a computer, have over six hundred pictures, and possess sadistic and masochistic images, and so the

---

[8]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Sentencing Commission could have made the base offense level 32 rather than 22 to incorporate the same enhancements.   Tr. at 11:7-12 (Court).   Crisman responded that, although the "enhancements are coming under increased scrutiny," Congress has not changed the child pornography sentencing guidelines and explained that he brought up the criticisms "to get the Court to consider what I believe to be a good sentence."   Tr. at 11:20-12:5 (Nieto).

The Court asked Crisman to address the Butner Study Redux that the United States attached to the United States' Memo.   See Tr. at 13:5-6 (Court).   Crisman noted that he was not very familiar with the First Butner Study and the Butner Study Redux, but asserted that, regarding the study's apparent correlation between child pornography users and hands-on molesters, the focus should boil down to a case-by-case determination.   See Tr. at 14:14-15:9 (Nieto).   He asserted that, even taking his activity "in the worst possible light," they do not "indicate or show any evidence of any hands on activity."   Tr. at 15:10-16 (Nieto).

Crisman then personally addressed the Court, explaining that he takes "full responsibility," and is "deeply ashamed and remorseful" for his actions.   Tr. at 16:18-20 (Crisman).   To the "children depicted in the files that I received, I want to say that I am seriously remorseful and very sorry by receiving their images of the views I have added to their continued victimization."   Tr. at 16:14-17:2 (Crisman).   He apologized to "the Court, also to my attorney, Mr. Nieto, to the prosecution, [Assistant United States Attorney] Ms. [Charlyn] Rees, and to all the police investigators and to anyone else that had to work on my case and view the vi[le] thin[g]s I possessed," as well as to his family, for causing them "pain, embarrassment, and shame."   Tr. at 17:11-18 (Crisman).   Crisman said that he has had a wake-up call and that he wants to "stop going down this road that has led me before" the Court.   Tr. at 17:19-25 (Crisman).   He explained that his father sexually abused him, that he had never told anyone

about that experience before he told investigators in this case, and that he is determined to get the help and therapy he needs to "not let this dark time in my life define who I am and what kind of person I am, because I know in my heart that I am a good and decent person and I do have something good and positive to contribute to society."  Tr. at 18:1-19:21 (Crisman).

Crisman, through his attorney, then argued that a lifetime of supervised release "is kind of excessive" and asked the Court to impose a shorter sentence of supervised release after imprisonment.  Tr. at 20:21-21:11 (Nieto).

The United States noted that "the guidelines are under attack and there's a great deal of scrutiny surrounding the guidelines," but that "the base offense level for this type of crime is substantially less than the mandatory minimum that applies."  Tr. at 22:5-10 (Rees).  The United States asserted that, although the enhancements may apply in many cases, it is "misguided to suggest that these sentencing enhancements apply in every case."  Tr. at 22:11-15 (Rees).  For example, regarding the number of images, the United States said that offenders have "varying amounts of child pornography," but that Crisman "had an exceptionally large amount of child pornography," with over 14,000 images and forty videos.  Tr. at 22:16-20 (Rees).  In the United States' view, the Sentencing Commission recognizes the "prepubescent children enhancement" because "offenders are becoming more and more interested in younger and younger children."  Tr. at 23:1-9 (Rees).  Regarding the sadistic or masochistic images, the United States asserted that the enhancement does not apply in every case, and that the Sentencing Commission recognizes that offenders who receive and possess sadistic or masochistic images are creating the demand for those images.  See Tr. at 23:10-16 (Rees).  The United States asserted that, although the use-of-a-computer enhancement is applied "more frequently in light of the technology today," "when the commission of the crime is made easier through an instrumentality, like a

firearm or like a computer, that is an appropriate enhancement, because you're fueling the industry[] and allowing someone to . . . more easily commit a crime." Tr. at 23:17-24 (Rees). The United States argued that 97 months is an appropriate sentence, based on Crisman's conduct in viewing child pornography for ten years, the large number of images he had on his computers, that he fantasized about having sexual relations with children multiple times throughout the day, that he masturbated anywhere from three to six times a day, and that he has "sexual fantasies involving two identified neighborhood children." Tr. at 24:24-25:10 (Rees). The United States also recommended a lifetime of supervised release, because, in its view, "Crisman presents a unique danger," and "the best assurance to curb this danger that he presents is a lifetime of monitoring." Tr. at 26:6-12 (Rees). Although the United States said it is sensitive to the fact that Crisman's father abused him, it argued "that doesn't minimize his conduct in this case," because "[t]here are many children who have sadly and unfortunately been abused and taken advantage of throughout[] their childhood but they have not resorted to the level of sexual deviancy, including child pornography and all the other activities that Mr. Crisman has been involved in." Tr. at 28:20-29:3 (Rees). The United States argued that the Court should impose a within-guidelines sentence so that Crisman is sentenced as other similarly situated offenders. See Tr. at 29:8-11 (Rees).

The Court asked the United States to explain why Crisman should receive a 2-level decrease for receiving, and not distributing, child pornography, when he obtained the child pornography on a P2P network. See Tr. at 30:5-12 (Court). The United States answered that P2P programs allow the users to choose whether they want to share files, and so the use of a P2P program would not necessarily involve distribution. See Tr. at 30:12-19 (Rees). The United States acknowledged that there is Tenth Circuit case law that indicates, if an offender uses a file

sharing program, the offender may receive an enhancement for distribution, but explained that, because Crisman pled guilty to receipt, and not to distribution, it seemed "unfair and unjust . . . to have him plead guilty to the less[er] of the two and then be able to escalate him to the same standard he would have been if he had been charged with distribution."  Tr. at 30:19-31:8 (Rees). The United States said that there is some evidence that Crisman distributed child pornography through the P2P program, "because law enforcement was able to make connection with Mr. Crisman's computer and download child pornography files from his computer," but that, pursuant to the Plea Agreement, it argued that he should receive the 2-level reduction for only receiving, and not distributing, child pornography.  Tr. at 31:9-24 (Court-Rees).

The Court then asked the United States to respond to Crisman's arguments that many of the enhancements apply in nearly every case.  See Tr. at 33:4-6 (Court).  The United States explained that, although it appears that the enhancements apply in every case, the reality is that the child pornography offenders who appear in federal court are "the worst of the worst offenders" and that the low-level offenders who may not receive the enhancements are prosecuted in state courts.  Tr. at 33:11-18 (Rees).  Although the United States acknowledged that the computer enhancement applies in nearly every case, it contended that, because using a computer makes the crime easier to commit, the enhancement is appropriate.  See Tr. at 24:18-24 (Rees).

The Court asked the United States to discuss the Butner Study Redux.  See Tr. at 37:4-5 (Court).  The United States explained that it is not suggesting that Crisman is a hands-on offender, "because that would be an unfair suggestion in this case," but that it directed the Court to the Butner Study Redux to emphasize that the Court should not minimize "image cases."  Tr. at 37: 7-20 (Rees).  The United States acknowledged that "the community of psychologists and

psychiatrists" often deem the Butner Study Redux as "the outlier of studies," but it argued that

Bourke and Hernandez had "a unique environment where they could conduct such a study that"

other psychologists and psychiatrists are not able to do.  Tr. at 38:13-15 (Rees).  It argued that

the use of polygraphs in the study demonstrated the truthfulness and veracity of the self-reported

statements.  See Tr. at 38:20-23 (Rees).  The United States asserted that lifetime supervised

release is necessary, because, in its view,

> Crisman is absolutely a danger.  We have seen an escalation . . . in his sexual
> deviancy within the ten years prior to law enforcement detection as well as his
> own statements, and that increase and escalation in sexual deviancy causes the . . .
> United States quite concern and alarm for the protection and safety of this
> community.

Tr. at 39:25-40:5 (Rees).

The Court accepted the Plea Agreement, including the stipulation to apply the 2-level

reduction for receiving, and not distributing, child pornography, although it said it would likely

scrutinize the reduction in other cases to determine if it is appropriate when using P2P software.[9]

---

[9]Although the Court accepted the parties' stipulation that the 2-level reduction in § 2G2.2(b)(1) applies, the Court would not accept such a stipulation today.  The 2-level reduction applies when: (i) the base offense level is 22 under subsection (a)(2); (ii) "the defendant's conduct was limited to the receipt or solicitation" of child pornography; and (iii) "the defendant did not intend to traffic in, or distribute" child pornography.  U.S.S.G. § 2G2.2(b)(1).  The problem is that Crisman's conduct was not "limited to the receipt or solicitation" of child pornography; rather, the Court thinks that the facts in the PSR support a finding that he distributed the images.  See PSR ¶ 21, at 8 ("Crisman . . . indicated he has never shared the images with anyone with the exception of peer to peer." (emphasis added)).  Without the 2-level reduction, Crisman's offense level would have been 32, resulting in a guideline range of 121-151 months.  The parties reached a stipulation, and the USPO did not disagree with it.  Thus, the Court was not alerted to the level of enhancement.

In United States v. Summers, No. CR 13-0673 JB, 2014 WL 1961542 (D.N.M. April 15, 2014)(Browning, J.), the Court discussed P2P file-sharing programs and how, under the Tenth Circuit's decisions in United States v. Ramos, 695 F.3d 1035 (10th Cir. 2012), and United States v. Ray, 704 F.3d 1307 (10th Cir. 2013), a defendant "distributes" pornographic material when other people are able to access the files, including detectives, even if the defendant does not understand the program's file-sharing capabilities.  2014 WL 1961542, at *2-3.  Because Crisman used a P2P file-sharing system that allowed other people to access the child

See Tr. at 41:9-42:2 (Court).  The Court explained eight factors that put downward pressure on the sentence: (i) the number of cases where the enhancements are applied, although it noted that it does not have a Kimbrough v. United States disagreement with the sentencing guidelines in general, see Tr. at 43:13-44:7 (Court); (ii) Crisman's childhood history of abuse, causing PTSD and other psychological problems, see Tr. at 44:8-22 (Court); (iii) Crisman's receptiveness to treatment, including the fact that this offense has made him confront what he endured as a child, see Tr. at 44:23-34:5 (Court); (iv) Crisman's young age and how, while "we are going to have to deal with him and his problems for quite some time," he has accepted responsibility and recognized that viewing child pornography is not a victimless crime, Tr. at 45:6-16 (Court); (v) there will be a reduced chance of recidivism as Crisman gets older, see Tr. at 45:23-46:3 (Court); (vi) his mother's health, because it would be helpful for him to return to her more quickly, see Tr. at 46:4-8 (Court); (vii) the fact that he did not distribute child pornography, see

pornography on his computer, the Court should not have accepted the stipulation to § 2G2.2(b)(1); if faced with the issue today, it would instead increase 2 offense levels pursuant to § 2G2.2(b)(3)(F).  This would result in offense level 34 and a guideline range of 151 to 188 months.  On the other hand, it is obvious that the United States was comfortable with a 97-month sentence in this case.  The Court would, under all the circumstances, also have been comfortable with that sentence and would have varied to that amount if the United States maintained its support for a 97-month sentence, as appears to have been the case.  While P2P file-sharing is distribution, it is not the worst kind of distribution, and the 97 months is already 37 months above the statutory minimum.  Also, the Sentencing Commission has recommended changing the guidelines in a way that could result in a sentence similar to the one he received; for example, and as the Court will discuss more fully in the analysis, the Sentencing Commission recommends updating the number-of-images enhancement.  Depending on how Congress responds, a defendant in Crisman's shoes may, in the future, receive a lower enhancement than the 5-level enhancement Crisman received.  Further, a defendant in his position would not likely receive the enhancement that the Sentencing Commission is recommending for offenders involved in online child pornography communities.  These proposed updates could balance out the fact that the Court did not enhance Crisman's offense level based on distributing images.

The United States is encouraged to, in the future, be careful not to fact bargain the enhancement away, but if it thinks the resulting sentence is too lengthy, to enter into a rule 11(c)(1)(C) agreement or not oppose a variance to a sentence that, for the individual defendant, better reflects the § 3553(a) factors and is a more reasonable sentence.

Tr. at 46:9-12 (Court); and (viii) the fact that Crisman has not, to the Court's knowledge, engaged in any violence or hands-on offenses, see Tr. at 47:10-13 (Court).  On the other hand, the Court acknowledge several factors that put upward pressure on the sentence: (i) the nature of the images, including the age of the children and the sadistic and masochistic nature of the images, see Tr. at 47:19-20 (Court); (ii) the "exceptionally large amount of materials," Tr. at 46:20-21 (Court); (iii) that child pornography is not a victimless crime, see Tr. at 46:25 (Court); (iv) that the psychologist diagnosed Crisman with pedophilia, see Tr. at 47:3-10 (Court); (v) that Crisman is addicted to child pornography, making recidivism more likely, see Tr. at 47:11-17 (Court); (vi) the Butner Study Redux, although not counseling the Court to vary upward, makes the Court cautious about varying downward, see Tr. at 47:23-48:12 (Court); and (vii) Crisman's other illegal conduct that went beyond viewing child pornography, including stealing children's underwear and stealing credit cards to purchase online pornographic material, which indicate Crisman may be more willing to act on his deviant sexual thoughts and inclinations, see Tr. at 49:14-50:6 (Court).  The Court concluded that, although there are factors that counsel against a guidelines sentence, a within-guidelines sentence is appropriate.  See Tr. at 52:3-8 (Court).  The Court sentenced Crisman to 97 months imprisonment and 25 years supervised release.  See Tr. at 53:6-9 (Court).

## HISTORY OF THE CHILD PORNOGRAPHY SENTENCING GUIDELINES

Since the inception of the Sentencing Commission, it has "reviewed and substantively revised the child pornography guidelines nine times."  U.S. Sentencing Comm'n, The History of the Child Pornography Guidelines 2 (2009), available at www.ussc.gov/general/2009103 0_History_Child_Pornography_ Guidelines.pdf ("Guidelines' History").  In setting the

sentencing guidelines, the Sentencing Commission is to consider the "the same factors that a sentencing court is required to consider under 18 U.S.C. § 3553(a)," including

> the nature and degree of the harm caused by the offense, the community view of the gravity of the offense, the public concern generated by the offense, the deterrent effect a particular sentence may have on the commission of the offense by others, and the current incidence of the offense in the community and in the Nation as a whole.

Guidelines' History at 2-3 (internal quotation marks omitted)(citing 28 U.S.C. § 994(c)). Congress retains "ultimate authority over the federal sentencing guidelines," as it may modify or reject amendments that the Sentencing Commission submits.   Guidelines' History at 5-6. Further, Congress may enact general or specific directives to the Commission, and the Commission must then "implement the directive in a manner consistent with the legislation." Guidelines' History at 6.  "Congress has delegated to the Commission significant discretion in formulating guidelines . . . .   Broad as that discretion may be, however, it must bow to the specific directives of Congress."   United States v. LaBonte 520 U.S. 751, 757 (1997)(internal quotation marks omitted).

> For more than 30 years, and particularly in recent years, Congress has focused attention on the scope of child pornography offenses and the severity of penalties for child pornography offenders. Through creating new offenses, enacting new mandatory minimums, increasing statutory maximums, and providing directives to the Commission, Congress has repeatedly expressed its will regarding appropriate penalties for child pornography offenders. Congress has specifically expressed an intent to raise penalties associated with certain child pornography offenses several times through directives to the Commission and statutory changes aimed at increasing the guideline penalties and reducing the incidence of downward departures for such offenses.

Guidelines' History at 6.

> Child pornography is defined as

> any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where --

> (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;
>
> (B) such visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or
>
> (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

18 U.S.C. § 2256(8).

Congress first addressed the distribution and receipt of child pornography in 1977, when it established a ten-year statutory maximum sentence for first-time trafficking offenders, as well as a fifteen-year statutory maximum and two-year mandatory minimum sentence for subsequent offenders. See Guidelines' History at 9. In 1984, Congress "extended penalties to producers and traffickers of child pornography who commit such offenses for non-pecuniary purposes." Guidelines' History at 9. Congress raised the mandatory minimum sentence for repeat child pornography offenders from two to five years of imprisonment and provided civil remedies for victims in 1986. See Guidelines' History at 9.

The Sentencing Commission promulgated the first set of guidelines in 1987, which set sentencing ranges for 18 U.S.C. § 2251 -- production of child pornography -- under § 2G2.1, and for 18 U.S.C. § 2252 -- the "transport, distribution, and receipt of child pornography" -- under § 2G2.2. Guidelines' History at 10. At the time, simple possession was not a federal crime. See Guidelines' History at 10.

> In establishing base offense levels for child pornography, as was the case with other offenses, the original Commission examined existing sentencing practices. The Commission did this, in part, by translating the Parole Commission's offense categorization into an estimated guideline offense level. For the offenses included under § 2G2.2, the Parole Commission categorization would be translated as base offense level 18 to 20. The Commission set the base offense level for § 2G2.2 at

level 13, which was substantially lower than the Parole Commission's categorization based on the expectation that the specific offense characteristics included in the new guideline would apply in many cases to increase the guidelines calculation from base offense level 13 to as high as level 20. Two specific offense characteristics were provided in § 2G2.2: a 2-level increase when an image depicted a child under twelve years of age; and no less than a 5-level increase for distribution with additional increases keyed to the retail value of the material distributed, rather than the number of images or reason for distribution.

Guidelines' History at 10 (footnotes omitted). In 1988, it revised § 2G2.2 "to expand the specific offense characteristic to refer to a prepubescent minor or a minor under the age of twelve years," which provided "an alternative measure to be used in determining whether the material involved an extremely young minor for cases in which the actual age of the minor is unknown." Guidelines' History at 12 (internal quotation marks omitted).

In 1990, the Sentencing Commission compiled a report on the status of child pornography prosecutions in the federal system. Guidelines' History at 13. First, the report noted Congress' findings regarding child pornography:

(1) both commercial and non-commercial distribution and receipt of child pornography contribute to the molestation and abuse of children; (2) child pornography had become a highly organized, multi-million dollar industry that operates on nationwide scale, but federal law enforcement efforts should not be limited to large scale distributors of child pornography; (3) child pornography causes substantial harm to both the child victim and to society as a whole since abused children tend to grow up "in an adult life of drugs and prostitution [and] become child molesters themselves, thus continuing the vicious cycle."

Guidelines' History at 13 (footnotes omitted). The report also analyzed child pornography prosecutions and made recommendations based on 28 U.S.C. § 994. Guidelines' History at 13.

The report identified only 31 cases involving child pornography convictions, half of which involved defendants who had engaged in sexual abuse of children and none of which involved trafficking or production of child pornography for pecuniary gain. Rather, the trafficking cases involved defendants who traded images for pleasure. Thirty-four percent of child pornography offenders convicted under 18 U.S.C. § 2252 received a departure from the guidelines and the departures were almost evenly split between sentences above and below the guideline range.

Guidelines' History at 13 (footnotes omitted).  The report suggested enhancements that would account for past or present abuse of children, which is "often referred to as a 'pattern of activity.'"  Guidelines' History at 13-14 & n.60.  The report also concluded that § 2G2.2's penalty structure did not give sufficient credence to Congress' intent with respect to repeat child pornography trafficking offenders, because, although 18 U.S.C. § 2252 imposed a mandatory minimum term of five years' imprisonment, the guidelines calculations were far below that minimum.  Guidelines' History at 14.  The report "suggested that the base offense level for § 2G2.2 be increased from level 13 to 15 to better insure that the severity of the offense as indicated by the statutory penalty structure was reflected for all offenders under the guideline." Guidelines' History at 14 (internal quotation marks omitted).

During a notice and comment period, the Sentencing Commission considered additional enhancements regarding (i) sadistic and masochistic conduct, (ii) differentiating between victims under twelve and under sixteen, and (iii) whether the defendant sexually abused a minor at any time before the offense.  See Guidelines' History at 15.  The Sentencing Commission then promulgated § 2G2.2 with a 4-level enhancement for material that portrays "sadistic or masochistic conduct or other depictions of violence," and commentary recommending an upward departure when the defendant had sexually abused a minor at any time in the past.  See Guidelines' History at 16.

In 1990, Congress criminalized the possession of child pornography and directed the Sentencing Commission to "'amend existing guidelines for sentences involving sexual crimes against children . . . so that more substantial penalties may be imposed if the Commission determines current penalties are inadequate.'"  Guidelines' History at 17 (quoting Crime Control Act of 1990, Pub. L. No. 101-647, 104 Stat. 4789, Title III, § 321).  The Sentencing

Commission, after a notice and comment period and an additional staff report, revised the child pornography guidelines by adding § 2G2.4 "to address offenses involving receipt or possession of materials depicting a minor engaged in sexually explicit conduct, as distinguished from offenses involving trafficking in such material, which continue to be covered under § 2G2.2." History at 18-19 (internal quotation marks omitted).

> The Commission decided to treat receipt, as distinguished from receipt with intent to traffic, as analogous to possession (rather than to trafficking) because the Commission determined that receipt is a logical predicate to possession, and concluded that the guideline sentence in such cases should not turn on the timing or nature of law enforcement intervention, but rather on the gravity of the underlying conduct.

Guidelines' History at 19 (internal quotation marks omitted)(alterations omitted).    The Sentencing Commission set the base offense level for § 2G2.4 at 10 for the receipt or possession of child pornography, and set the base offense level for § 2G2.2 at 13 for receiving, transporting, advertising, or possessing child pornography with the intent to traffic.  See Guidelines' History at 19.  These changes were in effect for less than a month before Congress passed superseding legislation.  See Guidelines' History at 19.

> In response to the Sentencing Commission's changes,

> lawmakers expressed dissatisfaction with the Commission's efforts in establishing sentencing guidelines for child pornography offenders convicted of possession. On July 18, 1991, Senator Jesse Helms addressed the changes made to the child pornography guidelines.  Senator Helms, along with co-sponsor Senator Strom Thurmond, proposed an amendment to the 1991 appropriations bill (the "Helms-Thurmond Amendment") that directed the Commission to raise base offense levels for all child pornography offenses and return the offense of receipt of child pornography to the trafficking guideline at § 2G2.2.    In support of this amendment, Senator Helms stated,

>> [I]n effect, . . . the Sentencing Commission has undermined Congress['s] attempt to assure severe punishment for dealing in child pornography.  I want to turn that around.  I want to say to the Sentencing Commission, "You made a mistake; now you correct it."  The Helms-Thurmond amendment ensures that criminals will

> receive serious punishment for child pornography offenses, not a
> mere slap on the wrist.
>
> The only other floor statements regarding the Helms-Thurmond Amendment were
> offered in support and the amendment passed the Senate by a vote of 99-0.

Guidelines' History at 19-20 (footnotes omitted).   While the House of Representatives was

considering a similar amendment, the Sentencing Commission sent a letter to the House,

explaining that

> "the debate in the Senate mischaracterized the Commission's recent actions as
> having reduced the guideline penalties for trafficking in child pornography" and
> offered support for why the Commission had chosen to categorize receipt and
> possession of child pornography as it did.  The Commission noted that proposed
> child pornography amendments "continue to require substantially tougher
> penalties than typically were imposed under pre-guidelines practice," and
> explained that a high rate of downward departures and low likelihood of
> government appeal from these departures suggested that judges and prosecutors
> thought "that the offense level for the least serious forms of conduct under §2G2.2
> was too severe."  The Commission suggested a substitute, more general, directive
> for the Helms-Thurmond Amendment directing the Commission to "review and
> amend as necessary" the child pornography guidelines.

Guidelines' History at 20-21.   The amendment's proponent responded to the Sentencing

Commission's letter, contending that "the Commission's decision to reference simple receipt to

the possession guideline was unexpected as '[s]urely no member of Congress understood that by

voting to create a new federal offense he would also be voting to reduce penalties for existing

offenses.'"  Guidelines' History at 22 (footnote omitted).  The House amendment passed by a

vote of 414-0.  See Guidelines' History at 22.  The legislation did not directly "disapprove" the

Sentencing Commission's earlier amendments, but directed the Sentencing Commission to

(i) treat receipt cases similar to trafficking cases, rather than treating them as possession cases;

(ii) set a base offense level in § 2G2.2 of not less than 15 with at least a 5-level increase for

offenders with a pattern of activity involving sexual abuse or exploitation of a minor; and

(iii) use § 2G2.4 for simple possession cases and set the offense level at not less than 13 with at

least a 2-level increase for possessing ten or more child pornography items.  Guidelines' History at 23-24.

Congress acted again in December 1995, directing the Sentencing Commission to increase the base offense level for child pornography offenses by at least 2 levels and to increase the base offense level by at least 2 levels if a computer was used to solicit participation.  See Guidelines' History at 26.  The Sentencing Commission "recommended increasing the base offense levels by only two levels, the minimum increase permitted by the directive"; noted that computer use in child pornography crimes had become more prevalent; explained that offenders who had a prior history of abusing children were more likely to recidivate, warranting a longer sentence; stated that it was considering an expansion of the pattern-of-activity enhancement; and suggested clarifications for the possession and receipt guidelines by combining §§ 2G2.2 and 2G2.4, and including a 2-level downward adjustment for simple receipt cases.  Guidelines' History at 30-31.  In 2000, Congress directed the Sentencing Commission to address different distribution offense characteristics, and the Sentencing Commission amended the guidelines to include 2- to 7-level increases depending on, for example, whether the defendant distributed child pornography for pecuniary gain or a thing of value, or distributed the child pornography to a minor.  See Guidelines' History at 32-36.

In 2003, "for the first and only time to date," Congress directly amended the sentencing guidelines, which it did through the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act, Pub. L. No. 108-21, 117 Stat. 650 ("PROTECT" Act).  Guidelines' History at 38.  The PROTECT Act directly amended the guidelines by adding "specific offense characteristics relating to the number and type of child pornographic images."  Guidelines' History at 39.  It "also provided general directives, created a five-year mandatory

minimum for trafficking and receipt, [and] raised the statutory maximum for trafficking and

receipt from 15 to 20 years and for possession from five to ten years."  Guidelines' History at 38.

In response to the PROTECT Act, the Sentencing Commission conducted a number of studies

regarding the changes, including:

> • A prison impact analysis that used 2002 data to report how the 2004
> amendments to §§2G2.2 and 2G2.4 directly mandated by Congress would likely
> impact sentences.  This analysis revealed that average sentences for §2G2.2
> would likely more than double from 42.8 months to 88.8 months.  Those
> previously sentenced under §2G2.4 were predicted to see a similarly large average
> increase in sentence from 28 months to 54 months.

> • An examination of state sentencing practices for child pornography offenses in
> Florida, Oklahoma, Massachusetts, North Carolina, Oregon, Pennsylvania, South
> Carolina, Tennessee, Virginia, and Washington.  The results were ultimately
> ambiguous due to differing data collection models in each state, but such
> information was considered during the policy development process.

> • A project examining offenders sentenced under §§2G2.2 and 2G2.4 to determine
> the statute of conviction; the offender's most serious behavior; any inappropriate
> contact with a minor by offender; travel by victim or offender; arrest due to a
> sting operation; age of victim; number of victims; use of a computer by offender;
> pattern of activity by offender; offender's criminal history (particularly, the
> existence of prior offenses against persons); existence of plea agreement; history
> of substance abuse by offender; psychological evaluation of offender; and
> offender's marital status.  The project also examined departure rates in child
> pornography cases.  The results informed the drafting of proposed amendments
> and identified issues for comment.  It also permitted the Commission to
> understand the likely rates at which new enhancements would apply.

Guidelines' History at 41-42.  Although Congress had directly amended the guidelines, the

Sentencing Commission had to implement the changes.  For example, "the Commission had to

define the term 'images,' quantify video images, and implement the directive."  Guidelines'

History at 43.

> Given that the image table enacted by Congress assigned a 2-level increase for
> between ten images and 150 images, and a 3-level increase for 150 to 300 images,
> the Commission adopted a definition of video that considered each video to
> contain 75 images, squarely in the middle of the 2-level increase range.

Guidelines' History at 43-44.

The Sentencing Commission also had to implement the five-year mandatory minimum sentence:

> After engaging in extensive analysis of its data, including a review of typical trafficking and receipt offenders, offense characteristics, and rates of below guideline sentences for these offenses, the Commission adopted the third, most lenient option of those typically used by the Commission, and selected base offense level 18 for possession offenders and base offense level 22 for trafficking and distribution offenders.
>
> The Commission's analysis revealed that a majority of offenders sentenced under §2G2.2 were subject to specific offense characteristics that increased their offense level. Specifically, the overwhelming majority of these offenders received a 2-level enhancement for use of a computer (89.4%) and a 2-level enhancement for material involving a child under 12 (91.4%).

Guidelines' History at 46. The Federal Defenders' office "concurred with the Commission's assessment that setting the base offense level lower than the mandatory minimum would be appropriate given the likelihood that certain enhancements would frequently apply." Guidelines' History at 46-47.

> The Commission's research and review of comments indicated that if it placed the base offense level at 26, or even 24, after applying the typical enhancements, most first-time offenders' Guidelines calculations would be far in excess of the mandatory minimum. However, setting the base offense level at level 22 would permit the Guidelines and enhancements to operate in conjunction with the statutory mandatory minimum.

Guidelines' History at 47. The Sentencing Commission also studied the proportionality of § 2G2.2 with sentences of other types of offenses and determined that,

> if the base offense level were set any higher than 22, the typical offender sentenced under § 2G2.2 for receipt of child pornography would face a higher guideline than a typical offender convicted of conspiracy to commit murder and kidnapping. Thus by setting the base offense level at 22 for trafficking, the Commission sought to preserve proportionality, avoid double counting, and provide a wider sentencing range for defendants than would be otherwise available.

Guidelines' History at 47-48.

Based on the Sentencing Commission's conclusion that "simple receipt" is similar to "simple possession," it also added a 2-level decrease to § 2G2.2(b)(1) for when the offense was limited to receipt or solicitation of child pornography.  Guidelines' History at 48.

The most recent amendment to the child pornography guidelines came after Congress created a new offense at 18 U.S.C. § 2252A(a)(7) "with a statutory maximum of 15 years, which made it unlawful to knowingly produce with intent to distribute, or to knowingly distribute, 'child pornography that is an adapted or modified depiction of an identifiable minor.'" Guidelines' History at 50.  "These adapted images are referred to as 'morphed images' because they morph a non-sexual image of an identifiable child with sexually explicit images." Guidelines' History at 50 n.226.  Further, Congress clarified that "receipt or distribution of a live visual depiction of child pornography via the Internet or other electronic method is a child pornography offense and that one who 'knowingly accesses with intent to view' a live visual depiction of child pornography has possessed child pornography."  Guidelines' History at 50 n.226.  The Sentencing Commission modified § 2G2.2(a)(1) to include the new offense, setting the base offense level at 18, 4 levels lower than other distribution offenses as the new offense did not involve the sexual abuse of a child and Congress set a lower penalty structure than other child pornography distribution offenses.  See Guidelines' History at 51.

Courts and commentators have criticized the child pornography receipt and possession guidelines, because, in their view, the guidelines "do not reflect the kind of empirical data, national experience, and independent expertise that are characteristic of the Commission's institutional role."  United States v. Stern, 590 F. Supp. 2d 945, 960 (N.D. Ohio 2008).  In one often-cited case -- United States v. Dorvee, 616 F.3d 174 (2d Cir. 2010) -- the United States

Court of Appeals for the Second Circuit reviewed the procedural and substantive reasonableness of the district court's imposition of a statutory maximum sentence of 240 months for the defendant, who pled guilty to distributing child pornography.  See 616 F.3d at 176.  It noted that the district court did not properly calculate the guideline range, resulting in procedural error, but it also concluded that the sentence imposed was substantively unreasonable, in part because, in its view, the district court was relying on "a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires."   616 F.3d at 184.   The Second Circuit noted that, normally, the Sentencing Commission develops the guidelines "using an empirical approach based on data about past sentencing practices," but that "the Commission did not use this empirical approach in formulating the Guidelines for child pornography."  616 F.3d at 184.  After reviewing the history of the child pornography guidelines in relation to Congress' directives, the Second Circuit expressed some concerns with § 2G2.2, particularly that the base offense level for distribution has steadily increased since 1991 from 13 to 22 "as the Commission has attempted to square the Guidelines with Congress's various directives," and, given that "many of the § 2G2.2 enhancements apply in nearly all cases," the guideline ranges are "near or exceeding the statutory maximum, even in run-of-the-mill cases."  616 F.3d at 185.  The Second Circuit was critical that a first-time distribution offender is "likely to qualify for a sentence of at least 168 to 210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction," and that "adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories," a result the

Second Circuit described as "fundamentally incompatible with § 3553(a)."  616 F.3d at 184.  The Second Circuit encouraged district judges "to take seriously the broad discretion they possess in fashioning sentences under § 2G2.2 -- ones that can range from non-custodial sentences to the statutory maximum -- bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." 616 F.3d at 188.   It concluded that the defendant's statutory maximum sentence was substantively unreasonable.  See 616 F.3d at 188.

On the other hand, some courts defend the Sentencing Commission's work on the child pornography sentencing guidelines.  In United States v. Cunningham, 680 F. Supp. 2d 844 (N.D. Ohio 2010), aff'd, 669 F.3d 723 (6th Cir. 2012), the Honorable John R. Adams, United States District Judge for the Northern District of Ohio, reviewed the Commission's work after Congress passed the PROTECT Act, including the Commission's studies on how the amendments would impact sentences, its work to implement the guidelines and set appropriate base levels, and its proportionality review of the guidelines.  See 680 F. Supp. 2d at 849-51.

> Having reviewed the actions taken by the Commission, the Court finds that giving deference to the Guidelines is appropriate.  We are often told that when life gives you lemons, make lemonade.  In this instance, the Commission was given grandstanding politicians, but still crafted proper Guidelines.  Rather than cede its responsibility, the Commission instead appears to have gone above and beyond to justify its amendments.  Far from failing to rely on empirical data and its own expertise, the Commission has conducted formal studies whenever possible and has conducted extensive analyses to fulfill its statutory obligations. Have politicians unduly hampered the Commission's ability to perform its duties? There can be no question that they have interfered.  However, at the same time, Congress' actions could be viewed as a necessary response to a crime that was spiraling out of control.  As internet access grew across this country, so did the online community of pedophiles that supports the market for child pornography. Rather than remain silent, Congress acted.   In turn, the Commission used empirical data and its own expertise to craft the appropriate Guideline amendments.  This Court, therefore, declines to join those district judges that have found otherwise.

United States v. Cunningham, 680 F. Supp. 2d at 849-51.

The Tenth Circuit has addressed various defendants' arguments that the child pornography sentencing guidelines do not warrant deference, and, while it has acknowledged some basis for the criticism, it has repeated that a sentencing court must use its discretion when sentencing, whether the sentence imposed is within or outside the guideline range.  In United States v. Regan, 627 F.3d 1348 (10th Cir. 2010)(Holloway, J.), the defendant pled guilty to receiving child pornography; the applicable guideline range was 97 to 121 months imprisonment, and the defendant requested the statutory minimum of 60 months, but the district court sentenced the defendant to 97 months, and the Tenth Circuit affirmed.  See 627 F.3d at 1350.  The defendant argued that "the district court accorded too much weight to the applicable Sentencing Guideline range because the Guideline range was not based on careful empirical study," but instead, the ranges "have escalated as a result of the general revulsion associated with child pornography and in this case, yield a sentence that is out of line with the § 3553(a) factors."  627 F.3d at 1352.  The defendant pointed to other courts that "held that the applicable Sentencing Guideline range in the child pornography cases before them was difficult to reconcile with the individualized weighing of factors required by § 3553(a)," 627 F.3d at 1353, including United States v. Dorvee, 604 F.3d 84 (2d Cir. 2010), amended and superseded by 616 F.3d 174 (2d Cir. 2010),[10] and United States v. Grober, 595 F. Supp. 2d 382 (D.N.J. 2008)(Hayden, J.).

> Grober reviewed the decisions of several other district courts that declined to accord the Sentencing Guidelines range deference.  Grober, 595 F. Supp. 2d at 391-93 (quoting United States v. Baird, 580 F. Supp. 2d 889, 893-94 (D. Neb. 2008)("[B]ased on the history of the child pornography guidelines as the Commission has keyed them into policy and statutory mandates, the sentencing ranges of imprisonment are 'a less reliable appraisal of a fair sentence.'"); United States v. Shipley, 560 F. Supp. 2d 739, 744 (S.D. Iowa 2008)("[T]he guidelines

_____

[10]The amended and superseded version includes the same discussion of the district court's substantive error.

for child exploitation offenses were not developed using an empirical approach by the Sentencing Commission, but were rather mainly promulgated in response to statutory directives. . . .  These modifications do not appear to be based on any sort of empirical data, and the Court has been unable to locate any particular rationale for them beyond the general revulsion that is associated with child exploitation-related offenses."); United States v. Hanson, 561 F. Supp. 2d 1004, 1010-11 (E.D. Wis.2008)("The flaw with U.S.S.G. § 2G2.2 today is that the average defendant charts at the statutory maximum. . . . The results are illogical." (quoting Troy Stabenow, Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines 22-23 (June 10, 2008), http://www.fd.org/pdf_lib/Deconstructing the Child Pornography Guidelines 6.10.08.pdf)); United States v. Johnson, 588 F. Supp. 2d 997, 1003-04 (N.D. Iowa 2008)("At the urging of Congress, the Sentencing Commission has amended the guidelines under § 2G2.2 on several occasions, recommending more severe penalties.  As far as this Court can tell, these modifications do not appear to be based on any sort of empirical data, and the Court has been unable to locate any particular rationale for them beyond the general revulsion that is associated with child exploitation-related offenses.")).  Consequently, the district judge in Grober found the reasoning of those courts persuasive and was convinced that "the present guideline, § 2G2.2, must be given less deference than the guidelines traditionally command."  Id. at 412.

United States v. Regan, 627 F.3d at 1353.  The Tenth Circuit said that the defendant's "argument is quite forceful," but, because he did not make the argument to the district court in his sentencing memorandum or at the sentencing hearing, and none of the cases were binding precedent, the Tenth Circuit concluded that it could not "hold that the district court abused its discretion by failing to consider an argument that Regan did not raise."  627 F.3d at 1354.

The Tenth Circuit again analyzed the argument that the child pornography guidelines do not merit deference in United States v. Nghiem, 432 F. App'x 753 (10th Cir. 2011)(unpublished)(Hartz, J.).  The defendant in that case pled guilty to distributing child pornography, and "the district court sentenced him to 121 months' imprisonment, the bottom of the advisory guidelines range."  432 F. App'x at 755.  He challenged the substantive reasonableness of the sentence, because, although the sentence was "within the properly calculated guideline range and therefore is afforded a rebuttable presumption of reasonableness,"

he attempted to "rebut that presumption by arguing that there are serious flaws in U.S.S.G. § 2G2.2, the guideline that applies to distribution of child pornography." 432 F. App'x at 757. The Tenth Circuit acknowledged that many courts are questioning § 2G2.2's soundness, explaining:

> That does not mean, however, that a within-guideline sentence based in part on a sentencing guideline lacking an empirical basis is necessarily unreasonable. Guidelines levels can properly follow Congressional policy regarding the severity of punishment appropriate for particular offenses, and that policy need not be founded on scientific data. See United States v. Alvarez-Bernabe, 626 F.3d 1161, 1165-66 (10th Cir.2010). To be sure, district courts that disagree with § 2G2.2 may vary from the guidelines to adjust for what they perceive as its shortcomings. "But if they do not, we will not second-guess their decisions under a more lenient standard simply because the . . . Guideline is not empirically-based." United States v. Mondragon-Santiago, 564 F.3d 357, 367 (5th Cir. 2009); see United States v. Lopez-Reyes, 589 F.3d 667, 671 (3d Cir. 2009)("[A] district court is not required to engage in 'independent analysis' of the empirical justifications and deliberative undertakings that led to a particular Guideline."). Even if a lesser sentence may have been reasonable in this case, so may a greater sentence. There will almost always be a range of reasonable sentences. "The fact that [we] might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." Gall v. United States, 552 U.S. 38, 51 . . . (2007). We cannot say that Defendant has overcome the presumption that his within-guideline sentence fell within the realm of rationally available sentences.

432 F. App'x at 757.

Most recently, the Tenth Circuit has addressed the argument that the guidelines are not worthy of deference in United States v. Grigsby, 749 F.3d 908 (10th Cir. 2014)(Baldock, J.). In that case, the defendant challenged his 260-year[11] sentence, which the district court calculated

---

[11]The 260-year sentence was the statutory maximum sentence for the defendant, who pled guilty to

> eight counts of sexual exploitation of a nine-year-old child for the purpose of producing visual depictions in violation of 18 U.S.C. § 2251(a), one count of possessing with intent to view child pornography in violation of 18 U.S.C. § 2252(a)(4)(B), and one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).

based on § 2G2.1 for producing child pornography, as "procedurally and substantively unreasonable because the guideline is 'defective.'" 749 F.3d at 908. Under the guidelines, the initial imprisonment range was life, but, "because the statutory maximum sentence of 260 years was less than life, U.S.S.G. § 5G1.2(b) established the former term as the recommended guideline sentence." 749 F.3d at 909. The defendant argued that "§ 2G2.1 is flawed and any reliance thereon necessarily constitutes both procedural and substantive error," 749 F.3d at 910, pointing to United States v. Dorvee and the Sentencing Commission's Report to Congress, but the Tenth Circuit noted that the defendant's argument focusing on § 2G2.2 for non-production cases did not speak to his situation, nor did it agree that "any application of § 2G2.2 will yield an unreasonable sentence," 749 F.3d at 911 (emphasis in original).

### RESEARCH REGARDING THE BUTNER STUDY AND BUTNER STUDY REDUX

Changing technology has vastly increased the prevalence of internet-based sex crimes as well as the arrest and conviction of such offenders. The method of sentencing child pornography offenders has been the subject of congressional inquiries and United States Sentencing Commission hearings for the past several years. The conversation regarding the nature of child pornography offenders and the scope of the harm that they cause children has been similarly prevalent in the social sciences. One study in particular, published in 2009 -- the Butner Study Redux -- offers scientific justification for a claim that convicted child pornography offenders are likely guilty of additional crimes against children. Michael Bourke and Andres Hernandez conducted research on 155 child pornography offenders treated at the Federal Correctional Institution ("FCI") in Butner, North Carolina. Bourke and Hernandez concluded that the vast majority of convicted child pornography offenders -- eighty-five percent in their study -- had

---

749 F.3d at 908. The Tenth Circuit did not explain how the statutory maximum reached 260 years, but that calculation seems to be based on the multiple counts running consecutively.

committed at least one hands-on sexual offense.  Butner Study Redux at 187-88.  Twenty-six

percent of the offenders in the study had a known history of abusing a child at the beginning of

the study, meaning that at least fifty-nine percent of the offenders had committed at least one,

unknown, hands-on sexual offense, and likely more, as the offenders with known histories also

disclosed additional victims during treatment.  See Butner Study Redux at 187-88.  The study's

results are disturbing.  The possibility that most child pornography offenders are not just

"lookers" but also "touchers" presents an interesting dilemma for the courts.  Before relying too

heavily, however, on Bourke and Hernandez' findings, the Court must examine both the

scientific reliability and legal application of Bourke and Hernandez' methodology.

      **1.**     **Overview of the Research.**

In 2000, Hernandez, the director of the Sex Offender Treatment Program ("SOTP") at

FCI Butner, presented preliminary findings before the annual conference for the Association for

the Treatment of Sexual Abusers ("ATSA") in San Diego, California.  Andres E. Hernandez,

Self-Reported Contact Sexual Offenses by Participants in the Federal Bureau of Prisons' Sex

Offender Treatment Program: Implications for Internet Sex Offenders (Nov. 2000)(unpublished

manuscript), available at http://www.ovsom.texas.gov/docs/Self-Reported-Contact-Sexual-

Offenses-Hernandez-et-al-2000.pdf ("First Butner Study").  The preliminary findings suggested

a significantly higher rate of hands-on offenses amongst the population of child pornography

offenders than had been known at the time of sentencing.  First Butner Study at 6.  The study

involved ninety individuals who were classified in three groups: (i) sixty-two people in the

"Child Pornographer/Traveler" group, whose crimes of conviction "involve[d] the production,

distribution, receipt, and possession of child pornography," or "involve[d] luring a child and

traveling across state lines to sexually abuse a child"; (ii) twenty-four people in the "Contact Sex

Offender" group, whose crimes of conviction "involve[d] the sexual molestation, abuse, or assault of a child or adult"; and (iii) four people in the "Other" group, whose crimes of conviction were "non-sexual offenses such as bank robbery, mail fraud, or drug trafficking. All subjects except one did not have a history of sexual crimes for which they were previously adjudicated in state jurisdictions." First Butner Study at 3. Each of these offenders volunteered to participate in the SOTP at FCI Butner during the time of the study. See First Butner Study at 3. Hernandez examined two variables: first, he examined the "number of contact sexual crimes the subject was known to have committed prior to entering treatment," as reported in the individual's PSR. First Butner Study at 2. Second, he examined the "number of self-reported contact sexual crimes divulged over the course of evaluation and treatment in the SOTP," gathering this data from "the subject's discharge report," which "summarizes the offender's self-reported sexual history and list of victims." First Butner Study at 2.

Hernandez found that prisoners in the Child Porn/Traveler group identified fifty-five contact sex crimes in their PSRs, but, following their treatment, "these offenders admitted to an additional 1,379 contact sexual crimes for which they were never detected by or reported to the criminal justice system." First Butner Study at 4. This difference represents a significant increase in the number of crimes that known child molesters and those with no previous history of hands-on offending committed. At the time of sentencing, forty-two percent of the offenders in this group were known to be contact sexual criminals. See Sexual Exploitation of Children Over the Internet: The Face of a Child Predator and Other Issues: Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce, 109th Cong. 109-143, at 4 (2006)(statement of Andres E. Hernandez, Dir., Sex Offender Treatment Program, Fed. Bureau of Prisons)("Hernandez Statement"). During and following treatment, an additional

thirty-four admitted to committing at least one, unprosecuted, hands-on offense.  See Hernandez

Statement at 4.  In a subsequent analysis, Hernandez focused only on the child pornography

offenders, excluding the data he collected from those who had traveled between states with the

intent to sexually abuse a child, resulting in fifty-five participants, eighty percent of whom had a

contact sexual offense recorded after treatment.  See Hernandez Statement at 4.  This statistic

includes both known child molesters and those convicted only of a child pornography crime.  See

Hernandez Statement at 4; First Butner Report at 3.

Hernandez acknowledged several limitations on his initial sample when he spoke to the

Subcommittee on Oversight and Investigations Committee on Energy and Commerce:

> The population of inmates in the SOTP is not representative of the entire
> population of sex offenders in the BOP.  It represents a unique group of offenders
> with the following general characteristics: 1) they have volunteered to participate
> in treatment and accept some degree of responsibility for their crimes; 2) speak
> English; 3) are not severely mentally ill; 4) do not have detainers or pending
> charges that would affect their release to the community; and 5) do not have a
> history of negative institutional adjustment.  The vast majority of the inmates in
> the SOTP are highly educated, and have marketable job skills.   These
> characteristics, and their willingness to volunteer for treatment are not typical of
> all sex offenders in the BOP.

Hernandez Statement at 3.

Given the striking nature of these initial findings, Hernandez continued recording the

incidents of hands-on offenses in the Butner SOTP.  See Hernandez Statement at 4.  He enlisted

the assistance of Michael Bourke, the Chief Psychologist for the United States Marshals Service.

See Butner Study Redux at 183.  Together, Hernandez and Bourke interviewed 155 offenders

undergoing treatment at Butner between 2002 and 2005.  See Butner Study Redux at 185.  In

2009, the Journal of Family Violence, a peer-reviewed, interdisciplinary publication that looks at

all aspects of family violence, published this study.  The article published in 2009 in the Journal

of Family Violence includes only the data collected between 2002 and 2005, and excludes the

data that Hernandez collected before 2002.  The distinction between the First Butner Study and the Butner Study Redux is important, as Hernandez' initial research lacks the specificity, clarity, and reliability of the later research.  The remainder of this Memorandum Opinion and Order will consider only the published article -- the Butner Study Redux -- and the findings contained therein.

Bourke and Hernandez conducted their research by interviewing child pornography offenders that chose to participate in an optional treatment program, SOTP, between 2002 and 2005.  See Butner Study Redux at 186.  Each SOTP participant worked with his clinician over the course of eighteen months.  See Butner Study Redux at 185.  They attended group and individual therapy sessions as well as unstructured "therapeutic activities" for fifteen hours a week.  Butner Study Redux at 185.  In addition, offenders spent sixty weeks attending a psychoeducational series in which they learn about coping mechanisms and managing their criminality after release.  See Butner Study Redux at 185.  They were also subjected to psychological testing.  See Butner Study Redux at 185.  While the subject pool initially included 201 offenders, forty-six subjects "were excluded because they did not participate in the SOTP for a minimum of six months due to voluntary withdrawal, expulsion or death (one subject)."  Butner Study Redux at 186.  The remaining 155 participants comprise the entire research sample relied upon in the published article.  See Butner Study Redux at 186.  Researchers studied two separate issues -- "Contact Sexual Criminality" and "Crossover Behavior."  Butner Study Redux at 186.  While they developed findings in both categories, the second is irrelevant to this Memorandum Opinion and Order as it examines the offenders' selection of victims based on both age and gender.

Their investigation of offenders' contact sexual criminality compares the information contained in the offenders' PSRs with the information that the offenders disclosed in their Psychosexual History Questionnaires ("PHQ"). This analysis compares an offender's known criminal history with any self-disclosures made during the course of treatment. See Butner Study Redux at 186. An offender was presumed to be a "known" contact offender if he had either been convicted of such an offense, acknowledged and documented such an offense in his PSR, or if evidence -- including at least one allegation and a substantiating investigation by a child protective services agency -- existed. Butner Study Redux at 186. Bourke and Hernandez did not consider only prosecuted or convicted offenses, but rather any substantiated claims of previous sexual abuse. See Butner Study Redux at 186. That evidence was considered in relation to the offender's PHQ, "an unpublished self-report measure on which offenders record demographic information and describe their development psychosocial, criminal, and sexual histories." Butner Study Redux at 186. Participants updated the PHQ every six months. See Butner Study Redux at 186. The Butner Study Redux relied on the disclosures made in the most recent PHQ update, that is, the one completed immediately before an offender's departure from SOTP. See Butner Study Redux at 186. To confirm the self-disclosures, Bourke and Hernandez conducted polygraph examinations on fifty-two percent of the study's participants. See Butner Study Redux at 186. This examination took place after the offender had completed at least fourteen months of treatment. See Butner Study Redux at 186. All polygraph examinations were conducted "in accordance with federal practice standards and . . . administered by a qualified examiner." Butner Study Redux at 186.

Bourke and Hernandez used the above procedure to determine how many of the 155 child pornography offenders had also molested a child. In doing so, they recorded the number of

hands-on victims disclosed on the PHQ and compared that number to what was in the PSR.  See Butner Study Redux at 186.  At sentencing, twenty-six percent were known to have committed a hands-on offense.  See Butner Study Redux at 187.  At the end of treatment, eighty-five percent admitted to molesting at least one child.  See Butner Study Redux at 187.  The study indicated that only fifteen percent of child pornography offenders had not committed any hands-on offense.  See Butner Study Redux at 187.  At the time of sentencing, there were seventy-five known hands-on victims.  See Butner Study Redux at 187.  After treatment, offenders self-disclosed abuse against 1,777 hands-on victims.  See Butner Study Redux at 187.  The researchers then included the results of the polygraph examination.  See Butner Study Redux at 188.  Twenty-four subjects in their sample denied they committed a hands-on offense.  See Butner Study Redux at 188.  After treatment, nine of those subjects were polygraphed, and "only two 'passed.'"[12]  Butner Study Redux at 188.  Bourke and Hernandez determined that "less than 2% of subjects who entered treatment without known hands-on offenses were verified to be 'just pictures' cases."  Butner Study Redux at 188.  The researchers assert that the polygraph examination was meant to test both "under and over-reporting," and that there was no evidence of over-reporting with any subject.  Butner Study Redux at 189.  "Our findings suggest that online criminal investigations, while targeting so-called 'Internet sex offenders,' likely have resulted in the apprehension of concomitant child molesters."  Butner Study Redux at 189.

The findings were based on data ending in 2005.  Initially, the article was set to be published in 2007.  See Tori DeAngelis, Porn Use and Child Abuse: The Link May Be Greater Than We Think, a Controversial Study Suggests, 40 Monitor on Psychology 56, 56 (2009).  The Journal of Family Violence, a peer-reviewed publication, had approved the article and was set to

---

[12]Bourke and Hernandez did not explain in the Butner Study Redux whether the remaining seven failed the polygraph examinations or whether the results were inconclusive.

include it in that year's journal when the Bureau of Prisons ("BOP") requested that the article be pulled.  See DeAngelis, supra, at 56.  Because Bourke and Hernandez were BOP employees, they required approval before any findings could be published.  See DeAngelis, supra, at 56.  An attorney from the BOP suggested several changes to the article's conclusion, none of which were made.[13]  See DeAngelis, supra, at 56.  In 2009, Bourke began his employment with the United States Marshal Services.  See DeAngelis, supra, at 56.  He then contacted the Journal of Family Violence, and the journal proceeded with publication.  See DeAngelis, supra, at 56.

Although the Butner Study Redux was not published until 2009, its conclusions were first discussed in Congress in 2006 when Hernandez testified before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce in a hearing entitled "Sexual Exploitation of Children Over the Internet: The Face of a Child Predator and Other Issues." Hernandez Statement at 1.  The Butner Study Redux findings became public knowledge as early as 2007 when controversy of the study's use was published in a front page New York Times article titled "Debate on Child Pornography's Link to Molesting."  Julian Sher and Benedict Carey, Debate on Child Pornography's Link to Molesting, N.Y. Times, July 19, 2007, http://www.nytimes.com/2007/07/19/us/19sex.html?pagewanted=all.  In 2012, the United States Sentencing Commission offered a report to Congress entitled "Federal Child Pornography Offenses."  U.S. Sentencing Comm'n, Report to Congress: Federal Child Pornography Offenses (2012), available at http://www.ussc.gov/news/congressional-testimony-and-reports/sex-offense-topics/report-congress-federal-child-pornography-offenses ("Report to Congress").  In the creation of that report, the Commission considered the Butner Study Redux as well as criticism

---

[13]The Court will examine the controversy surrounding the article's initial publication in the "criticisms" portion of this Memorandum Opinion and Order.

of its findings.  See U.S. Sentencing Comm'n, supra, at 99 n.157; id. at 172 nn.13-15; id. at 173 nn.17 & 19.

      **2.**    **Judicial History.**

The Butner Study Redux first appeared in a Federal opinion in 2008 when the Honorable Robert W. Pratt, Chief Judge, United States District Judge for the Southern District of Iowa, ruled that he could not consider the Butner Study Redux findings in the sentencing of defendant Johnson.  See United States v. Johnson, 588 F. Supp. 2d 997, 1007 (S.D. Iowa 2008).

The use of the Butner Study Redux in federal courts has caused great controversy.  Some judges have relied on the study while others have rejected it on multiple grounds.  While it is primarily used to assess a defendant's risk to society in the course of sentencing or detention hearings, courts have also relied upon the study to determine whether law enforcement had probable cause to search a defendant's computer.  The only decision that has analyzed the Butner Study Redux in depth is Judge Pratt's opinion in United States v. Johnson.  The other decisions evaluate the Butner Study Redux in little to no detail and often do not come to any conclusions regarding the study's reliability.

      **a.**    ***United States v. Johnson.***

In 2008, in United States v. Johnson, Judge Pratt dismissed the use of the Butner Study Redux in sentencing Michael Paul Johnson.  Johnson entered into a plea agreement and pled guilty "to Count Two of the Indictment, which charged him with knowingly receiving visual depictions of minors engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2)."  588 F. Supp. 2d at 998.  The first three counts of the indictment regarded possession of child pornography, and the fourth count "was a criminal forfeiture count."  588 F. Supp. 2d at 998.  Before addressing the study, Judge Pratt indicated that he needed to weigh the

defendant's unique circumstances more heavily than the sentencing guidelines, based on what he viewed as a lack of empirical support for the child pornography guidelines.  See 588 F. Supp. 2d at 1004.  Specifically, Judge Pratt considered Johnson's behavior after arrest, including his decision to "complete his medical degree and one year of residency," even after being faced with the possibility of a lengthy jail sentence.  588 F. Supp. 2d at 1004.  Johnson also sought treatment for himself, and began individual and marital counseling.  See 588 F. Supp. 2d at 1004.  Dr. Dan Loren Rogers, a "distinguished" psychologist with thirty years of experience treating child pornographers, determined that Johnson did not meet the diagnostic criteria for pedophilia and that defendant's actions were the result of "compulsive, obsessive  aspects of bipolar disorder."  588 F. Supp. 2d at 1000 (internal quotation marks omitted).  Johnson had recently became a father, and Dr. Rogers "opined that Defendant does not possess risk factors that would indicate that Defendant is a likely threat to children despite the fact that he derived some sexual pleasure from some of the photographs."  588 F. Supp. 2d at 1005.  Judge Pratt determined that Johnson was "not likely to harm the public through future crimes."  588 F. Supp. 2d at 1005.

The United States countered Dr. Rogers' testimony by providing Judge Pratt with a copy of the Butner Study Redux.  See 588 F. Supp. 2d at 1005.  According to the United States, the Butner Study Redux demonstrated that the defendant was "a threat to the public" and that the "'defendant is statistically more likely than not to have actually committed [a past] act of [hands-on] child abuse.'"  588 F. Supp. 2d at 1005 (alterations in original).  Judge Pratt rejected the argument that the Butner Study Redux supported the United States' theories.  See 588 F. Supp. 2d at 1005.

In addressing whether the Butner Study Redux can be used to show the statistical likelihood of Johnson's past offenses, Judge Pratt found no link between Johnson's conduct and

the study's findings.   See 588 F. Supp. 2d at 1005.   Judge Pratt reasoned that "uncharged criminal conduct may generally only be considered in sentencing if proved by a preponderance of the evidence," and concluded that the Butner Study Redux, "even if credible, falls far short of this standard because it fails to demonstrate whether Defendant has, personally, previously assaulted a child sexually."   588 F. Supp. 2d at 1005 (citing United States v. Howe, 538 F.3d 842, 855 (8th Cir. 2008), abrogated by United States v. Villareal-Amarillas, 562 F.3d 892 (8th Cir. 2009); United States v. Tyndall, 521 F.3d 877, 882 (8th Cir. 2008)).   Judge Pratt found that the Butner Study Redux alone does not meet the preponderance of the evidence standard, and, because the United States "produced no witnesses, no victims, no forensic evidence, no confession, and no other sign that any previous improper sexual activity occurred," Judge Pratt could not take into account this potential uncharged conduct in sentencing Johnson.   588 F. Supp. 2d at 1005-06.

Next, Judge Pratt assessed the United States' argument that the Butner Study Redux findings increase Johnson's threat to the public.   See 588 F. Supp. 2d at 1006.   "The government argues that Defendant is dangerous because the Study indicates other individuals charged with similar crimes have committed 'hands-on' sexual abuse of children."   588 F. Supp. 2d at 1006 (noting, in a footnote, that the Butner Study Redux does not address the risk of recidivism for sexual offenders, but accepting the "proposition that those who have physically harmed children are more dangerous to the community than individuals who only collect child pornography").   Judge Pratt rejected this proposition, because "the Butner Study is not credible."   588 F. Supp. 2d at 1006.   Judge Pratt examined the Butner Study Redux primarily through Dr. Rogers' testimony.   See 588 F. Supp. 2d at 1006.   The United States offered no expert testimony of its own, and, therefore, Judge Pratt considered only Dr. Rogers' determinations.   See 588 F. Supp. 2d at 1006-

07.  Dr. Rogers, a psychologist, testified that the <u>Butner Study Redux</u> was unreliable, because its approach is "rejected by the treatment and scientific community."  588 F. Supp. 2d at 1006. Dr. Rogers further noted that the program -- SOTP -- was "highly coercive," because, "unless offenders continue to admit to further sexual crimes, whether or not they actually committed those crimes, the offenders are discharged from the program."  588 F. Supp. 2d at 1006.[14]

Judge Pratt took into account Dr. Rogers' opinion, but also considered other methodological flaws with the study.  <u>See</u> 588 F. Supp. 2d at 1006.  First, Judge Pratt considered the forty-six offenders in SOTP that left the study either voluntarily, forcibly, or because of death.  <u>See</u> 588 F. Supp. 2d at 1006.  Without the data from those offenders, Judge Pratt determined that the results were skewed.  <u>See</u> 588 F. Supp. 2d at 1006.  Second, Judge Pratt expressed concern about the sample having been voluntarily rather than randomly selected.  <u>See</u> 588 F. Supp. 2d at 1006.  He said that such selection bias casts doubt on the representativeness of the <u>Butner Study Redux</u> sample, specifically whether it is representative of the general population that collects child pornography.  <u>See</u> 588 F. Supp. 2d at 1006.  Judge Pratt's third consideration was the study's use of an unpublished questionnaire.[15]  <u>See</u> 588 F. Supp. at 1006.  Without the publication of the questions used during the interviews, it would be impossible for future researchers to replicate the study or even evaluate the collection of the offenders' self-reported crimes.  <u>See</u> 588 F. Supp. 2d at 1006.  Fourth, Judge Pratt was concerned

---

[14]Dr. Rogers testified that the program was coercive, but Judge Pratt's opinion does not explain from where that determination came.  Dr. Rogers explained that patients were expected to disclose additional offenses, but it is unclear whether that determination came from something he learned from reading the report or if he has additional knowledge that led to that determination.  The Court will address this allegation more fully in the criticisms portion of the Memorandum Opinion and Order.

[15]Bourke and Hernandez, according to the published article, relied on the PHQ, an "unpublished self-report."  <u>Butner Study Redux</u> at 186.

about using polygraph results "given the unreliability of such tests, especially since 'no standard for training polygraph experts' exists."  588 F. Supp. 2d at 1006.  Fifth, the Butner Study Redux was not peer reviewed, and, therefore, Judge Pratt had no expert opinion other than that from Dr. Rogers.  See 588 F. Supp. 2d at 1006.  Judge Pratt's sixth concern was the study's lack of a control group or an independent variable.  See 588 F. Supp. 2d at 1006-07.  Judge Pratt determined that these factors cast doubt on the study's reliability, causing him to question whether the Butner Study Redux met the Daubert v. Merrell Dow Pharms., 509 U.S. 579 (1993), standard for admissibility, although he noted that the "Federal Rules of Evidence do not technically apply at sentencing."  588 F. Supp. 2d at 1006 n.8.  Judge Pratt concluded that he "will not accept 'science' conducted in secret."  588 F. Supp. 2d at 1007.

It is important to note that, six days after Judge Pratt issued his decision in United States v. Johnson, the peer reviewed Journal of Family Violence published the Butner Study Redux.  The article's publication in that journal would likely minimize some of Judge Pratt's concerns with the scientific reliability of Butner Redux, specifically the assertion that the research was not peer reviewed.  Judge Pratt determined that "peer review is also a key factor that the courts consider when deciding whether to allow scientific testimony into evidence . . . .  [T]he Court does note that this Study would likely fail to meet the Daubert standard."  588 F. Supp. 2d at 1006 n.8.  The Butner Study Redux's subsequent publication in a peer-reviewed journal might have assuaged Judge Pratt's concern with its admissibility.  The study's publication would likely not affect the other five of Judge Pratt's six criticisms of the Butner Study Redux's scientific reliability.  None of those criticisms were specific to the article being peer reviewed or affirmed by other experts in the field.

        **b.**    ***United States v. Phinney.***

In United States v. Phinney, 599 F. Supp. 2d 1037 (E.D. Wisc. 2009), the Honorable

Lynn Adelman, United States District Judge for the Eastern District of Wisconsin, sentenced the

defendant Michael Phinney after he pled guilty to possessing child pornography.  See 599 F.

Supp. 2d at 1038.  After discussing the sentencing guidelines and the purposes of sentencing,

Judge Adelman addressed the United States' reliance on "a study completed at the Bureau of

Prison's facility at Butner, which concluded that a significant percentage of defendants convicted

of possession of child pornography later admitted that they had actually engaged in acts of child

molestation."  599 F. Supp. 2d at 1044.  Although not clear whether Judge Adelman was citing

the First Butner Study or the Butner Study Redux, he explained that, "for the reasons set forth in

detail by Judge Pratt in Johnson, 588 F. Supp. 2d at 1005-07, the Butner studies are flawed.

Most significantly, participants risk being kicked out of treatment if they do not admit prior

contacts."  599 F. Supp. 2d at 1044.[16]  He also noted that the "study told me nothing about this

_____

[16]Judge Adelman did not cite any source for the proposition that participants were kicked
out of treatment if they did not admit prior contacts.  In a footnote, he addressed the United
States' arguments that Phinney may act on his impulses, stating that "[t]he notion that a child
pornography defendant has or will commit a contact offense is always lurking in the background
in these cases.  But courts should not assume that a defendant has or will commit additional
crimes without a reliable basis."  599 F. Supp. 2d at 1044 n.10.

In a Letter from Michael L. Bourke to the Honorable Patti B. Saris, Chair, United States
Sentencing Commission, dated May 17, 2012, available at www.ussc.gov/sites/default/files/pdf/
amendment-process/public-hearings-and-meetings/20120215-16/Testimony_15_Bourke.pdf
("Bourke Letter"), Bourke explained that, during a public hearing before the Sentencing
Commission regarding the issue of Federal Child Pornography Crimes, a number of experts
referenced the Butner Study Redux; while some of the statements were accurate, "other
observations were misleading or simply untrue."  Bourke Letter at 1.  First, he addressed the
testimony that "[i]nmates were removed from treatment if they failed to make disclosures of
hands-on victims.  As a result, they felt compelled to disclose more victims than was actually the
case."  Bourke Letter at 2.  Bourke explained:

defendant" and that the "record before me contained no evidence that defendant had ever harmed a child."  599 F. Supp. 2d at 1044.

        **c.**     ***United States v. Cunningham.***

In United States v. Cunningham, 680 F. Supp. 2d 844 (N.D. Ohio 2010), aff'd, 669 F.3d 723 (6th Cir. 2012), the Honorable John R. Adams, United States District Judge for the Northern District of Ohio, sentenced an individual in possession of child pornography to 121 months imprisonment.  See 680 F. Supp. 2d at 845-46.  Judge Adams' opinion addresses the Butner Study Redux findings and those of another study -- Jérôme Endrass, Frank Urbaniok, Lea C. Hammermeister, Christian Benz, Thomas Elbert, Arja Laubacher, & Astrid Rossegger, The Consumption of Internet Child Pornography and Violent and Sex Offending, 9 BMC Psychiatry 43 (2009) -- that examined the relationship between Internet child pornography and violent sex

_____

During the eight years I served as a Staff Psychologist at FCI Butner no program participant was ever removed because he did not disclose undetected contact offenses.  This is a myth of unknown origin.

I asked Dr. Andres Hernandez if he would like to comment on this persistent rumor.  He wrote the following in reply:

> "Inmates in the SOTP were encouraged to be honest in their disclosures.  There were many inmates in the SOTP for whom their instant offense was their only offense.  That was the truth and it was verified through a polygraph examination. . . .  [N]o one was ever expelled for failing a polygraph or for not making additional disclosures . . . ."

Fifteen percent of the Butner Redux sample satisfactorily completed the program without ever disclosing a hands-on victim, and other offenders who entered the program with known hands-on victims never disclosed any additional victims.

Bourke Letter at 2 (quoting a personal communication with Hernandez, dated March 5, 2012).  On the other hand, some critics assert that, regardless whether inmates would actually be removed from the program, they may fear being removed from the program if they do not continually disclose information.  See Melissa Hamilton, The Child Pornography Crusade and Its Net-Widening Effect, 33 Cardozo L. Rev. 1679, 1708-09 (2012).  The Court will address these concerns further in the criticisms and analysis portions of this Memorandum Opinion and Order.

offending.  See 680 F. Supp. 2d at 859.  In both studies, the sample size was relatively small --

155 offenders in the Butner Study Redux and 231 in the Endrass et al., supra, study.  See 680 F.

Supp. 2d at 859.  Because of the small sample size, Judge Adams concluded that he could not

"draw broad conclusions from the data derived from the study."  680 F. Supp. 2d at 859.

Judge Adams considered, however, two specific Butner Study Redux findings in his

assessment of the defendant's threat to society.  The first was Judge Adams' determination that

the Butner Study Redux offered compelling evidence of a correlation between the viewing of

child pornography and committing hands-on offenses, a correlation which Judge Adams found

relevant to Cunningham's previous admissions.  See 680 F. Supp. 2d at 859-60.  While

Cunningham had not been charged with a hands-on offense, and no such evidence was presented

at the sentencing hearing, he had possessed and distributed a photograph of his girlfriend's

young niece.  See 680 F. Supp. 2d at 860.  Additionally, "Cunningham described a fantasy that

includes raping a toddler . . . ."  680 F. Supp. 2d at 859.  Judge Adams explained that such a

fantasy "becomes even more troubling after a review of a recent scientific study that addresses

whether those that view child pornography may be more prone to commit in-person sex

offenses."  680 F. Supp. 2d at 859.  Judge Adams then described and introduced the Butner

Study Redux, which was considered in light of Cunningham's admissions and verbalized sexual

fantasy.  See 680 F. Supp. 2d at 859-60.

The second finding of the Butner Study Redux that Judge Adams considered is the

researchers' discussion of the online "communities" that host and distribute child pornography

and their potential effect on users.  680 F. Supp. 2d at 860.  According to the author of the Butner

Study Redux, "'these online communities not only serve as online 'trading posts' for illicit

material, they also provide social validations, a sense of belonging, and support.'"  680 F. Supp.

2d at 860 (quoting Butner Study Redux at 188).   Judge Adams explained that Cunningham's conduct, specifically his possession and distribution of the photograph of his loved one's niece, demonstrated that these online forums "desensitized" him and allowed him to pass that photograph along to other online users that he "knew to be pedophiles."   680 F. Supp. 2d at 860.

Cunningham argued that the child pornography guidelines are not worthy of a court's deference, because "Congress has routinely required the Commission to increase the penalties for child pornography, effectively negating the Commission's ability to independently determine the appropriate sanctions based on empirical evidence," and because "many of the child pornography enhancements apply in nearly every case, resulting in unduly harsh sentences for 'average' offenders," but Judge Adams rejected both arguments.   680 F. Supp. 2d at 849. Regarding the frequency with which some enhancements apply, Judge Adams explained:

> There is no dispute that certain enhancements apply in nearly every child pornography case.   The 2-level enhancement for use of a computer applies in 96.5% of cases.   The 2-level enhancement for images involving a prepubescent child applies in 95.5% of cases.   The enhancement for possessing sadistic or masochistic images applies in over 60% of cases.   Based on the frequency of the application of these enhancements, Cunningham seems to contend that his sentence should be lower.   This argument suffers from several fatal flaws.

> Initially, the Court notes that the frequency of the enhancements was expressly acknowledged by the Commission when it set the base offense levels for these offenses.   The Commission was clear that it took into account the frequent use of these enhancements when it set the base offense levels.   For example, the base offense level herein is 22 and results in a sentencing range of 41 to 51 months, or 9 to 19 months below the mandatory minimum.   The bottom of the Guideline range remains below the mandatory minimum until a 4-level increase to offense level 26, resulting in a 63 to 78 month range.   Applying the two most common enhancements, the use of a computer and possession of images of prepubescent children, generates a level 26 offense.   In other words, once the two most common enhancements are applied, offenders effectively start off at the mandatory minimum.   If the Court factors in acceptance of responsibility, an additional 3-level enhancement could occur, followed by the deduction for acceptance of responsibility, and the Guideline range would remain near the mandatory minimum.   In other words, the Court could find that seven levels of enhancement are appropriate, yet still be in position to sentence an offender to the

mandatory minimum with only a 3-month variance.  The Court, therefore, affords little weight to the fact that some enhancements apply in nearly every instance.  It is clear that the Guidelines have taken this factor into account.

. . . .

Finally, the entirety of this argument is somewhat confusing to the Court. The fact that certain enhancements apply on a frequent basis does not serve as a basis for negating the Guidelines.  If anything, the fact that more than fifty percent of offenders have over 300 images and that over sixty-percent have sadistic and masochistic images supports a conclusion that even more harsh sentences are required for deterrence.

The assertion that sentences should be reduced because it is easy to accumulate a large number of pictures quickly also rings hollow.  The Court does not dispute that it is very likely that a defendant could acquire more than 600 images with just a few mouse clicks and several emails.  But that number of images is not collected by accident.  Instead, those images are sought out by a troubled mind, from like-minded individuals.    Thus, a defendant makes a cognitive choice to seek out that level of images.  Moreover, the Court has never before seen an argument that because a crime is easy to commit, it should be punished less severely.    Robbery is certainly simplified from the criminal's perspective by the use of a firearm and the choice of a feeble, elderly victim.  The Guidelines, however, do not lessen punishment because the crime was easier to commit.  In fact, seeking out a vulnerable victim leads to a 2-level enhancement under the Guidelines.  U.S.S.G. § 3A1.1(b)(1).  This Court, therefore, will not alter its sentence simply because accessing and growing a database of child pornography has become easier as technology has advanced.

In conclusion, the Court rejects any contention that the Guidelines should not be given deference.

United States v. Cunningham, 680 F. Supp. 2d at 851-53 (emphasis in original).

Cunningham appealed his sentence to the United States Court of Appeals for the Sixth

Circuit, which affirmed Judge Adams' decision, holding that Judge Adams conducted proper

procedure in sentencing defendant and that Judge Adams' consideration of outside evidence did

not render the sentence substantively unreasonable.  See United States v. Cunningham, 669 F.3d

723, 730-31 (6th Cir. 2012).  Regarding his reliance on the Butner Study Redux, the Sixth

Circuit noted:

Federal courts have taken different positions on the question of whether possession of child pornography positively correlates with commission of hands-on sex offenses, and the debate remains very much a live one. Compare Cunningham, 680 F. Supp. 2d at 855-56, with United States v. Garthus, 652 F.3d 715, 720 (7th Cir. 2011)("It's a mistake to lump together different types of sex offender."). Until scientific evidence firmly discredits a purported causal link between the two kinds of offenses, we think it is acceptable for a district court to take a position on the question so long as the court appropriately explains its conclusion. Cf. United States v. Apodaca, 641 F.3d 1077, 1084 (9th Cir. 2011).

It is not necessary, for purposes of this case, to determine whether the district court's reliance on child sex offender studies would have been erroneous had the district court afforded those studies even more weight. Suffice it to say that the district court's reliance on such studies was not excessive in this case, especially when one considers the manner in which the court comprehensively weighed and balanced a multiplicity of sentencing factors.

669 F.3d at 731.

### d.    *United States v. Campbell*.

Before sentencing defendant Matthew A. Campbell, who had been found guilty of possessing child pornography, the Honorable Richard G. Kopf, United States District Judge for the District of Nebraska, considered the Butner Study Redux findings. United States v. Campbell, 738 F. Supp. 2d 960, 967-68 (D. Neb. 2010).

While I have questions about the scientific validity of the research mentioned above and therefore question the conclusions of the article, the findings of the article are cause for caution. I have seriously considered whether Campbell is a risk for "hands-on" child abuse and firmly find and conclude that he is not such a risk.

738 F. Supp. 2d at 968. Judge Kopf proposed to sentence[17] Campbell below the guideline range and impose only a five-year probationary sentence, a fine of $7,500.00, "placement of up to 120 days in a community confinement center," followed by "six months of home confinement . . .

---

[17]Judge Kopf explained that the decision in his written opinion was "tentative," because he had yet to "hear the parties at the final sentencing hearing." 738 F. Supp. 2d at 963. He explained that he "offer[ed] this preliminary opinion in advance so the lawyers can be prepared to tell me why I am wrong." 738 F. Supp. 2d at 963.

under electronic monitoring, together with 100 hours of community service," and requiring that Campbell register "under Nebraska's new and onerous sex offender registration statutes." 738 F. Supp. 2d at 963. Judge Kopf based this proposed sentence primarily on the images that Campbell possessed -- although the images depicted "young girls between the approximate ages of 13 and 15 behaving in a libidinous manner and, at times, lasciviously exposing themselves, including their genitalia," the images did not "involve prepubescent minors or children under the age of 12," nor did they "involve young girls performing sex acts on themselves or with others," 738 F. Supp. 2d at 964-65 -- as well as on two separate psychological examinations, a polygraph test, and Campbell's family situation, see 738 F. Supp. 2d at 973. The images found on Campbell's computer involved victims between the ages of twelve and fifteen, while the images in a vast majority of child pornography cases in federal court -- ninety-four out of one-hundred -- involve children under the age of twelve. See 738 F. Supp. 2d at 972. Judge Kopf found and concluded "that the images in this case are far less harmful to the teenage victims than the normal images seen in most other child pornography cases." 738 F. Supp. 2d at 972. Judge Kopf also considered the results from two psychologists who examined Campbell. See 738 F. Supp. 2d at 966-67. The first determined that he was safe to remain in the presence of his significant other's two male children. See 738 F. Supp. 2d at 966. The second psychologist examined him in greater depth, and conducted several social and sexual violence risk assessment tests. See 738 F. Supp. 2d at 966-67. She determined that defendant is "at a low risk to act out in any sexually inappropriate ways." 738 F. Supp. 2d at 967.

The results from Campbell's polygraph examination also persuaded Judge Kopf to propose varying downward from the guideline range. See 738 F. Supp. 2d at 967. During the polygraph examination, a Nebraska Highway Patrol investigator asked Campbell if, since the age

of nineteen, he has engaged in any sexual contact with an individual below the age of sixteen. See 738 F. Supp. 2d at 966.  He indicated that he had not, and the polygraph indicated no deception.  See 738 F. Supp. 2d at 966.  Judge Kopf explained that he viewed the "polygraph results and the extensive forensic evaluation to be highly important," because "there is research suggesting that Internet offenders are significantly more likely than not to have sexually abused a child via a 'hands-on act.'"  738 F. Supp. 2d at 967 (quoting Butner Study Redux at 183).  Judge Kopf explained further why he viewed the defendant's positive polygraph test favorably in light of the Butner Study Redux:

> While I have questions about the scientific validity of the research mentioned above and therefore question the conclusions of the article, the findings of the article are cause for caution.  I have seriously considered whether Campbell is a risk for "hands-on" child abuse and firmly find and conclude that he is not such a risk.  In particular, the polygraph and the forensic evaluation ameliorate legitimate concerns about "hands-on" sexual abuse by Campbell.  In fact, the government accepted the results of the polygraph and the evaluations and agreed to allow Campbell to plead guilty to one count of possession of child pornography.  I accepted his plea and the case proceeded to sentencing.

738 F. Supp. 2d at 968.

### e. *United States v. Houston*.

In United States v. Houston, 754 F. Supp. 2d 1059 (D.S.D. 2010), aff'd, 665 F.3d 991 (8th Cir. 2012), the defendant, Kevin Clent Houston, filed a motion to suppress the digital and physical evidence that the government seized from his computer, which the United States searched after he admitted to the unlawful sexual contact with his niece approximately six or seven years earlier when she was four or five years old.  See 754 F. Supp. 2d at 1062.  In determining whether there was probable cause that the officers would find child pornography on Houston's computer, the Honorable Lawrence L. Piersol, United States District Judge for the Southern District of South Dakota, quoting an Eighth Circuit case, noted that "'[t]here is an

intuitive relationship between acts such as child molestation or enticement and possession of child pornography.  Child pornography is in many cases simply an electronic record of child molestation.'"  754 F. Supp. 2d at 1063 (quoting United States v. Colbert, 605 F.3d 573, 578 (8th Cir. 2010)).[18]  Judge Piersol continued:

> [A] categorical distinction between the possession of child pornography and other types of sexual exploitation of children is not accepted in the Eight Circuit. However, whatever intuitive relationship there is between acts such as child molestation or enticement and possession of child pornography will not in every instance support probable cause for a search for child pornography.  As in Colbert, there must be an examination of the facts presented for the search warrant.

754 F. Supp. 2d at 1063.  Judge Piersol noted that "[t]here appears to be a limited amount of literature on the issue of the relationship between possession of child pornography and child molestation."  754 F. Supp. 2d at 1063.  In a footnote, he cited several studies, including the Butner Study Redux, that offered findings related to "aberrant sexual practices."  754 F. Supp. 2d at 1063 & n.1 (citing, e.g., Seto, Cantor, and Blanchard, Child Pornography Offenses Are a Valid Diagnostic Indicator of Pedophilia, 115 J. of Abnormal Psychol. 610 (2006)("The results suggest child pornography offending is a stronger diagnostic indicator of pedophilia than is sexually offending against child victims.")).  Judge Piersol said that these case studies "cannot form a sole basis nor can [they] form any set of rules for probable cause determinations for child pornography search warrants," but that, "[a]side from the question of its use for probable cause, peer reviewed literature concerning child pornography and its relationship to child molestation would be helpful to sentencing courts given the enhanced possibility of the great wrong and

---

[18]Judge Piersol indicated that the "Second and the Sixth Circuit Courts of Appeals appear to differ with the Eight and Eleventh Circuits as to the existence or at least the strength of these relationships."  754 F. Supp. 2d at 1064.  Judge Piersol indicated that "these relationships" refer to the relationships between child molestation and the possession of child pornography.  754 F. Supp. 2d at 1064.

harm of child molestation."   754 F. Supp. 2d at 1063.   Judge Piersol also asserted that "intuitively," from the literature, "one who regularly views child pornography is more likely to be predisposed to child molestation than the general population."   754 F. Supp. 2d at 1064. Judge Piersol further noted that additional scientific research on this question would be of assistance.   See 754 F. Supp. 2d at 1064.   In evaluating whether there was probable cause to search Houston's computer for child pornography, Judge Piersol explained that,

> [h]ere, as in Colbert, we have not the question of whether child pornography warrants a search for evidence of child molestation.  The present facts present the at least intuitively stronger probable cause of searching the computer of an admitted child molester for both corroborating evidence of child molestation as well as child pornography.  It would seem that the intuitive relationship between known child molestation and possessing child pornography would be stronger than the inverse, the inverse being the relationship between possessing child pornography and the possibility of subsequently molesting a child.

754 F. Supp. 2d at 1063-64.  Judge Piersol went on to explain that research conducted in the sciences, while not to be the sole factor in the determination of probable cause, was relevant whether Houston's admission that he molested a child presents law enforcement with sufficient reason to obtain a search warrant, ultimately concluding that, in Houston's case, there was probable cause.  See 754 F. Supp. 2d at 1064.

### f.      *United States v. C.R.*

In United States v. C.R., 792 F. Supp. 2d 343 (E.D.N.Y. 2011), vacated and remanded sub nom. United States v. Reingold, 731 F.3d 204 (2d Cir. 2013), the Honorable Jack B Weinstein, Senior United States District Judge for the Eastern District of New York, sentenced a juvenile to 30 months imprisonment for his distribution of child pornography.  792 F. Supp. 2d at 347.  Although the defendant, who was nineteen years old at the time of the offense, was "subject to a statutory minimum prison sentence of five[] years, with a maximum of twenty years, and a Guidelines range of 63-78 months," Judge Weinstein varied significantly and

imposed a thirty-month sentence, because he concluded, "[a]s applied to this defendant and this case, the statutory minimum five-year sentence of imprisonment is unconstitutional," and "is cruel and unusual."  792 F. Supp. 2d at 347.  Judge Weinstein addressed the "relationship between viewing and acting; real and perceived harms," and cited the <u>Butner Study Redux</u> as one of several "statistically unreliable studies of convicted child pornography offenders."  792 F. Supp. 2d at 375 (capitalization and bolding altered for readability).  Judge Weinstein found the probative value of the <u>Butner Study Redux</u> "somewhat dubious."  792 F. Supp. 2d at 375.  "At most, these materials suggest some possible correlation between child pornography and contact offenses among a non-randomized subset of convicted offenders -- many of whom were convicted in connection with a contact offense or suspicions of a contact offense."[19]  792 F. Supp. 2d at 375-76.  Judge Weinstein, accordingly, did not use the <u>Butner Study Redux</u> findings in any substantial way.  In his conclusion, he did not address <u>Butner Study Redux</u>'s reliability, or lack thereof, nor did he consider any scientific conclusions regarding the relationship between hands-on offending and viewing child pornography.  <u>See</u> 792 F. Supp. 2d at 519-20.

The United States appealed, arguing that Judge Weinstein "erred in refusing to impose the minimum five-year prison term mandated by 18 U.S.C. § 2252(b)(1)" and that he miscalculated the proper range under the sentencing guidelines.  <u>United States v. Reingold</u>, 731 F.3d 204, 205 (2d Cir. 2013).  The United States Court of Appeals for the Second Circuit

---

[19]It is not clear whether Judge Weinstein lodged this criticism against the <u>Butner Study Redux</u> or a different study, because he did not cite any source when he made this statement.  The Court notes that the 155 offenders in the <u>Butner Study Redux</u> were convicted for possession, distribution, or receipt of child pornography, but were not convicted for producing child pornography.  <u>See</u> <u>Butner Study Redux</u> at 186.  Although forty of the offenders -- twenty-six percent of the pool -- had a known history of a hands-on offense at the time of sentencing, the other 115 offenders -- seventy-four percent -- did not have any documented hands-on victims.  <u>See</u> <u>Butner Study Redux</u> at 187.

reversed and remanded "for the district court to vacate its original sentence and to sentence Reingold consistent with the statutory mandate," because it determined that "the district court erred in concluding that the Eighth Amendment barred the application of a five-year mandatory minimum sentence in this case."  731 F.3d at 222.

> g.     *United States v. Apodaca.*

In 2009, defendant Daniel Apodaca was sentenced to twenty-four months imprisonment and a lifetime of supervised release after pleading guilty to the possession of child pornography. See United States v. Apodaca, 641 F.3d 1077, 1080 (9th Cir. 2011).  On appeal to the United States Court of Appeals for the Ninth Circuit, Apodaca argued that the lifetime of supervised release portion of the sentence was too harsh, see 641 F.3d at 1080; he argued that the sentence was unreasonable, because, in his view,  (i) "the district court did not consider all of the mitigating facts present in his case and that the court's sentence contradicted its own findings concerning Apodaca's character and likelihood of committing future crimes," and (ii) "the court failed to recognize important differences between individuals who have been convicted of possession-only child pornography crimes and violent sexual predators, leading it to enter an unduly severe sentence," 641 F.3d at 1082.  In their two-step analysis of the reasonableness of the district court's sentence, the Ninth Circuit, in an opinion written by the Honorable Richard D. Cudahy, Senior United States Circuit Judge for the Seventh Circuit, sitting by designation, first considered "whether the district court committed significant procedural error," and after finding that no such error had occurred, it moved on to an examination of "the substantive reasonableness of the sentence."  641 F.3d at 1080-81 (internal quotation marks omitted).  The Ninth Circuit found Apodaca's argument that the "imposition of lifetime supervised release constitutes a disproportionately severe punishment for his crime" to be Apodaca's "stronger

argument," because "several of our sister circuits have criticized the Guidelines-recommended sentence for possession-only offenders like Apodoca as being unduly severe."  641 F.3d at 1082-83.  In looking at criticisms of the guideline range for imprisonment in possession-only cases, the Ninth Circuit also questioned the supervised released provisions:  "A lifetime term of supervised release is recommended for all individuals convicted of sex offenses, regardless of whether the offense in question is a violent rape or child molestation versus mere possession of child pornography."  641 F.3d at 1083.  The Ninth Circuit further developed this consideration by discussing a "growing body of empirical literature" that indicates "there are significant, relevant differences between these two groups."  641 F.3d at 1083-84.

The Ninth Circuit cited a number of scientific studies that examine both recidivism rates amongst child pornography offenders and offenders of other sex abuse crimes, as well as the Butner Study Redux findings.  See 641 F.3d at 1083 (citing, e.g., Jesse P. Basbaum, Note, Inequitable Sentencing for Possession of Child Pornography: A Failure to Distinguish Voyeurs from Pederasts, 61 Hastings L.J. 1281, 1294-97 (2010)(collecting recent studies); Andreas Frei, Nuray Erenay, Volker Dittmann, & Marc Graf, Paedophilia on the Internet -- A Study of 33 Convicted Offenders in the Canton of Lucerne, 135 Swiss Med. Weekly 488 (2005); Michael C. Seto & Angela W. Eke, The Criminal Histories and Later Offending of Child Pornography Offenders, 17 Sexual Abuse: J. Res. & Treatment 201 (2005)).  The Butner Study Redux was offered as a counter to this "growing body of empirical literature," because it does not indicate that there are "relevant differences" between possession-only offenders and child molesters.  641 F.3d at 1083.  The Ninth Circuit noted, however, that one of the Butner Study Redux's authors -- Hernandez -- "has criticized the government's characterization of his work, stating that 'the argument that the majority of [child pornography] offenders are indeed contact sexual offenders

and, therefore, dangerous predators . . . simply is not supported by the scientific evidence.'"  641

F.3d at 1083 n.1 (quoting Andres E. Hernandez, <u>Psychological and Behavioral Characteristics of</u>

<u>Child Pornography Offenders in Treatment</u> at 4 (2009)(unpublished manuscript), <u>available at</u>

http://www.iprc.unc.edu/G8/Hernandez_position_paper_Global_Symposium.pdf)("Hernandez

Position Paper").  The Ninth Circuit relied on these studies in determining that the lifetime of

supervised release was substantively reasonable:

> If we were presented with scientific evidence that conclusively (or near-conclusively) established that possession-only Internet child offenders were highly unlikely to recidivate or commit more serious sex offenses, then we might have grounds to find that sentencing an individual like Apodaca to a lifetime term of supervised release is substantively unreasonable . . . .  [U]nfortunately for Apodaca, the scientific literature before the Court falls short of this standard.

641 F.3d at 1084.  While the Ninth Circuit acknowledged that the "Guidelines-recommended

sentence for possession-only offenders may be difficult to support, the decision as to whether the

Guidelines should be revised must, at this point, be made by the legislature and Sentencing

Commission."  641 F.3d at 1084.

The Honorable William A. Fletcher, United States Circuit Judge for the Ninth Circuit,

concurred "in the judgment and almost all of the opinion," but wrote separately to express his

view that the applicable statute and sentencing guidelines policy statement leading to the routine

imposition of lifetime supervised release "grossly overestimate the risk that defendants like

Apodaca, who are convicted only of possessing child pornography downloaded from the

Internet, and who have no prior contact child sex abuse convictions, will commit contact sex

offenses against children."  641 F.3d at 1085 (Fletcher, J., concurring).  He asserted that the

"[c]urrent empirical literature casts serious doubt on the existence of a substantial relationship

between the consumption of child pornography and the likelihood of a contact sexual offense

against a child."  641 F.3d at 1086 (Fletcher, J., concurring).  Although the United States had

pointed to the Butner Study Redux, arguing that it "demonstrates a causal link between viewing child pornography and sexually assaulting children," Judge Fletcher disagreed with the United States' reliance on the Butner Study Redux for that proposition:

> [O]ne of the study's authors has disavowed the government's citation of his work to support this claim, and has cautioned that "the argument that the majority of [child pornography] offenders are indeed contact sexual offenders and, therefore, dangerous predators . . . simply is not supported by the scientific evidence." Andres E. Hernandez, Psychological and Behavioral Characteristics of Child Pornography Offenders in Treatment, at 4 (Apr. 2009)(unpublished manuscript)(emphasis deleted), available at http://www.iprc.unc.edu/G8/ Hernandez_position_paper_Global_Symposium.pdf. The author has explained that, because the study subjects were volunteer participants in a prison sex offender treatment program, the observed correlation between Internet child pornography consumption and contact sex offenses cannot be generalized. Id. at 9. Moreover, the underlying Butner study reported that "[t]he vast majority of our subjects indicated they committed acts of hands-on abuse prior to seeking child pornography via the Internet." Id. (emphasis in original).

641 F.3d at 1087 (Fletcher, J., concurring). Judge Fletcher concluded that, while "Congress has permitted and the Sentencing Commission has recommended a lifetime term of supervised release for every child pornography offender," the evidence in many cases demonstrates that "such a sentence is not justifiable on the grounds that the defendant poses an elevated risk of committing contact sex offenses." 641 F.3d at 1088 (Fletcher, J., concurring). He said that he hopes Congress or the Sentencing Commission would address the "undifferentiated treatment of the dissimilar groups of sex offenders . . . to ensure that terms of supervised release are no greater than necessary to achieve the purposes of sentencing, while keeping in mind that supervised release fulfills rehabilitative ends, distinct from those served by incarceration." 641 F.3d at 1088 (Fletcher, J., concurring)(internal quotation marks omitted)(citations omitted).

<strong>h.       <em>United States v. Crisman</em>.</strong>

The Court cited the Butner Study Redux in 2011 in this case, see Memorandum Opinion and Order, filed November 15, 2011 (Doc. 34); United States v. Crisman, No. CR 11-2281 JB,

- 68 -

2011 WL 5822731 (D.N.M. Nov. 15, 2011)(Browning, J.). The primary issue before the Court was "whether the Court should vacate the Detention Order Pending Trial that the Honorable Robert H. Scott, United States Magistrate Judge, entered on September 8, 2011." 2011 WL 5822731, at *1. The United States offered the Butner Study Redux to suggest that "there is a relationship between child pornography and sexual contact crimes." 2011 WL 5822731, at *7. Crisman argued that using the Butner Study Redux findings would require the Court to step "through the looking glass and assume that he is lying." 2011 WL 5822731, at *10. Crisman argued that the Court must consider only the record before it, which contains no evidence "that he crossed the line from looker to doer." 2011 WL 5822731, at *10. The Court determined, however, that the Butner Study Redux "suggests that most who appear to be lookers are, in fact, doers." 2011 WL 5822731, at *21.

In determining whether Crisman was a candidate for pre-trial release, the Court considered the danger he presents to society: "The nature and seriousness of the danger to any person or the community posed by release, weighs in favor of detention." 2011 WL 5822731, at *17. The Court came to this determination based on Crisman's admitted "fantasies regarding neighborhood children," Crisman's therapist rating his dangerousness as a four out of ten, evidence that Crisman "stole identification information from Best Buy customers and employees and used it to support his child pornography addiction," 2011 WL 5822731, at *18-19, and his knowledge and resourcefulness as a former member of the "Best Buy Geek Squad," 2011 WL 5822731, at *20.

The Court said that, while it is "cautious about detaining 'lookers' and people who merely fantasize, the Court is also not obliged to close its eyes and to not detain someone until it has evidence that the defendant has touched someone." 2011 WL 5822731, at *21. In

supporting that determination, the Court considered the <u>Butner Study Redux</u>'s findings, as they "suggest[] that most who appear to be lookers are, in fact, doers."  2011 WL 5822731, at *21.  The Court denied Crisman's motion, finding that (i) "Crisman presents a danger to the community"; and (ii) "no conditions or combination of conditions can reasonably assure the safety of the community."  2011 WL 5822731, at *21.  The Court, therefore, affirmed Judge Scott's detention order.  <u>See</u> 2011 WL 5822731, at *22.

### i.    *United States v. Inman*.

In <u>United States v. Inman</u>, 666 F.3d 1001 (6th Cir. 2012), the United States Court of Appeals for the Sixth Circuit vacated defendant Brandon M. Inman's sentence of lifetime supervision and remanded the case, because the district court judge -- the Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky -- did not adequately explain why he was sentencing Inman to a lifetime of supervised release when the parties had requested a ten-year term of supervised release.  <u>See</u> 666 F.3d at 1003-04.  The Sixth Circuit directed the district court to, on remand, "consider the lifetime term of supervised release" and a number of conditions of supervised release.  666 F.3d at 1007.

On remand, Judge Van Tatenhove noted that the Sixth Circuit "vacated seven discrete parts of the sentence because insufficient rationale was offered."   <u>United States v. Inman</u>, Criminal No. 08-127-GFVT, 2013 WL 2389814, at *2 (E.D. Ky. 2013).  He explained that the Sixth Circuit instructed him to "reexamine the imposition of a lifetime term of supervised release," which he viewed as "consistent with the Sixth Circuit's growing skepticism regarding the efficacy of lifetime supervision in this context," meaning, in sex offense cases, including child pornography.  2013 WL 2389814, at *2.  Judge Van Tatenhove considered the lifetime term of supervised release that the Guidelines recommend, explaining that "there must be

something about this category of crime that suggests to Congress that ongoing remedial intervention and monitoring is needed." 2013 WL 2389814, at *3. He went on to state that, "as a judge, it is tempting to reconsider this conclusion. After all, the literature on this topic is far from conclusive." 2013 WL 2389814, at *3. Judge Van Tatenhove then cited a number of federal cases that consider the "disputed research pertaining to relationship between viewing child pornography and committing sexual abuse," and all scientific studies relied upon which the judges relied in those cases. 2013 WL 2389814, at *3 (citing United States v. C.R., 792 F. Supp. 2d 343, 375-77 (E.D.N.Y. 2011)(discussing disputed research pertaining to relationship between viewing child pornography and committing sexual abuse); United States v. Cunningham, 669 F.3d 723, 731 (6th Cir. 2012)(holding the same); United States v. Quinn, No. 12-2260, 2012 WL 4962433, at *1 (7th Cir. Oct. 18, 2012)(citing Richard Wollert, The Implications of Recidivism Research and Clinical Experience For Assessing and Treating Federal Child Pornography Offenders: Written Testimony Presented to the U.S. Sentencing Commission (Feb. 15, 2012), available at www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120 215-16/Testimony_15_Wollert_2.pdf)); United States v. Johnson, 588 F. Supp. 2d 997, (S.D. Iowa 2008)(citing Troy Stabenow, Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines (2008) favorably while criticizing Michael L. Bourke & Andres E. Hernandez, The 'Butner Study' Redux: A Report of the Incidence of Hands-on Child Victimization by Child Pornography Offenders, 24 J. Fam. Violence 183-91 (2008))).

Judge Van Tatenhove included United States v. Johnson and Judge Pratt's criticism of the Butner Study Redux as evidence that the threat child pornography offenders pose to society is "far from conclusive." 2013 WL 2389814, at *3. Judge Van Tatenhove, however, did not

himself rely on the Butner Study Redux findings in sentencing Inman; instead, he primarily considered the testimony and opinions of psychologists, psychiatrists, social workers, and professional staff of the United States Probation Office.  See 2013 WL 2389814, at *4.  Judge Van Tatenhove determined that Inman would serve a lifetime term of supervised release to be re-evaluated ten years after release from prison.  See 2013 WL 2389814, at *6.  Additionally, Judge Van Tatenhove modified several conditions of the previous sentence, including altering the scope of drug testing, eliminating the prohibition on the consumption of alcohol, and shortening the time frame within which he must refrain from certain activities.  See 2013 WL 2389814, at *8-11.

        **3.**       **Criticisms of the Butner Study Redux.**

Scholars have examined in great depth the accuracy and reliability of the Butner Study Redux.  Other researchers who have examined the same or similar questions as Bourke and Hernandez have not come to the same conclusion.  In a meta-analysis,[20] Michael Seto, with the Royal Ottawa Health Care Group in Ontario, Canada, with Karl Hanson and Kelly Babchishin, both with Public Safety Canada, identified twenty-four studies that examine child pornography offenders' criminal history.  See Michael C. Seto, R. Karl Hanson & Kelly M. Babchishin, Contact Sexual Offending by Men with Online Sexual Offenses, 23 Sexual Abuse 124, 125 (2011), available at http://sax.sagepub.com/content/23/1/124 (abstract).  In total, the Seto meta-analysis considered data collected from 4,697 online offenders, while official records were available for 4,464 online sexual offenders.  See Seto et al., supra, at 132.

---

[20]A "meta-analysis refers to methods that focus on contrasting and combining results from different studies, in the hope of identifying patterns among study results, sources of disagreement among those results, or other interesting relationships that may come to light in the context of multiple studies."  Meta-analysis, Wikipedia, http://en.wikipedia.org/wiki/Meta-analysis (last visited July 4, 2014).  Performing a meta-analysis "can be thought of as 'conducting research about research.'"  Meta-analysis, Wikipedia, supra.

Of the total combined sample of 4,697 online offenders, 17.3% ($n = 812$) were known to have committed a contact sexual offense, mostly against a child. As expected, samples using official data had lower rates of prior sexual offenses than those using self-reported offense histories. Official records were available for 4,464 online sexual offenders. Of these, 12.2% ($n = 544$) had prior contact sex offenses. In contrast, of the 523 online sexual offenders with self-reported offense history information, 55.1% ($n = 288$) disclosed prior sexual contact with children.

Seto et al., supra, at 132-33. The Seto meta-analysis noted that the Butner Study Redux was an "outlier in the self-report data," although it explained that, "[r]egardless of the analyses, and whether or not the outlier was excluded, approximately half of the online offenders admitted to prior contact offenses." Seto et al., supra, at 133.

Bourke noted in a statement that he made to the United States Sentencing Commission that Seto's description of the Butner Study Redux as an "outlier" does not necessarily mean the Butner Study Redux's results should be discounted or that the study is unreliable, but rather that "such findings should serve as catalysts to spark further intellectual inquiry." Letter from Michael L. Bourke to the Honorable Patti B. Saris, Chair, United States Sentencing Commission at 16, dated May 17, 2012, available at www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215-16/Testimony_15_Bourke.pdf ("Bourke Letter to Sentencing Commission"). Additionally, Bourke proffered that, when considering only the data that included both a self-report and the use of a polygraph test or "intensive treatment environment," the Butner Study Redux is not an "outlier," but, more accurately, at the higher end of disclosed offenders. Bourke Letter to Sentencing Commission at 23.

The disparity between the Butner Study Redux and other similar studies leads, however, to the question why the Butner Study Redux's results differ so sharply from those of other studies. For example, the Seto meta-analysis listed the Butner Study Redux as finding that 84.5% of offenders self-reported to committing a hands-on offense, while the next highest self-

reported percentage was 57.4%, from a German community sample of self-identified pedophiles and hebephiles, see Seto et al., supra, at 128-29, and then 55.3%, based on a study group of convicted internet sexual offenders who volunteered for the study and used polygraph, see Seto et al, supra, at 128.  While Bourke has affirmed the reliability of his study and asserted that it is "more accurate" than previous research, Bourke Letter to Sentencing Commission at 17, other scholars have argued that Bourke and Hernandez' non-randomized sample, researcher bias, and lack of self-reported incident verification skewed the results in an upward direction.  See Melissa Hamilton, The Child Pornography Crusade and Its Net-Widening Effect, 33 Cardozo L. Rev. 1679, 1707-09 (2012).  In another vein of the Butner Study Redux conversation, scholars -- including one of the study's authors -- criticize not the study itself but its application. Hernandez, for example, said that some individuals have "misused" the results of the First Butner Study and the Butner Study Redux

> to fuel the argument that the majority of [child pornography] offenders are indeed contact sexual offenders and, therefore, dangerous predators.  This simply is not supported by the scientific evidence.  The incidence of contact sexual crimes among [child pornography] offenders, as we reported in our studies, is important and worthy of considerable empirical examination.  However, it is not a conclusive finding that can be generalized to all [child pornography] offenders. Notwithstanding, some individuals in law enforcement are tempted to rely on a biased interpretation of our study (i.e., to prove that the majority of [child pornography] offenders are child molesters)).

Hernandez Position Paper at 4-5 (emphasis in original).

Despite the criticisms surrounding the Butner Study Redux's findings, "they key point -- that some child pornography offenders have committed officially undetected contact offenses -- is not controversial,"  there is little question that "some child pornography offenders have committed officially undetected contact offenses."  Michael C. Seto, Child Pornography Offender Characteristics and Risk to Reoffend: Prepared for the United States Sentencing

Commission at 3 (2012)("Seto Statement to Sentencing Commission").  What is at issue is the Butner Study Redux specifically, and its higher correlation between child pornography offenders and contact crimes.  In other words, the issue is whether the Butner Study Redux sample accurately depicts the relationship between contact offending and child pornography crimes.

        a.      **Methodology.**

Some scholars have criticized several aspects of Bourke and Hernandez' methodology. Specifically, scholars point out that Bourke and Hernandez served as both treating clinicians and researchers, which introduces the risk of author bias.  Further, the sample size included a limited number of voluntary offenders committed to a single facility.  Finally, Bourke and Hernandez provided no valid method of verification.  See, e.g., Richard Wollert, The Implications of Recidivism Research and Clinical Experience for Assessing and Treating Federal Child Pornography Offenders: Written Testimony Presented to the U.S. Sentencing Commission (2012), available at  http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215-16/Testimony_15_Wollert_2.pdf.

        i.      **Author Bias.**

Some concerns stem from having the study's researcher and primary author hold a position of power over those he is researching.  See Hamilton, supra, at 1709 (commenting that "the fact that the researchers were also the clinicians opens the studies up to additional questions of reliability," because "[t]he potential for interviewer bias exists when the researcher is also the clinician providing the research sample with treatment," especially "where there is no evidence of independent oversight of the methods or analyses" (footnotes omitted)); United States v. Johnson, 588 F. Supp. 2d at 1007 n.9 (noting the "2,369% increase 'in the number of contact sexual offenses acknowledged by the treatment participants' during the course of the Study,"

leading Judge Pratt to "question whether this unvetted prison Study, conducted by the former chief of the federal sexual offender treatment program and distributed by the Department of Justice to prosecutors, is, in actuality, a product of the tremendous 'political pressure applied' to researchers in this research field").  In simultaneously treating offenders in SOTP and attempting to prove something about their past behavior, there is concern that Bourke and Hernandez could be neither objective researchers nor open and honest clinicians.  While Bourke has asserted that his role as both the clinician and the researcher is a strength, in that he and Hernandez were able to build an open relationship between patient and clinician, which allowed for greater honesty in the reporting of hands-on offenses, see Bourke Letter to Sentencing Commission at 13, others have argued that clinician bias might have tainted the results, see Hamilton, supra, at 1709.

Bourke and Hernandez' role in the study could have caused a number of reporting errors. As a result of how the study's participants perceived the clinicians' expectations, some have argued that offenders would have over-reported the number of hands-on offenses and victims. See Hamilton, supra, at 1708 (stating that "[p]rogrammatic rules often carry a strong suggestion that offenders had much incentive to admit to asexual contacts even if untrue," and that "it is possible that study subjects made admissions and statements that they perceived would please the clinicians, who would in turn view them as more honest and positive toward their rehabilitative outcomes" (internal quotation marks and footnotes omitted)).  To prove that, as incarcerated child pornography offenders, they were improving and taking responsibility for their past behavior, offenders may have -- according to some scholars -- disclosed additional crimes as evidence of their rehabilitation.  See Wollert, supra, at 11-14.  Bourke forcefully denies the assertion that participants who did not report hands-on offenses were discharged from SOTP and responds that no evidence supports that criticism, see Bourke Letter to Sentencing Commission

at 11-12; however, a number of psychology experts have asserted that offenders who did not report offenses were discharged.[21]   Moreover, because there is evidence that not all of the individuals who initially participated in the study completed treatment, there is a question of how those individuals -- making up twenty-three percent of the initial sample pool -- might have altered the study's results.   See Butner Study Redux at 186 (noting that forty-six "subjects were excluded because they did not participate in the SOTP for a minimum of 6 months due to voluntary withdrawal, expulsion, or death (one subject)").

According to Wollert, because Hernandez was the director of SOTP at the time the data was collected, inmates might have been compelled to offer the researchers the information they were seeking to avoid being transferred to a general population prison, an environment where sexual offenders are often the victims of prison violence and inmate abuse.   See Wollert, supra, at 11-12.   Bourke emphatically denies these assertions, explaining that the child pornography "offenders slept and received treatment in their own housing unit (each inmate participated in treatment for four hours each day, either in the morning or afternoon), but otherwise spent their days and evenings on the general compound."   Bourke Letter to Sentencing Commission at 4. According to the study itself, however, "these offenders [SOTP participants] are immersed in a treatment milieu by virtue of their placement in a housing unit that is utilized solely for the treatment of SOTP inmates."   Butner Study Redux at 185.   Given the conflicting record in

---

[21]A number of reports repeat this attack against the study.  There does not seem to be any supporting evidence, such as participant recollections, written confirmation, or researcher disclosure, for the criticism, but because of the prevalence of the criticisms, the Court mentions the criticisms.  Wollert asserted that, "[a]bout a year after we finalized our criticisms" of the Butner Study Redux, "I received an anonymous 13-page report that was apparently compiled by Butner inmates and 'distributed to the forensic psychology and legal communities, and law enforcement'"; the report "alleged that Hernandez' research was 'fraudulent' and explained the reasons for this assertion." Wollert, supra, at 14.  He explained that he had "never encountered a similar complaint about research participation from a group of sex offenders," Wollert, supra, at 14, but Wollert did not further explain or substantiate these anonymous allegations.

regards to the housing location of SOTP participants, the concern that subjects would have been compelled to stay in the program to remain in an isolated housing unit finds support in the facts.

### ii.      Sample Size and Representativeness.

The relatively small sample of offenders, and the selection of those offenders, potentially undermines the Butner Study Redux's findings.  In April of 2012, Melissa Hamilton, a visiting assistant professor of law at the University of South Carolina College of Law, wrote a law review article in the Cardozo Law Review entitled "The Child Pornography Crusade and Its Net-Widening Effect."   Hamilton criticized the Butner Study Redux's methodology and generalizability.  See Hamilton, supra, at 1696-1710.  In particular, she addressed the study's sample: the subjects of the study were all in SOTP treatment at FCI Butner.  See Hamilton, supra, at 1706.  According to Hamilton, "samples with convicted offenders are in general 'necessarily skewed,'" because the samples measure only successfully prosecuted individuals. Hamilton, supra, at 1706.  In relation to the Butner Study Redux sample in particular, she emphasized that,

> [d]uring the years when the data was collected, this program was the most intensive sex offender treatment program offered in the federal prison system . . . . Space was limited to 112 beds.  As a result, offenders were selectively accepted only after they volunteered for admission and were individually screened and approved by departmental personnel.

Hamilton, supra, at 1706.  Additionally, they had to be serving sentences of at least thirty-six months.  The initial pool from which Bourke and Hernandez could have selected, that is the population in SOTP at Butner, was already narrow.  See Hamilton, supra, at 1706.  Rather than selecting from the entire population of child pornography offenders, including those serving at different facilities or for shorter sentences, Hamilton said the participants in the study "may well, then, have represented particularly dangerous offenders who were a high risk to children."

Hamilton, supra, at 1706.  Both the offender himself and the treating clinician had to deem that individual in need of extensive treatment before the offender could be admitted to SOTP.  The Butner FCI pool is, therefore, not necessarily representative of all individuals who have committed a child pornography crime, although it is not clear how important this difference is.  For example, in fiscal year 2010, the average sentence imposed in non-production child pornography offenses was ninety-five months, suggesting that the FCI Butner pool was representative for the length of sentences.  See United States Sentencing Commission, Federal Child Pornography Offenses Report to Congress, at ii n.10 (2012).

Bourke responded to the criticism that the sampling procedures were flawed when he wrote to the Sentencing Commission, explaining:

> Offenders in the Butner program volunteered for treatment, which makes the study group a *convenience* sample.  Such samples are less ideal than *randomized* sampling (the "gold standard" in a perfect world), but by no means is this a flaw.  In fact, convenience sampling is the most common form of sampling in the social sciences.

Bourke Letter to Sentencing Commission at 27 (emphasis in original).

### iii.    Verifying the Results.

To dispel concerns regarding the sample size and the potential biases that resulted from Bourke and Heranandez' position as both researcher and clinician, it would be helpful to verify their results.  This verification could be done in two different ways: first, by verifying the incidents that subjects disclosed in their PHQs and, second, by replicating the study with a new sample of child pornography offenders.

It would be useful if Bourke and Hernandez had provided some method of verifying their patients' disclosures.  Some scholars have argued that Bourke and Hernandez should have asked subjects to provide some "victim information," Wollert, supra, at 13, that is, identifying

characteristics of their victims, to help distinguish between honest confessions and false reports.

Bourke warned, however, that asking the psychologists to verify the accuracy of client reports by

asking the inmates to identify their victims would be "contrary to accepted standards of

professional practice," because "obtaining such information would have instantaneously

activated mandatory reporting laws and likely would have resulted in the filing of additional

charges against the inmates," and, additionally, would have resulted in the therapists acting as

investigators, likely causing "nearly all SOTP program participants" to immediately withdraw

from treatment.  Bourke Letter to Sentencing Commission at 10.   While the study reported that a

polygraph test was used to address the concern that participants falsely reported hands-on

offenses, only fifty-two percent of the participants were given such a test.  See Butner Study

Redux at 186.  Additionally, some scholars have proffered that polygraph testing would not

account for a subject's over-reporting.  Wollert warned that "a technique that is widely used to

pass this [polygraph] exam entails 'overestimating the number of possible victims.'"  Wollert,

supra, at 12.  This overestimation could occur in situations where an offender does not remember

whether he

> had molested 60 or 70 different children.  In instances of this nature, the examiner
> has to resort to questions such as, "Are you certain that you did not sexually
> molest more than 70 minors?"  The subject has to be allowed the leeway of over-
> estimating the number of possible victims so that he/she can reach the point where
> he/she can be completely certain that that number was not exceeded.  If the
> subject is unsure of whether he/she molested more than that number, the results
> will most likely be deceptive or inconclusive.

Stan Abrams, The Use of Polygraphy with Sex Offenders, 4 Annals of Sex Abuse 239, 258-59

(1991).  Bourke denied this assertion and argued the opposite, that is, that the polygraph

"assessed both over-reporting as well as under-reporting."   Bourke Letter to Sentencing

Commission at 27 (emphasis omitted).  The Court is unable to determine which of the above

statements is accurate, that is, whether polygraph testing can account for "under-reporting."[22] The researchers' choice not to probe deeper into the disclosures made magnifies the concern that subjects over-reported.

Furthermore, the overall methodology cannot be substantiated, because Bourke and Hernandez did not disclose the written forms used during their research.  Because their data is based exclusively on confidential interviews with child pornography offenders at FCI Butner, other researchers cannot attempt to replicate the Butner Study Redux methodology.  See United States v. Johnson, 588 F. Supp. 2d at 1006 (noting that "the Study employed an unpublished questionnaire," which "prevents other independent researchers from verifying whether the questionnaire is reliable and capable of producing results that are accurate and meaningful").  Without replication, it is difficult to allay concerns that this sample was not representative of the general child pornography population.  The study is, therefore, neither verifiable for individual offenders nor verifiable on a larger statistical scale.

### b.   Generalizing the Butner Study Redux's Findings.

Apart from the potential flaws with the study's methodology, there are also concerns that its results have been misinterpreted and misused.  While the study's results are shocking and indicate that the vast majority of child pornography offenders who worked with Bourke and Hernandez between 2002 and 2005 were also child molesters, extrapolating the findings beyond

---

[22]This Memorandum Opinion and Order is ambitious enough without trying to research the many disagreements over the reliability of polygraph tests.  The Memorandum Opinion and Order thus is not able to fully address the breadth of scientific literature surrounding the reliability of polygraph testing.  There certainly is great controversy surrounding its usefulness.  See Laurie P. Cohen, The Polygraph Paradox, Wall Street Journal (March 22, 2008), available at http://online.wsj.com/news/articles/SB120612863077155601 (stating that polygraphy has "long been derided as 'voodoo science,'" but that "polygraph use is at the highest level in two decades").  While the "idea behind polygraphy is that physiological changes often accompany lying," critics say that "subjects can fool the machine."  Cohen, supra.

the sample group is problematic.  The <u>Journal of Family Violence</u> was set to publish the study in 2007.  The BOP, which vetted the <u>Butner Study Redux</u> and approved its release, asked for publication to be halted upon learning that Bourke and Hernandez had not changed the conclusion to address a concern that a BOP attorney had relayed to the researchers.  <u>See</u> DeAngelis, <u>supra</u>, at 56.  The BOP suggested that Bourke and Hernandez downplay the conclusion that their findings could be generalized beyond the sample group in their study. Bourke explained his refusal to make that edit to the American Psychological Association ("APA"): "Those edits minimized the scientific nature of the work by removing professional language and inserting inappropriate replacements that downplayed the significance of the research, including a statement saying that the results could not be generalized to other child pornography offenders." DeAngelis, <u>supra</u>, at 56.  The authors waited two years and proceeded with publishing the article in the same journal despite the BOP's concerns.  Once Bourke became an employee of the United States Marshals, he was able to proceed with publication on his own. In 2007, an article appeared in the <u>New York Times</u> that addressed the controversy surrounding the publication of the <u>Butner Study Redux</u>.  According to the newspaper article, the BOP pulled the <u>Butner Study Redux</u> from publication that April, 2007, because of a "concern that the results might be misinterpreted."  Sher & Carey, <u>supra</u>.  The authors did not make the changes that the BOP had requested.  When Bourke wrote to the Sentencing Commission, he defended the <u>Butner Study Redux</u>, including the timing of publication:

> The latter study (Bourke and Hernandez, 2009) was <u>not</u> . . . withdrawn from the <u>Journal of Family Violence</u>.  The paper was accepted for publication after peer review but was placed "on hold" when Bureau of Prisons officials expressed an interest in discussing the paper with us before it went to press.  Dr. Abel's statement [-- that the <u>Butner Study Redux</u> was "originally sent for publication, withdrawn, discussed, sent back, and there's still criticisms about it" --] unfairly and inaccurately insinuates there was something wrong with the study that had to be fixed.  This is not the case.  Ultimately, <u>no</u> changes were made during that

period, and the paper published by the <u>Journal of Family Violence</u> is the original submission.

Bourke Letter to Sentencing Commission at 6 (emphasis in original).  In the 2009 APA article, Hernandez asserted: "We felt it would have been scientifically incorrect to say the findings are not generalizable -- we simply don't know the degree to which the results are generalizable to other child pornography offenders."  DeAngelis, <u>supra</u>, at 56.  Eight months earlier, however, Hernandez, in a written statement to "The Injury Prevention Research Center" at the University of North Carolina, Chapel Hill, offered a slightly different interpretation of the study's generalizability:

> Some individuals have misused the results of Hernandez (2000) and Bourke and Hernandez (2009) to fuel the argument that the majority of [child pornography] offenders <u>are</u> indeed contact sexual offenders and, therefore, dangerous predators. This simply is not supported by the scientific evidence.  The incidence of contact sexual crimes among [child pornography] offenders, as we reported in our studies, is important and worthy of considerable empirical examination.  However, it is not a conclusive finding that can be generalized to all [child pornography] offenders.

Hernandez Position Paper at 4-5 (emphasis in original).

This issue of generalization is one of the greatest controversies surrounding the <u>Butner Study Redux</u>.  In another written statement, this time before the United States House of Representatives Subcommittee on Oversight and Investigations, Hernandez affirmed the veracity of his findings and proffered that the subjects of his study are more dangerous to society than previously thought.  This hearing was set to address "Sexual Exploitation of Children Over the Internet: The Face of a Child Predator and Other Issues."  Hernandez went on to say that he would "caution the law enforcement community and others against generalizing beyond the offenders who were the subjects of my treatment interviews."  Hernandez Statement to Congress,

supra, at 6.  He concluded this prepared statement by expressing a need for further research of this "understudied group."  Hernandez Statement to Congress, supra, at 6.

The criticisms of the <u>Butner Study Redux</u> are relatively numerous.  Bourke has gone to great efforts, including through the writing of a letter to the Honorable Patti Saris, the Chair of the United States Sentencing Commission, to debunk many of these criticisms; in the letter, he addresses seventeen criticisms, including that the research is methodologically flawed and lacks scientific and factual bases.  <u>See</u> Bourke Letter to Sentencing Commission, *passim*.  Hernandez, on the other hand, has been more hesitant to generalize beyond the subjects of his study.  There are two sides to the criticisms that have been lodged against the <u>Butner Study Redux</u>.  The reliability of the data and the generalizability of the findings continue to be a source of contention within the scientific community.

**4.     The Sentencing Commission's 2012 Report to Congress.**

In 2012, the Sentencing Commission published a Report to Congress regarding the child pornography sentencing guidelines, making several recommendations.  <u>See</u> U.S. Sentencing Comm'n, <u>Report to Congress: Federal Child Pornography Offenses</u> (2012), <u>available at</u> http://www.ussc.gov/news/congressional-testimony-and-reports/sex-offense-topics/report-congress-federal-child-pornography-offenses  ("Report to Congress").  The Sentencing Commission identified several factors that prompted it to examine child pornography cases: (i) "[f]irst, during the past two decades, cases in which offenders have been sentenced under the child pornography guidelines, while only a small percentage of the overall federal criminal caseload, have grown substantially both in total numbers and as a percentage of the total caseload"; (ii) "[s]econd, since the enactment of the PROTECT Act of 2003 and <u>United States v. Booker</u>, 543 U.S. 220 (2005), which made the guidelines 'effectively advisory' in 2005, there

has been a steadily decreasing rate of sentences imposed within the applicable guidelines ranges in non-production cases"; (iii) "[t]hird, as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability"; (iv) "[f]ourth, recent social science research -- by both the Commission and outside researchers -- has provided new insights about child pornography offenders and offense characteristics that are relevant to sentencing policy"; and (v) "[f]inally, most stakeholders in the federal criminal justice system consider the non-production child pornography sentencing scheme to be seriously outmoded."  Report to Congress at ii-iii (footnotes omitted).

In the chapter about child pornography offender behavior, the Sentencing Commission pointed to a number of studies distinguishing between child pornography offenders who have also engaged in other sex offending from offenders who have not.  See Report to Congress at 99. The studies that analyzed only official reports or convictions for non-child-pornography sex offending found lower percentages:

> Richard Wollert et al., Federal Internet Child Pornography Offenders -- Limited Offense Histories and Low Recidivism Rates, in The Sex Offender: Current Trends in Policy & Treatment Practice Vol. VII (Barbara K. Schwartz, ed. 2012)(based on a study of 72 federal child pornography offenders in the United States who were treated by the authors during the past decade, the authors found that 20, or 28%, had prior convictions for a contact or non-contact sexual offense); [Janis] Wolak[, David Finkelhor & Kimberly Mitchell], Child Pornography Possessors: Trends[ in Offender and Case Characteristics, 23 Sexual Abuse 22,] 34 [(2011)](finding, based on 2006 data from surveys of approximately 5,000 law enforcement officials throughout the United States, that 21% of cases that began with investigations of child pornography possession "detected offenders who had either committed concurrent sexual abuse [offenses] or been arrested in the past for such crimes"); . . . Jérôme Endrass et al., The Consumption of Internet Child Pornography and Violent and Sex Offending, 9 BMC Psychiatry 43 (2009)(study of 231 Swiss child pornography offenders; finding that only 1.0% had prior convictions for "hands-on" sex offenses and an additional 3.5% had prior convictions for possession of child pornography); Caroline Sullivan, Internet Traders of Child Pornography: Profiling Research --

> Update (New Zealand Dep't of Internal Affairs 2009)(finding that approximately
> 10% of 318 New Zealand child pornography offenders prosecuted from 1993-
> 2007 "have been found to have criminal histories involving a sexual offence
> against a male or female under the age of 16 years"),
> http://www.dia.govt.nz/pubforms.nsf/URL/InternetTradersOfChildPornography-
> ProfilingResearchUpdate-December2009.pdf/$file/InternetTradersOfChild
> Pornography-ProfilingResearchUpdate-December2009.pdf

Report to Congress at 99 n.157 (some alterations in original).  The two studies to which the

Sentencing Commission pointed that analyzed self-reporting data were the Seto meta-analysis

and the Butner Study Redux:

> Michael C. Seto, R. Karl Hanson & Kelly M. Babchishin, Contact Sex Offending
> by Men With Online Sexual Offenses, 23 Sexual Abuse 124, 124, 135-136
> (2011)(meta-analysis of 24 international studies, which found that approximately
> one in eight "online offenders" -- the majority of whom were child pornography
> offenders -- had an "officially known contact sex offense history," but estimating
> that a much higher percentage, approximately one in two, in fact had committed
> prior contact sexual offenses based on clinical "self-report" data); Michael L.
> Bourke & Andres E. Hernandez, The "Butner Study" Redux: A Report on the
> Incidence of Hands-On Child Victimization by Child Pornography Offenders, 24
> J. Fam. Violence 183 (2009)(study of 155 federal child pornography offenders in
> the United States who participated in the residential sex offender treatment
> program at FCI Butner from 2002-05; finding that 85% had committed prior
> "hands on" sex offenses).

Report to Congress at 99 n.157.  After reviewing a number of studies addressing the

characteristics of child pornography offenders who also committed hands-on offenses, whether

there is a causal relationship between viewing child pornography and committing other sex

offenses, and analyzing whether some child pornography offenders view child pornography as an

alternative to sex offending, the Sentencing Commission made the following conclusions:

> • Child pornography offending, pedophilia, and other sex offending are related
> and overlapping classifications, but not all child pornography offenders are
> pedophiles or engage in other sex offending.

• Child pornography offender behavior can be broadly classified into three categories: collecting child pornography images, participating in online "communities"[23] of offenders, and engaging in other sex offending.

---

[23]The Sentencing Commission described child pornography communities as "social and supportive environments" in which "a child pornography offender can develop relationships with others who share his interests." Report to Congress at 97.

> One child pornography offender posted on a child pornography community bulletin board, "[f]or many of us, this is our social life.  We can discuss our feelings here and feel a part of something without fear of being condemned by society for our feelings and beliefs."  Relationships in child pornography communities can be emotionally gratifying and may escalate the level of offending.  Offenders receive reinforcement and support by finding that others are trading images depicting sexual activity with children.  Research also suggests that online communities help child pornography offenders to develop positive feelings about their own deviant online sexual identities.  As their online sexual identities become dominant, willingness to comply with cultural and societal norms may erode.  This process may explain why some researchers have found that some offenders progress from viewing child pornography to committing other sex offenses.  Other researchers, however, caution that inappropriate attitudes and beliefs have not been investigated sufficiently among child molesters to draw firm conclusions about the pathway from online child pornography offending to other sex offending.

Report to Congress at 97-98 (footnotes omitted).  Child pornography communities are varied, however, as "[s]ome exist primarily as a means to find trading partners, while others are dedicated to furthering sexual interest in children."  Report to Congress at 92.  The communities "are often very organized," and offenders "gain status and expertise vis-á-vis other community members by amassing large organized collections, distributing missing parts of image series, posting new images, and educating other members about technology."  Report to Congress at 95. Further, "some child pornography groups have explicit rules about content and demand that its members use security precautions."  Report to Congress at 95.

Offenders who engage in online child pornography communities are often more sophisticated than offenders who rely on P2P file-sharing:

> Child pornography offenders' involvement in child pornography communities can be classified based on "the different socialization aspects of the activity."  The lowest level of such "socialization" involves an offender "acting alone to receive, collect, and share material online."  Such activity is typically done through the use of commercial websites offering child pornography for a fee or through anonymous, open P2P technologies . . . .  Offenders who purchase images from commercial websites may have to reveal their identities and thus risk detection.  An offender who does may not be involved in a trading community and "may even be an entry-level offender."  Similarly, open P2P file-sharing does

• Child pornography offenders often amass large collections with thousands or even hundreds of thousands of images and videos. Offenders' collections may contain a variety of images, including legal but sexually suggestive child images as well as sexually explicit images depicting violence, humiliation, bondage, and bestiality. Some child pornography offenders, particularly pedophilic offenders, collect ancillary child-related items. Such collecting activities may be related to sexual deviance and correlated with other sex offending.

• Most child pornography offenders have some degree of sexual interest in children, but some offenders are partially or completely motivated by other sexual and nonsexual reasons.

• Offenders engage in a variety of collecting behaviors, some of which may relate to compulsive collecting rather than sexual interest. Many child pornography offenders expend considerable efforts to organize their collections. It appears that offenders who engage in more extensive trading are more likely to have particularly organized collections.

• Social science research establishes that child pornography images feature minor victims of all ages and depict many types of sexual conduct. Images of female victims are more commonly circulated than images of male victims.

• The Commission has reviewed over 2,600 PSRs in non-production child pornography cases in preparation for this report, and finds that the depiction of oral, vaginal, or anal penetration of prepubescent children is present in the overwhelming majority of PSRs that were reviewed. Sexual acts involving infants or toddlers, while not in a majority of PSRs, were depicted in a substantial minority.

• Purchasing child pornography through a commercial website (without use of identity-cloaking technology) is a behavior that is higher-risk for detection. Such offenders may be entry-level offenders.

• Some offenders are engaged in child pornography or pedophilic "communities." Communities are varied. Some exist primarily as a means to find child pornography trading partners, while others are also dedicated to supporting sexual

---

not require much technological sophistication. More sophisticated offenders may remain in the comparatively safer confines of newsgroups or chat channels.

    "As the offender increases their desire for more specific material, they [often] begin to reach out and contact other individuals" in "web-based forums" of individuals "who share the same interest."

Report to Congress at 93.

interest in children by buttressing deviant sexual beliefs or encouraging the commission of other sex offending.  Child pornography communities make viewing of sexualized images of children acceptable and implicitly or explicitly condone sexual offenses against children.

• Child pornography communities can be social and supportive environments and can foster relationships among offenders.  These relationships appear to support development of deviant sexual beliefs concerning children and validate and normalize child sexual exploitation.

• Child pornography communities often are hierarchical communities that value those with technological sophistication and those who are able to provide new images.  Evidence suggests that at least some individuals begin producing child pornography in order to gain access to additional child pornography.

• Social science research is inconclusive regarding whether child pornography offenders' involvement with such communities is a risk factor for the commission of contact sex offenses against children.

• Research has identified some correlation between viewing child pornography and other sex offending, but most current social science research suggests that viewing child pornography alone does not "cause" individuals to commit other sex offenses absent other risk factors.  Research suggests that deviant sexual beliefs and antisociality are the two primary risk factors for other sex offending.

• It is unlikely that viewing child pornography has a cathartic effect that would reduce the likelihood of other sex offending against children.  In addition, offenders who considered their use of child pornography therapeutic or preventative were less likely to hold themselves responsible for their actions.

Report to Congress at 104-06.

In the chapter regarding "prior criminal sexually dangerous behavior by offenders sentenced under the non-production child pornography guidelines," the Sentencing Commission analyzed child pornography offenders' acts of criminally sexually dangerous behavior ("CSDB") that occurred before prosecution of the child pornography offense.  Report to Congress at 169. Although analyzing only CSDB, the Sentencing Commission noted that "an offender's sexually deviant behavior may be relevant regarding the offender's sexual dangerousness even if such

behavior does not rise to the level of a criminal offense."  Report to Congress at 169.  The Sentencing Commission explained that,

> [a]lthough there is a lack of consensus among social scientists and others about the historical prevalence rate of CSDB among child pornography offenders convicted of a non-production offense, there appears to be general agreement that offenders who in the past or concomitantly with their non-production offenses also engaged in CSDB are qualitatively different from child pornography offenders who never engaged in CSDB.

Report to Congress at 170.  It offered three reasons why child pornography offenders with known histories of CSDB are "qualitatively different": (i) they have a higher risk of sexual recidivism; (ii) they are more likely to have other undetected CSDB in their past; and (iii) they are "more culpable for having engaged in CSDB in addition to having committed  their instant non-production offenses -- in the same manner that any offender who has committed multiple related offenses is generally more culpable than an otherwise similarly situated offender who committed only a single offense."  Report to Congress at 170-71.  Regarding the social science research in this area, the Sentencing Commission explained that "studies have found substantially different prevalence rates," and that the studies "varied in their methodologies, operative definitions, and study samples (with respect to time periods, size of sample, and nationality of offenders studied)," resulting in "significantly inconsistent results about the correlation between offenders' viewing child pornography and their prior or concomitant commission of other sex offenses."  Report to Congress at 172-73 (footnotes omitted).  Of the studies that the Sentencing Commission listed, only the <u>Butner Study Redux</u> and the Seto meta-analysis analyzed self-reporting data.  <u>See</u> Report to Congress at 172 n.13.  The Sentencing Commission described the results from the Seta meta-analysis:

> In order to better evaluate the prevalence of child pornography offenders who also have committed "contact" child sex offenses, Canadian researchers in 2010 conducted a meta-analysis" of numerous studies involving offender populations

from several different countries.  They identified 24 studies of offenders whose instant offense was an Internet sex offense (the vast majority were child pornography offenses) where researchers attempted to determine how many offenders also had committed contact sex offenses.  Of the total sample of 24 studies with 4,697 offenders, 17.3 percent of offenders (812) were known to have committed a prior contact sex offense, mostly against children.  Of the 24 studies, 18 used "official" reports (<u>e.g.</u>, convictions or arrest records), and six used offenders' "self reports" (typically made during therapy) to determine the prevalence rate of prior contact sex offending.  The 18 official report studies, when considered collectively, found a rate of 12.2 percent.  The six self-report studies taken together reported a rate of 55 percent.

The much higher percentage of prior contact sex offending found by the "self-report" studies is in large part attributable to the fact that many of the self-reported prior child sex offenses were not captured by official reports.  Studies show that only an "estimated 1 in 20 cases of child sexual abuse is reported or identified" and that "an arrest was made in only 29% of reported juvenile sexual assaults."  This research demonstrates that a very large percentage of child sex abuse is unreported.  As such, regardless of whether one relies on official reports, self- reports, or a combination, "[t]he key point, that some child pornography offenders have committed officially undetected contact offenses[,] is not controversial."

Report to Congress at 173-74 (footnotes omitted).

Throughout the report, the Sentencing Commission made several recommendations regarding the child pornography guidelines:

[T]he current non-production guideline warrants revision in view of its outdated and disproportionate enhancements related to offenders' collecting behavior as well as its failure to account fully for some offenders' involvement in child pornography communities and sexually dangerous behavior.  The current guideline produces overly severe sentencing ranges for some offenders, unduly lenient ranges for other offenders, and widespread inconsistent application.  A revised guideline that more fully accounts for [the following three factors] -- the full range of an offender's collecting behavior, the degree of his involvement in a child pornography community, and any history of sexually dangerous behavior -- would better promote proportionate sentences and reflect the statutory purposes of sentencing.

Report to Congress at xxi.  The Sentencing Commission described in further detail the three factors that it thinks should be considered in imposing sentences under § 2G2.2.

1) the content of an offender's child pornography collection and the nature of an offender's collecting behavior (in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology);

2) the degree of an offender's engagement with other offenders -- in particular, in an Internet "community" devoted to child pornography and child sexual exploitation; and

3) whether an offender has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense.

Report to Congress at 320.  Regarding the first factor -- the offender's collecting behavior -- the Sentencing Commission said that three of the six enhancements in the current § 2G2.2 relate to an offender's collection, including (i) "a 2-level enhancement for possession of images of a pre-pubescent minor," (ii) "a 4-level enhancement for possession of sado-masochistic images or other depictions of violence," and (iii) "a 2- to 5-level enhancement for collections of a certain number of images (with increments ranging from ten or more images to 600 or more images)." Report to Congress at 322.  The Sentencing Commission said that these three provisions apply to a majority of offenders, which adds "a significant 11-level cumulative enhancement based on the content of the typical offender's collection"; in its view, the structure "does not adequately distinguish among most offenders regarding their culpability for their collecting behaviors." Report to Congress at 323.  The Sentencing Commission did not state precisely how it would change the number of images enhancement, perhaps because Congress itself imposed the number of images table when it passed the PROTECT Act, but it recommended

that §2G2.2(b) be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability (*e.g.*, the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; the number of unique, as opposed to duplicate, images possessed by an offender).  Such a revision should create more precisely

> calibrated enhancements that provide proportionate penalty levels based on the aggravating circumstances present in the full range of offenders' collecting behavior today.

Report to Congress at 323.  In an earlier portion of the Report to Congress, the Sentencing Commission explained that "[m]any offenders possess child pornography collections numbering in the hundreds of thousands or even millions of images and videos."  Report to Congress at 45. See Report to Congress at 80 ("Child pornography offenders often amass large collections of child pornography with thousands or even hundreds of thousands of images and videos.").  The Sentencing Commission requests that Congress "enact legislation providing the Commission with express authority to amend the current guideline provisions that were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines."  Report to Congress at 322.

Next, the Sentencing Commission explained in greater detail the second factor -- the offender's engagement in child pornography communities.  See Report to Congress at 323.  It noted that several enhancements indirectly punish offenders for their involvement in child pornography communities, such as the distribution enhancements and use-of-a-computer enhancement, but noted that those enhancements are both over- and under-inclusive and do not "punish community involvement *per se*."  Report to Congress at 323-24.

> A new guideline provision specifically dealing with offenders' community involvement, as distinct from their distribution conduct, could better differentiate among offenders' culpability based on their degree of such community involvement.  In addition, the guideline could be amended to better distinguish between more and less culpable distribution conduct while remaining "technology-neutral" (and, thus, remain relevant in view of inevitable future changes in technologies).  The enhancement in § 2G2.2(b)(3) was created before the widespread use of P2P file-sharing programs and other types of emerging technologies by non-production offenders.  Therefore, a revised guideline should better differentiate among offenders based both on their degree of community involvement and the nature of their distribution conduct.

Report to Congress at 324 (footnotes omitted).

Regarding the third factor -- the offenders' known histories of sexually dangerous behavior -- the Sentencing Commission noted that, while some offenders receive the pattern of activity enhancement under § 2G2.2(b)(5) or statutory enhancements under 18 U.S.C. §§ 2252(b) or 2252A(b), other offenders with CSDB histories were not subject to higher penalty ranges; further, the Sentencing Commission noted that the current scheme does not consider non-criminally sexually deviant behavior that suggests sexual dangerousness.   See Report to Congress at 324-25.   The Sentencing Commission recommended "[a]n amendment to the guidelines [that would] better address a broader range of offenders' sexual dangerousness and provide for a more nuanced approach depending on the number and type of acts of sexually dangerous behavior in an offender's history."  Report to Congress at 325.

The Sentencing Commission also recommended aligning "the statutory penalties for receipt and possession," and that, if Congress wishes to "maintain a statutory mandatory minimum penalty," the "statutory minimum should be less than five years."  Report to Congress at xx.   Regarding supervised release, the Sentencing Commission noted that, currently, § 5D1.2(b) recommends that courts impose "the statutory maximum term of supervised release" for all offenders convicted of a sex offense, including any child pornography offense, but that "the recommendation in § 5D1.2(b) was made before the enactment of the PROTECT Act of 2003, which raised the statutory maximum term of supervision from three years for most child pornography offenders to a lifetime term for all child pornography offenders."   Report to Congress at xix.  The Sentencing Commission said it "is considering amending the guideline in a manner that provides guidance to judges to impose a term of supervised release within the

statutory range of five years to a lifetime term that is tailored to individual offender's risk and corresponding need for supervision."  Report to Congress at xix.

The child pornography guidelines have not changed, however, since the Sentencing Commission published its Report to Congress in 2012.

## ANALYSIS

The PSR calculates[24] Crisman's total offense level at 30 and his criminal history category of I, resulting in a sentencing guideline range of 97 to 121 months incarceration.  The Court will not vary from the sentencing guidelines for the length of incarceration, and will sentence Crisman to the low-end of the guideline range -- ninety-seven months imprisonment and twenty-five years of supervised release.  While the Court concludes that it would be improper to rely on the Butner Study Redux to enhance Crisman's sentence, it finds that the Butner Study Redux is useful in concluding that it does not have a substantive disagreement with the sentencing guidelines for child pornography cases, and that the study's findings are a factor in the § 3553(a) calculations that puts upward pressure to keep the sentence in the guideline range and to not vary.  Although Crisman contends that several of the enhancements are applied in a vast majority of cases, the Court does not think the frequency with which enhancements are applied is a reason to vary downward in this case.  The Court will first explain what it is going to do with the Butner Study Redux, and then address the remaining variance issues.

I.      **GIVEN THE BUTNER STUDY REDUX'S LIMITATIONS, THE COURT WILL NOT USE IT TO CONCLUDE THAT CRISMAN MAY HAVE, IN THE PAST, COMMITTED A HANDS-ON OFFENSE AGAINST A CHILD, NOR WILL IT USE THE STUDY TO FIND THAT HE IS A RISK OF, SOMETIME IN THE**

---

[24]The PSR correctly reflects the parties' stipulations from the Plea Agreement, but, as the Court noted in supra note 9, at 23, the Court would likely not accept the stipulation that the 2-level reduction under § 2G2.2(b)(1), and instead would apply the 2-level enhancement under § 2G2.2(b)(3)(F), because Crisman distributed child pornography images using the P2P program. The resulting offense level would be 34, with a guideline range of 151 to 188 months.

**FUTURE, MOLESTING A CHILD, BUT IT WILL RELY ON THE <u>BUTNER
STUDY REDUX</u> TO EXPLAIN WHY IT DOES NOT HAVE A SUBSTANTIVE
DISAGREEMENT WITH THE GUIDELINES.**

Many of the criticisms of the <u>Butner Study Redux</u> are worth consideration.   The Court
will consider criticisms based on the participants' perception of either the study or their
researchers' expectations, as they go to the likelihood that subjects over-reported previous
offenses.   After examining the study's structural flaws, the Court will address the question of the
finding's generalizability.   Based partially on the study's limitations, the Court will not use it to
find that Crisman committed hands-on sexual offenses in the past, or that he is likely to commit
such offenses in the future, but the study's disturbing findings are useful to explain why the
Court does not have a substantive disagreement with the child pornography sentencing
guidelines, and why it believes the study is an appropriate factor in the § 3553(a) calculation
when deciding whether to vary.

    **A.**    **THE <u>BUTNER STUDY REDUX</u> SUFFERS FROM SEVERAL
METHODOLOGICAL FLAWS, INCLUDING A SMALL, NON-
REPRESENTATIVE RESEARCH SAMPLE AND BIASED
RESEARCHERS.**

One of the <u>Butner Study Redux</u>'s flaws is that there is no method of verification.   This
flaw exists both as it relates to the verification of an individual's reported offense and regarding
the replication of the study as a whole.   It is impossible to track down each of the offenders' self-
reported victims and confirm that an offense was perpetrated against them.   It would also be
unethical for these researchers to play the role of investigator, and to track down each reported
victim and ask for verification of the offender's claim.   <u>See</u> Bourke Letter to Sentencing
Commission at 10 (stating that "[t]he notion that psychologists should 'verify the accuracy' of
client reports" by asking inmates to identify the victims so that the researchers can corroborate
the claims, or by not counting unidentified victims, "is contrary to accepted standards of

professional practice"). One remaining method of confirming the individual offenses is through a polygraph examination, a less than fool-proof method of verification. The use of the polygraph examination is complicated in this case in one additional way: not all subjects were polygraphed, making the polygraph results inconclusive at best.

As scholars have pointed out, it would have been helpful had Bourke and Hernandez asked their subjects to provide some identifying factors so as to determine the truthfulness of their disclosures. Instead, they only asked the participants to "use numbers or initials for differentiation." Butner Study Redux at 186. The authors note that they did not request identifying information about their victims in an effort to "decrease the offenders' fears that the disclosure of undetected crimes will result in self-incrimination." Butner Study Redux at 186. While this research methodology is reasonable, it makes it difficult to verify the incidents reported and assess the offenders' truthfulness.

Hence, if the Court is going to use the Butner Study Redux in sentencing child pornography offenders, it will use the study with care and with some limitations, recognizing the need for, and encouraging, more in-depth research. As Hernandez explains, while patterns have now emerged and the offenders that were the subject of the study have been shown to present more danger to society than initially thought, there is no basis to generalize these results to all child pornography offenders. While 155 offenders provide some useful data, the sample size is not conclusive. An additional concern with generalizing from the Butner Study Redux findings is that other attempts at determining this same question have produced different results; while the Butner Study Redux resulted in 84.5% of the pool self-reporting to have committed a hands-on offense, the next highest study resulted in 57.4% so reporting. See Seto et al., supra, at 128-29. The question then becomes why the Butner Study Redux's results are what they are. Either the

<u>Butner Study Redux</u> is <u>more</u> accurate than previous studies, or it suffers from some methodological or sampling flaw.  The latter answer cannot be dismissed until the <u>Butner Study Redux</u>'s findings have been independently corroborated through subsequent studies.  Such verification can only truly happen once the questionnaire that the researchers used and their precise method of interviewing offenders is revealed.  Similarly, to account for selection bias, the new study should use a random sample of offenders rather than only those that are being treated at the most extensive sex offender treatment program in the country.

There are evidently some sampling and methodological flaws in, or at the very least, criticisms of, with the <u>Butner Study Redux</u>.  Such flaws and criticisms, however, are not unique to Bourke and Hernandez' research.  As is the case with most studies conducted in the social sciences, obtaining a perfectly random sample is difficult.  Additionally, the data desired can be obtained only through incarcerated felons' self-reporting.  The research is meant to uncover whether individuals with no known history of child molestation had engaged in a hands-on offense.  The seemingly appropriate method to research that question is to interview such offenders.  There are, however, two separate concerns with the study that appear problematic enough to have affected the researchers' results, both of which could be addressed in a future study.  The first concern is that Bourke and Hernandez' sample group was too small.  The second concern is that Bourke and Hernandez' positions in two conflicting roles, that of researcher and clinician, biased the study.

The small sample size is a relatively self-explanatory concern.  Basing their conclusion on 155 voluntary participants in a psychological treatment program may not offer a conclusion

that would apply to the general population of child pornography offenders.[25]  As Bourke and Hernandez note in the Butner Study Redux, "future research designs should . . . control for volunteerism and increase the representativeness of the sample."  Butner Study Redux at 190. While a number of critics have addressed the sample's representativeness of the general child pornography population, the discussion has so far concerned only one factor: whether voluntary participants serving time in the same FCI offer a sample that can be generalized to all child pornography offenders.

There is, however, another factor that relates to the study's representativeness that deserves some attention.  In the Butner Study Redux, twenty-six percent of the participants were known contact sexual offenders at the time of sentencing.  Seto found that the Butner Study Redux was an outlier within their analysis, because, at eighty-five percent, it found a higher correlation between child pornography offenders and hands-on offenses than any other study. The Butner Study Redux's sample may not be representative of the general population of convicted online sex offenders; the inmates who participated in the Butner Study Redux may have been more likely to have committed a hands-on offense that was known at the time of sentencing than the participants in other analyses.  About one quarter -- twenty-six percent -- of the Butner Study Redux sample had a "known histor[y] of abusing a child via a hands-on sexual act."  Butner Study Redux at 187.  After treatment, eighty-five percent admitted to at least one

---

[25]The Court does not have the expertise to, and should not, offer any determination what would qualify as a "sufficient" sample size.  A court's day-to-day task of deciding legal and factual issues is difficult enough, without having to also resolve academic disputes.  See Roe v. Wade, 410 U.S. 113, 159 (1973)("We need not resolve the difficult question of when life begins. When those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer.").  The Court notes, however, that there are studies that interviewed many more offenders.  The Seto meta-analysis listed several studies with larger pools than the Butner Study Redux, ranging up to 870 participants.  See Seto et al., supra, at 128.

contact offense.  See Butner Study Redux at 187.  This difference represents a fifty-nine percent "increase in the number of subjects with known hands-on offenses."  Butner Study Redux at 187. This result is in contrast to the larger sample that the Seto meta-analysis examined, in which only 12.2% of online sexual offenders' official records disclosed prior contact sex offenses, while 55.1% self reported prior sexual contact with children.  See Seto et al., supra, at 132-33.  This result would mean that, in the Butner Study Redux, an additional fifty-nine percent of offenders disclosed hands-on incidents, while in the Seto meta-analysis, an additional 42.9% were found to have had at least one hands-on offense.  These numbers are not as drastically different.  While the Butner Study Redux found a much higher percentage of child pornography offenders perpetrated a hands-on offense, that statistic is based on a sample with a much higher incidence of known child molesters.  The results of the studies that looked at this issue may, therefore, be more similar than critics have presumed.  An independent study would have to consider the percentage of the child pornography offender population that is known to have committed at least one hands-on offense.  For instance, if fifteen percent of all convicted child pornography offenders were also convicted of a hands-on crime, then a future study should similarly have fifteen percent of its subjects be known contact offenders.  This failure to hold constant the numbers of people whom are known to be "touchers" could account for the lack of consistency in samples between studies, and holding the variable constant could demonstrate whether the Butner Study Redux is an outlier, more representative of the child pornography offender population, or based on a skewed sample.

The impact that researcher bias would have had on the study is more complicated.  In evaluating the Butner Study Redux methodology, Richard Wollert -- a forensic clinical psychologist at Washington State University, Vancouver -- interviewed inmates at FCI Butner

who participated in the study.  He learned that "they were fearful of program termination" and that "several Butner patients revealed . . . that staff members expected them to disclose new offenses on an ongoing basis."  Wollert, supra, at 11-12.  Wollert explains that "subjects in psychological experiments will act the way a researcher wants them to act if they know what the researcher hopes to find."  Wollert, supra, at 12.  In the Butner Study Redux, the subjects may have been aware that Bourke and Hernandez were expecting disclosures of unknown sexual offenses.

No weight should be given to the allegation that Bourke and Hernandez were intent on dismissing participants who did not disclose previous offenses; however, there is some validation for the concern that the subjects felt compelled to over-report.  This concern should not be given too much weight, however, because, any pressure inmates may have felt to over disclose may have been balanced by their hesitancy to disclose additional crimes for fear of retribution, or perhaps out of guilt and embarrassment.  "There are strong moral and legal consequences from admitting additional sexually deviant acts, and these serve as significant deterrents to honesty."  Bourke Letter to Sentencing Commission at 14.  This factor would seem to balance against any encouragement offenders may or may not have received from researchers to disclose additional victims.  It seems that it would be nearly impossible to have a clean, unbiased, and entirely honest research sample when the subject matter is of this nature.

Until corroborating evidence exists, and until the authors of the Butner Study Redux release the questionnaire that they used when interviewing patients, it is difficult to know how much methodological and sampling flaws affected the results.

> **B.**  **THE COURT WILL NOT USE THE BUTNER STUDY REDUX AS PROOF OF UNCHARGED CRIMES.**

Evidence that other child pornography offenders committed hands-on crimes does not necessarily make it more likely true than not that an individual defendant committed a hands-on offense.  It would violate many principles of the Anglo-American system of criminal justice to use evidence of some other person's criminal conduct to conclude that the defendant before the Court also must have committed the criminal conduct.  Our system of criminal justice focuses on the individual and not on a class of defendants.  This principle of individual rather than class justice, which our system compels, is even more important and necessary here, when none of the social science says that every child pornography looker is a toucher.

Perhaps in a case where the defendant is known to have sexually abused a child, or even in cases where there are reliable allegations of such conduct, it would be reasonable to use the Butner Study Redux as additional evidence of that defendant's sexual offense history.  The problem, however, is when the study is the only evidence supporting such a theory.  Uncharged offenses should not be presumed.  Even if courts take the Butner Study Redux as incontrovertible fact and assume that eighty-five percent of all child pornography offenders have also committed hands-on offenses, fifteen percent of the defendants who have been charged with possessing child pornography have committed no additional crimes.  To differentiate among defendants, that is, those who are also guilty of a hands-on offense and those who are solely child pornography offenders, more evidence beyond the Butner Study Redux is needed.  Each defendant should be judged based on the evidence against that defendant.  Child pornography defendants should not be presumed guilty of a crime without any such evidence being presented.  In the end, the Court cannot and should not use the Butner Study Redux to say that, because many or even most child pornographers are child molesters, this defendant must be, too.

**C.    THE COURT WILL NOT USE THE BUTNER STUDY REDUX AS EVIDENCE THAT A DEFENDANT IS A THREAT TO SOCIETY.**

One of the primary factors a judge must consider in sentencing is whether the defendant poses a threat to society.  See 18 U.S.C. § 3553(a)("The court, in determining the particular sentence to be imposed, shall consider . . . the need for the sentence imposed . . . to protect the public from further crimes of the defendant").  A defendant's potential threat to society may be weighed at sentencing through either the defendant's criminal history, or his or her likelihood to reoffend.  Using the Butner Study Redux, however, to evaluate a defendant's risk to society either presumes that a defendant committed an additional offense, or implies that, after incarceration, he or she is more likely to present a danger.  To presume an additional crime would require more evidence than just the Butner Study Redux's findings.  The question when determining a defendant's risk to society remains his or her likelihood to reoffend, and not many or most offenders' likelihood to reoffend.

The question is whether the data offered in the Butner Study Redux assists a judge in determining a defendant's behavior post-incarceration.  If the study demonstrated that child pornography offenders are likely to recommit an internet sex crime or become involved in more dangerous crimes, such as child molestation, then such evidence would be useful in assessing a defendant's risk to society after incarceration.  There are studies that have examined that question, examining offenders following their incarceration, and those studies have indicated relatively low rates of recidivism.  See Seto et al., supra, at 135 (finding that, for the online offenders, 2.0% recidivated with a contact sexual offense and 3.4% recidivated with a child pornography offense).  The Butner Study Redux does not, however, present that evidence.  Bourke and Hernandez looked only at behavior that occurred before the offenders' incarceration.  They did not incorporate any evidence of conduct after defendants were released from incarceration.  To use this study to demonstrate a defendant's likelihood to reoffend, either

through another child pornography offense or a contact sexual offense, is thus one of its least defensible uses.

D.   **WHILE THE FEDERAL RULES OF EVIDENCE DO NOT APPLY AT SENTENCING, THE COURT IS CAUTIOUS TO RELY TOO HEAVILY ON THE <u>BUTNER STUDY REDUX</u> AS EVIDENCE.**

Without going into any in-depth legal analysis of the <u>Butner Study Redux</u>'s admissibility, an additional question that judges may consider is whether, irrespective of scholarly criticism of the study, it would be admissible under rule 702 of the Federal Rules of Evidence and <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993), because, although the "Federal Rules of Evidence do not technically apply at sentencing," <u>United States v. Johnson</u>, 588 F. Supp. 2d at 1006 n.8, an analysis of the study's legal reliability may still be useful.   Scholarly criticism is one part of the question, but judges must also consider whether the study merits inclusion in court proceedings.   Judge Pratt concluded that, given all the flaws with which he was presented, the article may not have met the <u>Daubert v. Merrell Dow</u> standard for admissibility.   <u>See</u> <u>United States v. Johnson</u>, 588 F. Supp. 2d at 1006 n.8.   According to the Court's research, no federal judge has yet found that the <u>Butner Study Redux</u> complies with <u>Daubert v. Merrell Dow</u>'s standards, probably because a defendant would not challenge, at sentencing, the study on <u>Daubert v. Merrell Dow</u> grounds.   Also, given that the <u>Butner Study Redux</u> has been published in a peer-reviewed journal, it is difficult for courts to exclude it entirely.   The better approach is probably to consider it, and then use criticisms to decide what to do with the <u>Butner Study Redux</u> findings.

From the evidence examined, judges should be cautious in relying on the <u>Butner Study Redux</u> in sentencing for two reasons.   The first is that no subsequent study has confirmed the <u>Butner Study Redux</u>'s findings.   While some of the methodological and sampling criticisms

lodged against the study are relatively minor, judges would be wise to wait until the conclusions are independently corroborated before using its conclusions without any limitations.  A future study should increase the sample size, use a random sample of child pornography offenders, and remove the researcher bias.  The second reason is grounds for greater concern.  Hernandez asserts that "the incidence of contact sexual crimes among child pornography offenders, as we reported in our studies, is important and worthy of considerable empirical examination.  However, it is not a conclusive finding that can be generalized to all [child pornography] offenders."  Hernandez Position Paper, supra, at 5.  Hernandez' opinion that the results cannot be generalized is the strongest argument against using the study as proof that a higher sentence is warranted in a child pornography case.  If their findings admittedly do not apply to all child pornography offenders, then judges should not presume the study is relevant to every case.

E.     **THE BUTNER STUDY REDUX'S FINDINGS COUNSEL AGAINST THE COURT HAVING A SUBSTANTIVE DISAGREEMENT WITH THE SENTENCING GUIDELINES.**

Another question that judges should consider is what role the Butner Study Redux should play in sentencing.  The study's results, if independently corroborated, may serve as compelling supporting evidence of a defendant's prior conduct but may not necessarily be sufficient proof of a particular defendant's risk to society.  While the study presents some troubling findings and implies a high correlation between child pornography offenders and child molesters, judges should be hesitant in applying the study -- without any limitations -- until further research is conducted.

In the end, the question is what the Court will do with the Butner Study Redux.  Because the Court is a district court, no one is obligated to follow its opinion; the usefulness of the opinion is limited to the persuasiveness of its reasoning, and to guidance to the United States and

defendants on what the Court will do with the Butner Study Redux in this case and other child pornography cases.  On that latter task, the work is worth the effort.  First, the Court will not do some things with the study.  While the Butner Study Redux and other studies suggest an uncomfortable correlation between looking and touching, the Court will not use the Butner Study Redux and others, at least at this time, to support detention orders and sentencing decisions.  Even the Butner Study Redux makes clear that not all lookers are touchers.  It would thus violate many tenets of Anglo-American jurisprudence to assume that all lookers are touchers.  American jurisprudence requires a more individual determination to find out whether the defendant is a toucher.  Sentencing after Booker particularly requires an individual determination.  Second, the Butner Study Redux cannot be particularly useful to predict future behavior.  One co-author of the Butner Study Redux, Hernandez, does not believe that use would be proper. Accordingly, the Court will not use the Butner Study Redux to detain a child pornography defendant or to determine, when applying the 18 U.S.C. § 3553(a) factors, whether the defendant will likely reoffend as a child pornography or a child molester.

The Butner Study Redux has some purpose, however.  When defendants come to Court and ask the Court to make some Kimbrough v. United States variance, and argue that the guideline range is too harsh, the Court is inclined to reject such arguments, based in part on the Butner Study Redux and other standards.  At the present time, the studies indicate a strong correlation between looking and touching in the past for many defendants, regardless whether the correlation is eighty-five percent or fifty-five percent.  This correlation is disturbing.  As long as the strong correlation remains unrefuted, there is no reason to have a substantive disagreement with the guideline range.  There may, of course, be grounds to vary in a particular case, but the Court will base its variance on the factors in 18 U.S.C. § 3553(a) and not on some philosophical

difference with the guidelines, which are based on Congress' strong distaste for child pornography.  Congress' strong action reflects the public's aversion to child pornography.  There is often wisdom in crowds:

> [U]nder the right circumstances, groups are remarkably intelligent, and are often smarter than the smartest people in them.  Groups do not need to be dominated by exceptionally intelligent people in order to be smart.  Even if most of the people within a group are not especially well-informed or rational, it can still reach a collectively wise decision. . . .  [W]hen our imperfect judgments are aggregated in the right way, our collective intelligence is often excellent.

James Surowiecki, The Wisdom of Crowds at xiii-xiv (2004).  Most parents and lay people think that, if a man spends a lot of time viewing child pornography, he may be interested in touching young children, too.  Congress, as the democratic branch, and the Commission, trying to express Congressional intent, has expressed this intuition with harsh sentences, in part to protect the public.  The federal courts should be hesitant to disagree with this democratic expression by varying because of its own view of what sentences are needed to protect the public.  If the Butner Study Redux turns out to be accurate, or even close to accurate, then lay people's intuition that people who engage in the socially deviant behavior of child pornography may engage in other socially deviant behavior may be right all along.   At least until the Butner Study Redux is refuted, the Court will not engage in a substantive disagreement with Congress' and the Sentencing Commission's expression of that deep-seated fear, which finds considerable social-science support.  See Seto, et al., supra, at 133 (noting that, even excluding the Butner Study Redux from self-reporting data, "approximately half of the online offenders admitted to prior contact offenses").  Thus, any variance will be based on other factors.

## II.   THE COURT WILL NOT VARY DOWNWARD BASED ON THE FREQUENCY WITH WHICH CERTAIN ENHANCEMENTS APPLY OR ANY OTHER FACTOR IN THIS CASE.

Crisman has pointed out that several of the sentencing enhancements apply to a vast majority of child pornography cases, and he also contends that the guidelines do not adequately differentiate between possession or receipt cases, and production and distribution cases.  These challenges to a within-guidelines sentence have a fair amount of support, in cases as well as in the Sentencing Commission's 2012 Report to Congress.  Some courts have held that "the guideline provisions relating to child pornography offenses of this nature [meaning child pornography receipt and possession offenses] do not reflect the kind of empirical data, national experience, and independent expertise that are characteristic of the Commission's institutional role."  United States v. Stern, 590 F. Supp. 2d 945, 960 (N.D. Ohio 2008).  The defendant in United States v. Cunningham, for example, argued that the child pornography guidelines are not worthy of a court's deference, because "Congress has routinely required the Commission to increase the penalties for child pornography, effectively negating the Commission's ability to independently determine the appropriate sanctions based on empirical evidence," and because "many of the child pornography enhancements apply in nearly every case, resulting in unduly harsh sentences for 'average' offenders," but Judge Adams rejected both arguments.  680 F. Supp. 2d at 849.

Regarding the defendant's congressional influence argument, Judge Adams noted that "[t]here can be no dispute that Congress has repeatedly instructed the Commission to modify the child pornography Guidelines," including at least one amendment that "was made with little to no input from the Commission."  680 F. Supp. 2d at 849.  Judge Adams concluded that, "[w]hile Congress' actions give rise to some concern, they are also easily explained."  680 F. Supp. 2d at 849.

> Crimes involving the exploitation of children provide fertile ground for grandstanding politicians.  Public outcry is always at its loudest following media

coverage of a crime involving a child victim.  As such, it comes as little surprise that Senator Jesse Helms used inflammatory language in 1991, calling on tougher penalties for "smut peddlers and pedophiles," when Congress sought to have the Commission amend the Guidelines.  Based on that language, it is simple to conclude that the Guidelines were modified for no other reason than to serve as campaign fodder for public officials.  However, while the Commission made changes to the Guidelines on October 28, 1991, the Helms-Thurmond Amendment changes were foreshadowed.  A 1990 State Report generated by the Commission recommended two of the same changes included in the Congressional act: "increasing the base offense level for § 2G2.2 from 13 to 15, and including a specific offense characteristic at § 2G2.2 for pattern of abuse." The History of the Child Pornography Guidelines, at 24-25, available at www.ussc.gov/general/2009103 0_History_Child_Pornography_ Guidelines.pdf.

After the 1991 amendment, Congress continued to pass acts that affected the Guidelines.  In December of 1995, Congress passed the Sex Crimes Against Children Prevention Act.  In 1998, it passed the Protection of Children from Sexual Predators Act.  In 2003, the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act was passed.  The PROTECT Act was the first and only time Congress has directly amended the child pornography Guidelines.  The Act added the image table to the Guidelines and also added the enhancement for possessing sadistic or masochistic images.  Following the passage of the PROTECT Act, the Commission conducted a number of studies regarding the Guidelines, including the following:

• A prison impact analysis that used 2002 data to report how the 2004 amendments to §§ 2G2.2 and 2G2.4 directly mandated by Congress would likely impact sentences.  This analysis revealed that average sentences for § 2G2.2 would likely more than double from 42.8 months to 88.8 months. Those previously sentenced under § 2G2.4 were predicted to see a similarly large average increase in sentence from 28 months to 54 months.

• An examination of state sentencing practices for child pornography offenses in Florida, Oklahoma, Massachusetts, North Carolina, Oregon, Pennsylvania, South Carolina, Tennessee, Virginia, and Washington.  The results were ultimately ambiguous due to differing data collection models in each state, but such information was considered during the policy development process.

• A project examining offenders sentenced under §§ 2G2.2 and 2G2.4 to determine the statute of conviction; the offender's most serious behavior; any inappropriate contact with a minor by offender; travel by victim or offender; arrest due to a sting operation; age of victim; number of victims; use of a computer by

offender; pattern of activity by offender; offender's criminal history (particularly, the existence of prior offenses against persons); existence of plea agreement; history of substance abuse by offender; psychological evaluation of offender; and offender's marital status. The project also examined departure rates in child pornography cases. The results informed the drafting of proposed amendments and identified issues for comment. It also permitted the Commission to understand the likely rates at which new enhancements would apply.

History at 41-42. Moreover, despite Congress directly amending the Guidelines, the Commission was still required to implement those Guidelines. For example, "the Commission had to define the term 'images,' quantify video images, and implement the directive." Id. at 43. "Given that the image table enacted by Congress assigned a 2-level increase for between ten images and 150 images, and a 3-level increase for 150 to 300 images, the Commission adopted a definition of video that considered each video to contain 75 images, squarely in the middle of the 2-level increase range." Id. at 43-44.

The Commission was also tasked with implementing appropriate base offense levels that took into account the five-year statutory mandatory minimum.

After engaging in extensive analysis of its data, including a review of typical trafficking and receipt offenders, offense characteristics, and rates of below guideline sentences for these offenses, the Commission adopted the third, most lenient option of those typically used by the Commission, and selected base offense level 18 for possession offenders and base offense level 22 for trafficking and distribution offenders.

The Commission's analysis revealed that a majority of offenders sentenced under § 2G2.2 were subject to specific offense characteristics that increased their offense level. Specifically, the overwhelming majority of these offenders received a 2-level enhancement for use of a computer (89.4%) and a 2-level enhancement for material involving a child under 12 (91.4%).

Id. at 46. The Federal Defender's office agreed that setting the base offense levels below the mandatory minimum was appropriate. Id. at 47.

The Commission's research and review of comments indicated that if it placed the base offense level at 26, or even 24, after applying the typical enhancements, most first-time offenders' Guidelines calculations would be far in excess of the mandatory minimum. However, setting the base offense level at level 22 would permit

the Guidelines and enhancements to operate in conjunction with
the statutory mandatory minimum.

Id.

Finally, the Commission undertook a proportionality review of the
Guidelines prior to finalizing its base offense level analysis. "This review
demonstrated that if the base offense level were set any higher than 22, the typical
offender sentenced under § 2G2.2 for receipt of child pornography would face a
higher guideline than a typical offender convicted of conspiracy to commit
murder and kidnapping. Thus by setting the base offense level at 22 for
trafficking, the Commission sought to preserve proportionality, avoid double
counting, and provide a wider sentencing range for defendants than would be
otherwise available." Id. at 48.

Having reviewed the actions taken by the Commission, the Court finds
that giving deference to the Guidelines is appropriate. We are often told that
when life gives you lemons, make lemonade. In this instance, the Commission
was given grandstanding politicians, but still crafted proper Guidelines. Rather
than cede its responsibility, the Commission instead appears to have gone above
and beyond to justify its amendments. Far from failing to rely on empirical data
and its own expertise, the Commission has conducted formal studies whenever
possible and has conducted extensive analyses to fulfill its statutory obligations.
Have politicians unduly hampered the Commission's ability to perform its duties?
There can be no question that they have interfered. However, at the same time,
Congress' actions could be viewed as a necessary response to a crime that was
spiraling out of control. As internet access grew across this country, so did the
online community of pedophiles that supports the market for child pornography.
Rather than remain silent, Congress acted. In turn, the Commission used
empirical data and its own expertise to craft the appropriate Guideline
amendments. This Court, therefore, declines to join those district judges that have
found otherwise.

United States v. Cunningham, 680 F. Supp. 2d at 849-51.

Judge Adams also addressed the frequency with which some of the enhancements apply:

There is no dispute that certain enhancements apply in nearly every child
pornography case. The 2-level enhancement for use of a computer applies in
96.5% of cases. The 2-level enhancement for images involving a prepubescent
child applies in 95.5% of cases. The enhancement for possessing sadistic or
masochistic images applies in over 60% of cases. Based on the frequency of the
application of these enhancements, Cunningham seems to contend that his
sentence should be lower. This argument suffers from several fatal flaws.

Initially, the Court notes that the frequency of the enhancements was expressly acknowledged by the Commission when it set the base offense levels for these offenses.  The Commission was clear that it took into account the frequent use of these enhancements when it set the base offense levels.  For example, the base offense level herein is 22 and results in a sentencing range of 41 to 51 months, or 9 to 19 months *below* the mandatory minimum.  The bottom of the Guideline range remains below the mandatory minimum until a 4-level increase to offense level 26, resulting in a 63 to 78 month range.  Applying the two most common enhancements, the use of a computer and possession of images of prepubescent children, generates a level 26 offense.  In other words, once the two most common enhancements are applied, offenders effectively start off at the mandatory minimum.  If the Court factors in acceptance of responsibility, an additional 3-level enhancement could occur, followed by the deduction for acceptance of responsibility, and the Guideline range would remain near the mandatory minimum.  In other words, the Court could find that seven levels of enhancement are appropriate, yet still be in position to sentence an offender to the mandatory minimum with only a 3-month variance.  The Court, therefore, affords little weight to the fact that some enhancements apply in nearly every instance.  It is clear that the Guidelines have taken this factor into account.

. . . .

Finally, the entirety of this argument is somewhat confusing to the Court.  The fact that certain enhancements apply on a frequent basis does not serve as a basis for negating the Guidelines.  If anything, the fact that more than fifty percent of offenders have over 300 images and that over sixty-percent have sadistic and masochistic images supports a conclusion that even more harsh sentences are required for deterrence.

The assertion that sentences should be reduced because it is easy to accumulate a large number of pictures quickly also rings hollow.  The Court does not dispute that it is very likely that a defendant could acquire more than 600 images with just a few mouse clicks and several emails.  But that number of images is not collected by accident.  Instead, those images are sought out by a troubled mind, from like-minded individuals.  Thus, a defendant makes a cognitive choice to seek out that level of images.  Moreover, the Court has never before seen an argument that because a crime is easy to commit, it should be punished less severely.  Robbery is certainly simplified from the criminal's perspective by the use of a firearm and the choice of a feeble, elderly victim.  The Guidelines, however, do not lessen punishment because the crime was easier to commit.  In fact, seeking out a vulnerable victim leads to a 2-level enhancement under the Guidelines.  U.S.S.G. § 3A1.1(b)(1).  This Court, therefore, will not alter its sentence simply because accessing and growing a database of child pornography has become easier as technology has advanced.

In conclusion, the Court rejects any contention that the Guidelines should not be given deference.

United States v. Cunningham, 680 F. Supp. 2d at 851-53.

Although the Court agrees with much of Judge Adams' comments regarding the non-production sentencing guidelines -- specifically, that the Sentencing Commission did what it could, given Congress' directives -- the Court does not adopt Judge Adams' characterization of the PROTECT Act as "political grandstanding" or of the PROTECT Act as an "interference" on the Sentencing Commission's work. The PROTECT Act passed the Senate by a vote of 98-0, and the House by a vote of 400-25, see Guidelines' History at 38 n.181; what Judge Adams characterizes as "political grandstanding" and an "interference" may and should be more charitably explained as reflecting wide support among the people for harsher punishments for child pornography. In light of this alternative explanation for Congress' action, and given the great deference the Court owes to the people's will as they have expressed it through their elected officials, the Court will not join Judge Adams in attributing malignant motives to Congress. See United States v. Reyes, --- F. Supp. 2d ---, No. CR 12-1695 JB, 2014 WL 1281731, at *17 (D.N.M. March 10, 2014)(Browning, J.)(defending the Sentencing Commission's guideline ranges for drug trafficking offenses, stating that "the Commission's decision to defer to the [Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207, 3207-2 to 3207-4 (codified in scattered sections of 18 U.S.C. and 21 U.S.C.)] as the decision of the people's elected representatives in constructing the Guideline ranges was wholly appropriate."). With the people's will in mind, the Court emphasizes that, while the child pornography guidelines are harsh, they represent the public's distaste for child pornography and those who view it. The same is true for why the guidelines differentiate between possession and receipt cases, with the mandatory minimum sentences applying only in the latter. The Court

does not think that Congress, in passing strong legislation, or the Sentencing Commission, in setting the guidelines to reflect that legislation, have acted improperly in responding to the public's revulsion.   Indeed, the Sentencing Commission would have been proceeding inappropriately if it had ignored or tried to disagree with Congress with its guideline range.

The Court has before, albeit in regards to the drug trafficking sentencing guidelines rather than child pornography guidelines, responded to the criticism that the sentencing guidelines do not merit deference because they are not based on the Sentencing Commission's usual empirical evidence.  In United States v. Reyes, the Court defended the Sentencing Commission's work in setting the drug trafficking sentencing guidelines, and, while the specific information about setting drug quantities does not apply in this case, the Court sees many similarities, most importantly, that the Sentencing Commission acted appropriately in responding to Congress:

> These policy arguments [against using drug quantity as the basis for sentencing length] miss, however, an important reason why the Commission adopted quantity as its shorthand for how much punishment a defendant deserves, one so obvious its critics often miss it: Congress chose that shorthand in the ADAA, and the Commission thought it wise to create Guideline ranges that reflected the public's endorsement of that decision.
>
> Against that backdrop, it is now easy to understand why the Commission departed from its usual data-driven approach.  First, there was no need for empirical data; indeed, collecting further empirical data would have wasted the Commission's time, effort, and resources.  The Commission had already done empirical research; the problem is that any such empirical data would have measured sentencing practice that, in the public's mind as Congress reflected it, was flawed, because it did not punish drug offenders severely enough.  Thus, it is not sound to criticize the Commission for not doing more empirical research when the empirical research would only have measured sentencing practice that the people rejected -- and would, therefore, have ignored the political processes that rejected the sentencing practice that the empirical research would have measured. In the end, while the criticism of the Commission for not doing more empirical research sounds like a scientific criticism, it is no more than a dressed-up criticism of the high ranges with which many judges and defendants disagree -- the ranges are, in their opinion, just too high.  In fact, in a democracy, the Commission had no choice but to respond to the people's will in the ADAA; harsh criticism of the

Commission for doing its duty and what was right in a republican form of government is unfair.

Second, while judges and defendants often criticize some Guideline ranges for failure to be based on empirical data, they rarely explain why the lack of empirical data is so bad. The Court is quick to note how appreciative it is for all of the empirical research that the Commission has done and the way it has done it. The Commission's solid and extensive work has given judges confidence, when they consider a given Guideline range, that the range reflects the public's expectations as much as possible. Also, by drawing from such a large pool of information, the empirical data is about as democratic as empirical data can be. On the other hand, the Constitution envisions a republican form of government. If a court has to choose between empirical data and the judgment of the people's elected representatives that the empirical data would have measured overly lenient sentencing practice, it would seem that the more logical choice would be to honor the charge of the elected officials than the mechanical product of empirical data. It would seem best, in a republican form of government, to trust the representatives' decision rather than the product of empirical data. Thus, the burden falls on those who praise empirical data, and criticize every Guideline range when there is not sufficient empirical data to support the range, to show why they prefer empirical data rather than the decision of the people's representatives.

2014 WL 1281731, at *31-32. In responding to another judge's criticism that Congress "made a mistake" in passing the ADAA, the Court noted that,

unless the mistake is of constitutional dimension, i.e., the statute is inconsistent with the Constitution, it is hard for a Court to say that Congress, the elected branch of our government, ever makes a "mistake." Judges used to be more charitable to Congress and say that Congress acted such a way "in its infinite wisdom." The Court does not presume to tell Congress that it made a "mistake"; on an issue of how long a sentence should be, it is hard for a judge to say that another judge's sentence is a "mistake." It seems particularly hard for a judge to say, with any sound footing, that Congress made a mistake.

2014 WL 1281731, at *17. These responses to the drug trafficking sentencing guidelines capture many of the Court's thoughts regarding the child pornography sentencing guidelines, namely, that Congress' clear message that child pornography sentences should be harsher reflects the will of the people, and the Sentencing Commission responded appropriately and performed its institutional role in setting guidelines reflecting that will.

The Court will not vary downward based on Crisman's arguments regarding the frequency with which certain enhancements are applied.  As Judge Adams explained, the Sentencing Commission took its directives from Congress and fashioned guidelines that, while they perhaps could benefit from updates that more precisely differentiate among different offenders' culpability, consider the mandatory minimum sentences and the common attributes of child pornography offenses.  The base offense level is below the mandatory minimum sentence, demonstrating that the Sentencing Commission adjusted the base offense level knowing that certain enhancements would almost certainly apply, such as the use-of-a-computer enhancement, which was applied in 96.2% of all cases in fiscal year 2010, or that the victim was younger than twelve, resulting in a 2-level enhancement in 95.6% of the cases.  See Use of Guidelines and Specific Offense Characteristics at 37-38.  The Court tends to agree with the Sentencing Commission's recommendations regarding the non-production guidelines, because it would support guidelines that would punish more severely offenders with extensive child pornography collections, those who engage in online communities that may reinforce their deviant behavior, and those who have committed other acts that show they are sexually dangerous.  Although the Court supports the Sentencing Commission's recommendations, it is not saying that it views Crisman as a victim of outmoded guidelines; rather, the Court thinks that, in this case, the guideline range appropriately reflects Crisman's conduct, and it suspects that, if Congress responds to the Sentencing Commission's recommendations, the range would not greatly change.  For example, the Sentencing Commission recommends updating the number of images table to better reflect the volume of images offenders collect, as over sixty-six percent of offenders reach the highest enhancement of 600 or more images.  If Congress responds to the Sentencing Commission's suggestion to update the number of images enhancements, either by amending the

PROTECT Act's image table or permitting the Sentencing Commission broader discretion in setting the number of image enhancements, Crisman, who had over 14,000 images, may not receive the 5-level enhancement, considering the Sentencing Commission's comments that offenders often have hundreds of thousands or even millions of images, but the Court equally doubts that he would receive only a 2-level enhancement.  If the Sentencing Commission incorporates an enhancement for offenders involved in online communities, the enhancement would likely not apply to Crisman, because his PSR discusses his P2P activity, but does not mention any "community" involvement.  Finally, if the Sentencing Commission adjusts the guidelines to reflect sexually dangerous behavior, the Court suspects that Crisman's conduct in stealing children's underwear and his fetish related to that underwear could qualify him for an enhancement.  Updating the sentencing guidelines could affect the guidelines calculation in Crisman's case, but the Court suspects that the updated enhancements could balance themselves out as applied to Crisman.

As the Court noted at the sentencing hearing, there are seven[26] factors that put downward pressure on Crisman's sentence: (i) the number of defendants for whom the enhancements are applicable, although the Court, as explained earlier in this Memorandum Opinion and Order, does not have a Kimbrough v. United States disagreement with the guidelines; (ii) Crisman's childhood history of abuse, causing PTSD and other psychological problems; (iii) Crisman's receptiveness to treatment; (iv) Crisman's young age and how he has accepted responsibility and recognized that viewing child pornography is not a victimless crime; (v) there will be a reduced chance of recidivism as Crisman gets older; (vi) his mother's health, because it would be helpful

---

[26]The Court mentioned an eighth factor at the sentencing hearing: that Crisman did not distribute child pornography.  As the Court discussed in supra note 9, at 23, however, Crisman distributed child pornography through the P2P file-sharing program.

for him to return to her more quickly; and (vii) the fact that Crisman has not, to the Court's knowledge, engaged in any violence or hands-on offenses.   On the other hand, the Court acknowledges several factors that put upward pressure on the sentence: (i) the nature of the images, including the age of the children and the sadistic and masochistic nature of the images; (ii) the exceptionally large amount of materials; (iii) that child pornography is not a victimless crime; (iv) that the psychologist diagnosed Crisman with pedophilia; (v) that Crisman is addicted to child pornography, making recidivism more likely; (vi) the <u>Butner Study Redux</u>, although not counseling the Court to vary upward, makes the Court cautious about varying downward; and (vii) Crisman's other illegal conduct that went beyond viewing child pornography, including stealing children's underwear and stealing credit cards to purchase online pornographic material, which indicate Crisman may be more willing to act on his deviant sexual thoughts and inclinations.   Ultimately, the Court concludes that a within-guidelines sentence of 97 months is sufficient without being greater than necessary to comply with the purposes of punishment.   The Court will not sentence Crisman to a lifetime of supervised release, but will impose twenty-five years of supervised release.   The Court concludes that a lifetime of supervised release is longer than necessary in this case, but that twenty-five years is an appropriate amount of supervision given that Crisman will be thirty-five by the time he is released from prison and sixty when he finishes his term of supervised release.   Although the guidelines' policy statement recommends the maximum term of supervised release for sex offenses, which includes non-production child pornography offenses, <u>see</u> U.S.S.G. § 5D1.2(b) (Policy Statement), sentencing courts must still consider several factors from § 3553 when setting a term of supervised release, <u>see</u> 18 U.S.C. § 3583(c) (stating that, in "determining the length of the term and conditions of supervised release," the court "shall consider the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C),

(a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)").  As stated on the record and further explained here, the Court concludes that twenty-five years of supervised release, rather than a lifetime term, better reflects the nature and circumstances of Crisman's offense, provides adequate deterrence, protects the public -- as Crisman will be sixty by the time he finishes supervised release -- provides Crisman with accountability and resources to avoid recidivating after released from prison, and avoids unwarranted sentencing disparities from other non-production child pornography offenders with similar criminal histories.  See United States v. Apodaca, 641 F.3d at 1082-84 (noting that the defendant's strongest argument that his sentence was substantively unreasonable was that "the imposition of lifetime supervised release constitutes a disproportionately severe punishment for his crime," but upholding the sentence, because the district court explained that it imposed the lifetime term of supervised release as "'a way of saying let's be really safe and careful,'" and the "current state of research" regarding child pornography offenders' risk to society did not conclusively or near-conclusively establish that possession-only offenders were "highly unlikely to recidivate or commit more serious sex offenses").

   **IT IS ORDERED** that: (i) the request for the Court to impose a 97 month sentence in the United States' Sentencing Memorandum and Recommendation, filed October 10, 2012 (Doc. 58)("United States' Memo.") is granted; (ii) the request for a lifetime of supervised release in the United States' Memo. is denied; and (iii) the request for a sixty month sentence in the Defendant's Sentencing Memorandum and Motion for Sentence Varying from the Guideline Range, filed May 9, 2013 (Doc. 72)  is denied.  The Court sentences Defendant Richard D. Crisman to ninety-seven months incarceration and twenty-five years supervised release.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Kenneth J. Gonzales
   United States Attorney
Charlyn E. Rees
Stephen R. Kotz
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Arturo B. Nieto
Nieto Law Office
Albuquerque, New Mexico

     *Attorney for the Defendant*